UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WORLD ASSOCIATION OF ICEHOCKEY
PLAYERS UNIONS NORTH AMERICA
DIVISION and WORLD ASSOCIATION OF
ICEHOCKEY PLAYERS UNIONS USA
CORPORATION, on behalf of their members, and
Tanner Gould and Isaiah DiLaura, individually and
on behalf of all others similarly situated,

*Plaintiffs,*

v.

NATIONAL HOCKEY LEAGUE, CANADIAN
HOCKEY LEAGUE, WESTERN HOCKEY
LEAGUE, ONTARIO MAJOR JUNIOR
HOCKEY LEAGUE, QUÉBEC MARITIMES
JUNIOR HOCKEY LEAGUE, Dan MacKenzie,
Goldrush Sports Corp., Calgary Flames Limited
Partnership, Edmonton Major Junior Hockey
Corporation, EHT, Inc., Kamloops Blazers Hockey
Club, Inc., Kelowna Rockets Hockey Enterprises
Ltd., Shoot the Puck Foundation Inc., Lethbridge
Hurricanes Hockey Club, Medicine Hat Tigers
Hockey Club Ltd., Moose Jaw Warriors Tier 1
Hockey Inc., Winterhawks Hockey LLC, Prince
Albert Raiders Hockey Club Ltd., EDGEPRo
Sports & Entertainment Ltd., Rebels Sports Ltd.,
Queen City Sports & Entertainment Group Ltd.,
Saskatoon Blades Hockey Club Ltd., Thunderbird
Hockey Enterprises, LLC, Hat Trick, Inc., Swift
Current Bronco Hockey Club Inc., Top Shelf
Entertainment, Inc., Vancouver Junior Hockey
Limited Partnership, West Coast Hockey LLP,
Windsor Spitfires, Inc., London Knights Hockey
Inc., Barrie Colts Junior Hockey Ltd., Bulldog
Hockey Inc., Jaw Hockey Enterprises LP, Guelph
Storm Hockey Club Ltd., Kingston Frontenacs
Hockey Club Ltd., Mississauga Steelheads Hockey
Club Inc., Niagara IceDogs Hockey Club Inc.,
North Bay Battalion Hockey Club Ltd., Generals
Hockey, Inc., Ottawa 67's Limited Partnership, The
Owen Sound Attack Inc., Peterborough Petes
Limited, IMS Hockey, Corp, Saginaw Hockey

Case No. 1:24-cv-01066

<u>**CLASS ACTION**</u>

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Club, L.L.C., 211 SSHC Canada ULC, Soo Greyhounds Inc., Kitchener Rangers Jr. A Hockey Club, Sudbury Wolves Hockey Club Ltd., Le Titan Acadie Bathurst (2013) Inc./The Acadie Bathurst Titan (2013) Inc., Hockey Junior Baie-Comeau Inc., Le Club de Hockey Drummond Inc., Cape Breton Major Junior Hockey Club Limited, Les Olympiques de Gatineau Inc., Halifax Mooseheads Hockey Club Inc., Club de Hockey Les Remparts de Québec (2014) Inc., Le Club de Hockey Junior Armada Inc., Moncton Wildcats Hockey Club Limited, Le Club de Hockey L'Océanic de Rimouski Inc., Les Huskies de Rouyn-Noranda Inc., 8515182 Canada Inc., Les Tigres de Victoriaville (1991) Inc., Saint John Major Junior Hockey Club Limited, Club de Hockey Shawinigan Inc., Les Foreurs de Val-d'Or (2012) Inc., Les Saguenéens Junior Majeur de Chicoutimi, and 7759983 Canada Inc.,

*Defendants.*

This class action is brought by the World Association of Icehockey Players Unions North America Division and World Association of Icehockey Players Unions USA Corporation (collectively, "**WAIPU Plaintiffs**"), on behalf of their members, and Tanner Gould and Isaiah DiLaura ("**Individual Plaintiffs**"), on behalf of themselves and all others similarly situated (collectively, "**Major Junior Players**" or "**Players**"), against Defendants—a cartel comprised of the National Hockey League ("**NHL**"), the Canadian Hockey League ("**CHL**"), the Western Hockey League ("**WHL**"), each of the WHL-member clubs (except as hereinafter provided), the Ontario Major Junior Hockey League ("**Ontario Hockey League**" or "**OHL**"), each of the OHL-member clubs, the Québec Maritimes Junior Hockey League ("**QMJHL**"), and each of the QMJHL-member clubs—for violations of the Sherman Antitrust Act. The WHL, OHL, and QMJHL are referred to as the "**Major Junior Leagues**" or "**Leagues**," their member clubs are

referred to as the "**Major Junior Clubs**" or "**Clubs**," and the Major Junior Leagues, Major Junior Clubs, and CHL are referred to collectively herein as "**Major Junior Defendants**."

## INTRODUCTION

1.      This case is about Defendants' *per se* unlawful agreements to restrain the North American market for the provision of hockey services by players aged 16-20 to developmental leagues that train players to play hockey in the NHL and its affiliated developmental leagues. Defendants' scheme results in the systematic exploitation and abuse of Major Junior Players, which effectively treats those teenaged athletes as the property of the Major Junior Clubs that control those Players' rights and their futures.

2.      Major Junior Defendants have enshrined a "*winning at all costs*" mentality and maintained a "*systemic culture . . . that results in maltreatment becoming an embedded norm*" for Major Junior Players.  Such maltreatment includes abuse—economic, physical, psychological, and sexual—that is the foreseeable consequence of a system that deprives these Players of freedom of choice, freedom of movement, and freedom to play for the club of their choice, *i.e.*, the hallmarks of a competitive labor market.  In addition to perpetuating this abuse, Major Junior Defendants' anticompetitive agreements artificially reduce Major Junior Players' compensation below competitive levels, exacerbating their exploitation by depriving them of fair compensation for their labor.

3.      Plaintiffs bring this lawsuit to put an end to Defendants' systematic exploitation and abuse of Major Junior Players.

4.      While they are all members of the CHL, the Major Junior Leagues are each ***independent*** leagues.  Each independent Major Junior League is capable of producing hockey games, and a full schedule of games and playoffs, without entering into any agreement with either of the two other Major Junior Leagues, *i.e.*, cooperation among the Leagues is not necessary for

the product they produce to be available at all. Yet, these "*separate entities,*" that admittedly "*operate independently from one another*," have conspired to create and maintain the anticompetitive and exploitative system detailed below.

5.     Each of the unlawful agreements set forth herein is, individually and collectively, a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, because (a) there is no need for the three admittedly independent Major Junior Leagues to restrict competition, among themselves or among Clubs that play in different Major Junior Leagues, for the services of Players in order for the product (major junior hockey games) to be available at all; (b) courts have a long history of adjudicating cases based on the type of restraints Defendants have agreed to here, deeming them to be the "supreme evil of antitrust;" and/or (c) Defendants entered into these agreements without the authorization of a collective bargaining agreement ("**CBA**") with a labor union that could have protected the interests of Major Junior Players.

6.     As of the date of this Complaint, Major Junior Players are not represented by, and have never had been represented by, a union in bargaining with any Defendants, nor have they ever had a CBA with any Defendants.

7.     Major Junior Defendants have agreed to allocate the geographic territories in which each of the Major Junior Leagues, and the Major Junior Clubs that participate in those Leagues, recruit and source Players. To this end, the Major Junior Leagues have allocated exclusive, non-overlapping territories among themselves—including New York and every other state—with each League having the exclusive right to recruit and source Players from within their allocated exclusive territories. For example, the OHL Clubs—by agreement with the other two Major Junior Leagues and their constituent Clubs—have the exclusive right to recruit and source Players from New York, along with Players from the States of Alabama, Arkansas, Delaware, Florida, Georgia,

Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin, as well as from the Canadian Province of Ontario. Pursuant to this agreement, WHL and QMJHL Clubs cannot (and do not) recruit or source Players from any of these states and provinces. Likewise, pursuant to this agreement, OHL Clubs cannot (and do not) recruit or source Players from outside these states and provinces. The result is that no Club from one of the three Major Junior Leagues can ever compete against a Club from either of the other two Major Junior Leagues for the services of a North American Major Junior Player.

8.     Major Junior Defendants not only have agreed to eliminate competition among the three Major Junior Leagues for Players by allocating markets, but they have agreed to further restrain competition among the Clubs within each of the Leagues for Players by having each League operate an involuntary entry draft for all North American Players who will reach the age of 16 during the Player's first major junior hockey season. Specifically, Major Junior Defendants have agreed, therefore, to conduct involuntary drafts within their exclusive territories, to draft Players at the same age, and to respect the rights of drafting Clubs across all three Leagues. Major Junior Defendants have engaged in these blatantly anticompetitive drafts for decades, without ever having entered into a CBA with Major Junior Players, let alone a CBA that sanctioned such drafts.

9.     In an involuntary draft, Players may be drafted even if they did not apply to participate in the draft, with the end result being that the drafting Club will enjoy the exclusive rights to that Player for the entirety of his major junior hockey career.

10.     To that end, Major Junior Defendants have conspired to further restrain competition in this labor market by contractually prohibiting Major Junior Players from providing their hockey services to any club other than the Major Junior Club that drafted the Player until he reaches the

age of 20 (with a Club option to extend their contract for one "overage" year). Specifically, Major Junior Defendants agreed to include, and in fact did include, contractual provisions into each of their respective Standard Player Agreements ("**SPAs**") that give the Major Junior Clubs exclusive rights to each drafted Player for the entirety of his major junior career. This anticompetitive restraint on competition prevents Major Junior Players who sign with a Major Junior Club, at any stage of their major junior careers, to negotiate with other clubs, either within or outside the Major Junior Leagues, for their hockey services.

11.    To compound the harm to Players, Defendants have further agreed to restrain competition by restricting Major Junior Players' freedom of movement. Pursuant to League rules, each Major Junior Club maintains a "protected" list, which can include both unsigned Players and signed Players who no longer figure into a Club's plans. Indeed, Clubs routinely demand payment from any club (either within or outside of major junior hockey) that is interested in securing a release for a Player included on the Club's protected list. These payments, often styled as "professional development fees," can be very significant—*as much as $500,000*—and are designed to ensure that Players cannot switch clubs or leagues unless they can be sold for cash.

12.    Combined with the restrictive provisions of the SPAs, Major Junior Defendants have set up a *de facto* reserve system that denies Major Junior Players freedom of movement once they are drafted for the entirety of their major junior careers and even after their contracts have been terminated.

13.    As a result of the foregoing *per se* illegal agreements, there is no competition among Major Junior Defendants to source or sign Major Junior Players. The Major Junior Clubs are insulated from competition for Players through their territorial allocations, their involuntary drafts, and their rules and contractual provisions that bind Players to their Clubs for a term of five years.

In short, once a Club drafts a Player, that Club has the exclusive rights to sign that Player *and* to control and exploit the labor of that Player for the entirety of his major junior career.

14.     The monopsony power created by these illegal agreements empowers the Major Junior Clubs to exploit Players, including by Defendants' further illegal agreement to artificially suppress Player compensation through the standardized terms and payment schedules set forth in the Major Junior Leagues' rules and SPAs.  These rules and provisions also allow Defendants to illegally profit from the labor of Major Junior Players.

15.     Defendants' illegal agreement to artificially suppress the compensation of Major Junior Players arises directly as a consequence of, and is inextricably intertwined with, the illegal agreements set forth above to, *inter alia*, allocate territories, conduct involuntary drafts, and impose restraints that create a *de facto* reserve system.  As Players lack any ability to negotiate with multiple Clubs, Defendants have ensured that Major Junior Players cannot earn more than the meager and artificially depressed sums that Defendants have agreed among themselves to pay Players.

16.     Defendants have further conspired to unlawfully prevent Major Junior Players from receiving any compensation in connection with Defendants' commercial exploitation of Players' names, images, and/or likenesses ("**NIL**") in merchandise and other products including, among other things, hockey video games and other media products.  Specifically, Defendants have agreed among themselves to include non-negotiable provisions in each Player's SPA that assign all rights to commercially exploit his name, image, and likeness entirely to Major Junior Defendants.  To be clear, Defendants earn money from licensing and otherwise commercially exploiting Major Junior Players' NILs; they just do not share any of that money with Major Junior Players themselves.

17.     These foregoing *per se* illegal restraints on Players' compensation are memorialized in writing in each Major Junior League's various rules, regulations, directives, and SPAs, and all Major Junior Clubs are bound by those rules, regulations, and directives to follow them.

18.     Because of Clubs' strict adherence to these rules, regulations, and directives, all Major Junior Players are required to sign SPAs that include these anticompetitive provisions and League commissioners review each signed SPA to ensure that the terms are consistent with Major Junior Defendants' illegal agreement.  To ensure compliance with Defendants' standardized and agreed-upon compensation terms, significant fines are imposed on any Major Junior Clubs that deviate from these terms.  These fines discourage any future attempts to compete for talent, which Defendants consider to be cheating on the cartel's rules.

19.     As a result of Defendants' illegal agreements, Major Junior Players are paid a mere fraction of what they would earn in a competitive marketplace and are thus substantially undercompensated despite the full-time, physically demanding nature of the labor they provide.

20.     Major Junior Defendants are horizontal competitors.  In an unrestrained and competitive market, Major Junior Defendants would have to compete against each other for Players' services across the entirety of North America by, among other things, offering competitive compensation, including compensation for Players agreeing to assign the right to commercially exploit their NILs, as well as by creating a humane environment in which these teenaged boys could develop their hockey skills.  In reality, and as a result of Defendants' restraints on competition as detailed herein, the Major Junior Clubs have no incentive to and, in fact, do not compete against each other to recruit and sign Players.

21.    Major Junior Defendants' illegal agreements are horizontal restraints among competitors to purposefully restrain competition for Players' services.  The purpose and effect of these horizontal agreements are to eliminate competition for Players' services and artificially suppress labor costs so as to make them unresponsive to traditional market forces.  Defendants' cartel artificially suppresses and standardizes compensation by denying Players their freedom of choice, freedom of movement, and freedom to play for the Club of their choice.  Defendants' conduct, individually and collectively, is a textbook *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22.    Defendant NHL is a co-conspirator in the unlawful conduct alleged herein.

23.    Major Junior Defendants receive annual funding from the NHL, including, but not limited to, the substantial payments that the Major Junior Clubs receive when their Players are selected in the NHL draft.  Through these funding mechanisms, the NHL and its constituent clubs exert substantial influence and control over Major Junior Defendants, thereby facilitating Major Junior Defendants' conspiracy as detailed herein.  For example, the NHL makes its annual funding of Major Junior Defendants contingent on Major Junior Defendants maintaining many of the rules and policies that cement the illegal agreements set forth herein. This agreement, which is memorialized in writing as part of the NHL's transfer agreement with the Major Junior Leagues (the "**NHL-CHL Agreement**"), ensures that each Major Junior Defendant adheres to the cartel's illegal rules.

24.    No other developmental league in North America receives similar payments and funding from the NHL.

25.    The NHL and each of the NHL clubs also participate in the unlawful agreements through the American Hockey League (the "**AHL**") and the East Coast Hockey League

("**ECHL**"), each of which are developmental hockey leagues whose constituent clubs are largely owned and controlled by the NHL and the NHL clubs. AHL and ECHL players are paid substantially more than Major Junior Players, and AHL and ECHL clubs recruit players aged 20 and under from Europe to play in those leagues. But the AHL and the ECHL (and their respective clubs) have agreed not to do that for Major Junior Players, even further reducing competition for those Players' services. By doing so, the ACH and ECHL further reinforce the lack of competition that artificially limits the options for, and compensation to, Major Junior Players—all to Defendants' collective benefit.

26.     Major junior hockey is a very profitable business, earning Major Junior Defendants at least hundreds of millions of dollars a year.

27.     None of that revenue, however, would exist if it were not for the efforts of Major Junior Players themselves: No games could be played, no Clubs could exist, and no Leagues could come together without Major Junior Players working so hard to develop and hone their craft and compete at the highest possible level. Meanwhile, while Major Junior Players are subjected to abuse and paid only token compensation, many major junior coaches earn six-figure salaries *and* many Major Junior Club owners see outsized profits from their hockey-related activities, which exist only because of Major Junior Players' labor.

28.     Taken together, Defendants' anticompetitive agreements allow them to confront Major Junior Players with the collective economic might of *6 hockey leagues*, comprised of more than *146 clubs*—virtually the entire North American ice hockey industry. And because Major Junior Players are not represented by a labor union in their relations with Major Junior Defendants, each Player—in some cases *children* as young as 14 years old—faces that unified economic power wholly on his own. The result is predictable, but shocking: No freedom of choice or movement,

involuntary and non-negotiable contract terms that are little short of indentured servitude, token and non-competitive compensation, and a culture that forces Players to choose between their dreams of playing in the NHL and their education.  Defendants' exploitation and abuse of boys during their formative mid-to-late-teen years is systemic, pervasive, and likely to inflict scars that will affect these boys throughout their lives.

29.     Defendants' illegal agreements are no secret.  They are expressly memorialized in the various bylaws and administrative rules for each of the Major Junior Leagues, as well as in the NHL-CHL Agreement, which is also binding on Major Junior Defendants via the CHL bylaws and the bylaws of the Major Junior Leagues.

30.     Major Junior Players have been historically fearful of challenging these illegal agreements because of the risk that doing so would jeopardize their careers and perhaps eliminate their chances of ever competing in the NHL.  If this monopsonized labor market is allowed to continue to exist as the primary feeder path for North American hockey players to reach the highest level of their sport, concerns for future earnings make one of the most effective means of redress, *i.e.*, unionization, untenable as a means of combatting collusion.  Indeed, efforts to unionize Major Junior Players have been unsuccessful to date because Major Junior Players fear retaliation (and have, in fact, been retaliated against) by Defendants.

31.     But fear will no longer permit Defendants to exploit and abuse Major Junior Players.  Individual Plaintiffs, on behalf of themselves and the proposed Class, now come before the Court and seek four specific remedies.

- *First*, they seek an injunction that enjoins Defendants and their co-conspirators from (i) enforcing their agreement to allocate geographic markets to source, recruit, and draft talent; (ii) enforcing the terms of the SPAs and League rules that create a *de facto* reserve system and/or standardize the compensation (including for agreeing to assign their NIL rights) that Major Junior Players receive; (iii) otherwise restricting Major Junior Players' ability to negotiate with multiple Major Junior Clubs or clubs in other

leagues; and (iv) enforcing the provisions of the NHL-CHL Agreement that cement and codify the core aspects of this anticompetitive scheme.

- *Second*, they seek an injunction against Defendants boycotting or otherwise retaliating against any Major Junior Player who complains about these practices, participates in this lawsuit, or otherwise seeks to assert the rights or interests of Major Junior Players.

- *Third*, they seek an award of damages, to be automatically trebled under the federal antitrust laws, for the difference between the compensation actually paid to Major Junior Players as a result of the unlawful conspiracies set forth herein and the compensation they would have been paid in an unrestrained, competitive market.

- *Fourth,* they seek an award of damages, to be automatically trebled under the federal antitrust laws, and/or disgorgement of profits and restitution, consisting of all monies by which Defendants have been unjustly enriched through the exploitation of Major Junior Players' names, images, and/or likenesses.

32.     In addition, WAIPU Plaintiffs, on behalf of their members, seek an injunction in their representative capacity prohibiting Major Junior Defendants from conducting entry drafts in the absence of a valid CBA that authorizes such drafts.

## PARTIES

### A. <u>**Plaintiffs**</u>

33.     Plaintiffs World Association of Icehockey Players Unions North America Division and World Association of Icehockey Players Unions USA Corporation are labor organizations that represent the interests of current and prospective North American major junior hockey players.  WAIPU Plaintiffs have members in all three Major Junior Leagues, including both American members and non-American members who currently live in the United States.  WAIPU Plaintiffs have never bargained with Major Junior Defendants on Players' behalf regarding the services they provide to Major Junior Defendants, including but not limited to each of the restraints of trade described herein.  WAIPU Plaintiffs' membership includes hockey players from the United States and Canada who face the imminent prospect of being involuntarily drafted into one of the Major Junior Leagues.  WAIPU North America has a principal place of business at

1010 Sherbrooke Street West, Suite 2200, Montréal, QC H3A 2R7, Canada.  WAIPU USA is a Delaware Corporation and has a principal place of business at 254 Chapman Road, Suite 208 #4683, Newark, DE 19702.  WAIPU's members are members of both WAIPU North America and WAIPU USA.

34.     Plaintiff Tanner Gould ("**Gould**") is a Canadian citizen who was born and raised in Calgary, Canada.  By the time Gould was 14 years old, he was the captain of his bantam team and had already been recruited by several clubs in the WHL.  As the draft got closer, Gould's family received various phone calls from scouts and general managers.  Gould was originally drafted at age 15 in the third round of the 2020 WHL bantam entry draft by the Tri-City Americans, a Major Junior Club located in Kennewick, Washington that plays in the WHL.  After being drafted, Gould was presented with and signed a WHL SPA, which bound Gould to play hockey exclusively for Tri-City for five years.  Gould's SPA contained non-negotiable terms regarding his compensation for providing hockey services for Tri-City.  Gould's compensation was based on the conspiratorially agreed-upon fixed rate applicable to all Major Junior Players who play in the WHL, who are therefore required to sign the WHL SPA.  Gould's SPA also included the reserve system provisions, which are detailed herein, which rendered him property of Tri-City (or any Clubs to which he would be traded) during his major junior career.  Close to the beginning of his second season with Tri-City, Gould was traded and sent to the Prince Albert Raiders, a WHL Club located in Prince Albert, Saskatchewan.  Gould also received zero compensation for agreeing to assign the right to commercially exploit his name, image, and likeness to his Club and the WHL in his SPA.  Notwithstanding any other allegation of this Complaint, Gould is not asserting any claim against any of his former Clubs, namely the Tri-City Americans Club or the Prince Albert Raiders Club.  Gould is asserting claims against every other Defendant.

35.    Plaintiff Isaiah DiLaura ("**DiLaura**") is an American citizen who was born and raised in Lakeville, Minnesota.  DiLaura was first recruited at age 13 by scouts for certain WHL Clubs.  DiLaura was originally drafted at age 15 in the eighth round of the 2015 WHL bantam entry draft by the Prince George Cougars, a Major Junior Club in Prince George, British Columbia, Canada that plays in the WHL.  DiLaura was persuaded to play in the WHL by promises of being treated like a professional athlete, with all the glitz and glamour of fans, playing games in big arenas before large crowds, and free equipment.  With these promises, DiLaura was presented with and signed a WHL SPA, which bound him to play for Prince George for the entirety of his major junior career.  DiLaura's SPA contained non-negotiable terms regarding his compensation for providing hockey services to Prince George.  DiLaura's compensation was based on the conspiratorially agreed-upon fixed rate applicable to all Major Junior Players who play in the WHL, who are therefore required to sign the WHL SPA.  DiLaura's SPA also included the reserve system provisions, which are detailed below, that rendered him property of Prince George (or any Clubs to which he would be traded) during his major junior career.  DiLaura spent two years with Prince George, in the far north of British Columbia and was only granted one visit a season with his parents at Christmas.  After two seasons with Prince George, DiLaura was traded and sent to the Portland Winterhawks, located in Portland, Oregon, and then partway through the season he was traded again to the Swift Current Broncos, another WHL Club located in Swift Current, Saskatchewan.  DiLaura also received zero compensation for agreeing to assign the right to commercially exploit his name, image, and likeness to his Club and the WHL in his SPA.  Notwithstanding any other allegation of this Complaint, DiLaura is not asserting any claims against any of his former Clubs, namely the Prince George Cougars Club, the Portland

Winterhawks Club, or the Swift Current Broncos Club. DiLaura is asserting claims against every other Defendant.

**B.  Defendants**

36.     Defendant National Hockey League is an unincorporated joint venture association that operates a professional ice hockey league, which consists of thirty-two (32) member Clubs (the "NHL Clubs"). The NHL Board of Governors is the ruling and governing body of the NHL. The NHL operates in the United States and Canada and has a principal place of business within this district at 1 Manhattan West, 395 Ninth Avenue, New York, NY 10001. The majority of NHL Clubs (25) are located in the United States. All NHL Clubs prepare for and play games in the United States.

37.     Defendant Canadian Hockey League is an incorporated not-for-profit organization that is organized under the laws of Canada. The CHL has a principal place of business at 5401 Eglinton Ave W, #202, Etobicoke, ON, M9C 5K6, Canada. Through its constitution, bylaws, and regulations, the CHL oversees and issues rules pertaining to the operations of the three Major Junior Leagues. Combined, the Major Junior Leagues constitute the world's largest developmental leagues for hockey players aged 16-20 who aspire to play in the NHL. Sixty (60) Major Junior Clubs operate in these three Leagues across North America, in both the United States and Canada. The CHL has directly and substantially participated in commerce within the United States and has continuous and systemic business contacts with this district, including with respect to the licensing and selling of merchandise and products, including television events, as well as in its participation in the illegal anticompetitive scheme described herein, which has caused and is causing antitrust injury to Major Junior Players.

38.     Defendant Dan MacKenzie ("**MacKenzie**") is President of the CHL. MacKenzie is the first CHL President. Prior to MacKenzie's appointment, the Commissioner of the CHL had

been one of the three commissioners of the Major Junior Leagues.  MacKenzie reports to the CHL Executive Council, which consists of the commissioners of the three member leagues: Ron Robison of the WHL, David Branch of the OHL, and Mario Cecchini of the QMJHL.  MacKenzie has directly and substantially participated in commerce within the United States and has continuous and systemic business contacts with this district, including with respect to the licensing and selling of merchandise and products, including television events, and his participation in the illegal anticompetitive scheme described herein, which has caused and is causing antitrust injury to Major Junior Players.

*The WHL Defendants*

39.    Defendant Western Hockey League is a corporation incorporated under the laws of Canada.  Under the supervision of the CHL, the WHL operates twenty-two (22) franchises (*i.e.*, Clubs) located throughout the Western United States and Western Canada.  The Clubs playing in the WHL consist of the teams owned by the WHL Clubs.  The WHL has a principal place of business at 2424 University Drive N.W., Calgary, AB T2N 3Y9, Canada.  The WHL has directly and substantially participated in commerce within the United States and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of, *inter alia*, the States of Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming ("**WHL Exclusive States**"), thus causing antitrust injury to Major Junior Players.

40.     Defendant Goldrush Sports Corp. operates the team the "Brandon Wheat Kings," a team affiliated with the WHL.  Goldrush Sports Corp. has a principal place of business at 2404 Park Avenue, Brandon, MB R7B 0S3, Canada.  The Brandon Wheat Kings play at Westoba Place, 1175 18th Street, Brandon, MB R7A 7C5, Canada.  Goldrush Sports Corp. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

41.     Defendant Calgary Flames Limited Partnership (hereinafter "Calgary Flames") operates the "Calgary Hitmen," a team affiliated with the WHL.  Calgary Flames has a principal place of business at Scotiabank Saddledome, 555 Saddledome Rise SE, Calgary, AB T2G 2W1, Canada.  The Calgary Hitmen play at the Scotiabank Saddledome, 555 Saddledome Rise SE, Calgary, AB T2G 2W1, Canada.  Calgary Flames has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

42.     Defendant Edmonton Major Junior Hockey Corporation operates the "Edmonton Oil Kings," a team affiliated with the WHL.  Edmonton Major Junior Hockey Corporation has a

principal place of business at 10220, 104 Avenue NW, Edmonton, AB T5J 0H6, Canada.  The Edmonton Oil Kings play at Rogers Place, 10220 104 Avenue NW, Edmonton, AB T5J 0H6, Canada.  Edmonton Major Junior Hockey Corporation has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) their participation in the illegal anticompetitive scheme described herein, including but not limited to their adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

43.     Defendant EHT, Inc. operates the "Everett Silvertips," a team affiliated with the WHL.  EHT, Inc. is located in the United States and has a principal place of business at 2000 Hewitt Avenue, Suite 100, Everett, WA 98201.  The Everett Silvertips play at the Angel of the Winds Arena, 2000 Hewitt Ave, Everett, WA 98201.

44.     Defendant Kamloops Blazers Hockey Club, Inc. operates the "Kamloops Blazers," a team affiliated with the WHL.  Kamloops Blazers Hockey Club, Inc. has a principal place of business at 300 Mark Recchi Way, Kamloops, BC V2C 1W3, Canada.  The Kamloops Blazers play at the Sandman Centre, 300 Lorne Street, Kamloops, BC V2C 1W3, Canada.  Kamloops Blazers Hockey Club Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust

injury to Major Junior Players.

45.    Defendant Kelowna Rockets Hockey Enterprises Ltd. operates the "Kelowna Rockets," a team affiliated with the WHL.  Kelowna Rockets Hockey Enterprises Ltd. has a principal place of business at 101-1223 Water Street, Kelowna, BC V1Y 9V1, Canada.  The Kelowna Rockets play at Prospera Place, 1223 Water Street, Kelowna, BC V1Y 9V1, Canada. Kelowna Rockets Hockey Enterprises Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

46.    Defendant Shoot the Puck Foundation Inc. operates the "Wenatchee Wild," a team affiliated with the WHL.  Shoot the Puck Foundation Inc. is located within the United States and has a principal place of business at1300 Walla Walla Avenue, Wenatchee, WA 98801.  The Wenatchee Wild play at the Town Toyota Center, 1300 Walla Walla Avenue, Wenatchee, WA 98801.

47.    Defendant Lethbridge Hurricanes Hockey Club operates the "Lethbridge Hurricanes," a team affiliated with the WHL.  Lethbridge Hurricanes Hockey Club has a principal place of business at City of Lethbridge ENMAX Centre, #2-2510 Scenic Drive South, Lethbridge, AB T1K 7V7, Canada.  The Lethbridge Hurricanes play at the ENMAX Centre, 2510 Scenic Drive South, Lethbridge, AB T1K 1N2, Canada.  Lethbridge Hurricanes Hockey Club has directly and substantially participated in commerce with and within the United States, and has continuous

and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

48.    Defendant Medicine Hat Tigers Hockey Club Ltd. operates the "Medicine Hat Tigers," a team affiliated with the WHL.  Medicine Hat Tigers Hockey Club Ltd. has a principal place of business at 2808 Box Springs Way NW, Medicine Hat, AB T1C 0H3, Canada.  The Medicine Hat Tigers play at Co-op Place, 2802 Box Springs Way NW, Medicine Hat, AB T1C 0H3, Canada.  Medicine Hat Tigers Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) their participation in the illegal anticompetitive scheme described herein, including but not limited to their adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

49.    Defendant Moose Jaw Warriors Tier 1 Hockey Inc. operates the "Moose Jaw Warriors," a team affiliated with the WHL.  Moose Jaw Warriors Tier 1 Hockey Inc. has a principal place of business at 110 1st Avenue NW, Moose Jaw, SK S6H 3L9, Canada.  The Moose Jaw Warriors play at Moose Jaw Events Centre, 110 1st Avenue NW, Moose Jaw, SK S6H 3L9, Canada.  Moose Jaw Warriors Tier 1 Hockey Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and

products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

50.     Defendant Winterhawks Hockey LLC operates the "Portland Winterhawks," a team affiliated with the WHL.  Winterhawks Hockey LLC is located within the United States and has a reported primary place of business as 300 N. Winning Way, Portland, OR  97227. Prior to June 12, 2024, Winterhawks Hockey LLC had a reported primary place of business as 11 Times Square, Floor 36, c/o Ducera, New York, NY 10036.  The Portland Winterhawks play at Veterans Memorial Coliseum, 300 N Ramsay Way, Portland, OR 97227.

51.     Defendant Prince Albert Raiders Hockey Club Ltd. operates the "Prince Albert Raiders," a team affiliated with the WHL.  The Prince Albert Raiders Hockey Club Ltd. has a principal place of business at 690 32nd Street East, Prince Albert, SK S6V 2W8, Canada.  The Prince Albert Raiders play at the Art Hauser Centre, 690 Gary Anderson Way, Prince Albert, SK S6V 1P1, Canada.  Prince Albert Raiders Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

52.     Defendant EDGEPRo Sports & Entertainment Ltd. operates the "Prince George Cougars," a team affiliated with the WHL.  EDGEPRo Sports & Entertainment Ltd. has a

principal place of business at 2187 Ospika Boulevard South, Suite 102, Prince George, BC V2N 6Z1, Canada. The Prince George Cougars play at the CN Centre, 2187 Ospika Boulevard South, Prince George, BC V2N 6Z1, Canada. EDGEPRo Sports & Entertainment Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

53.     Defendant Rebels Sports Ltd. operates the "Red Deer Rebels," a team affiliated with the WHL. Rebels Sports Ltd. has a principal place of business at 4847 19th Street, Red Deer, AB T4R 2N7, Canada. The Red Deer Rebels play at Peavey Mart Centrium, 4847A 19th Street, Red Deer, AB T4R 2N7, Canada. Rebels Sports Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

54.     Defendant Queen City Sports & Entertainment Group Ltd. operates the "Regina Pats," a team affiliated with the WHL. Queen City Sports & Entertainment Group Ltd. has a principal place of business at 1500-1874 Scarth St Regina, SK, S4P 4E9, Canada. The Regina Pats play at the Brandt Centre, 1700 Elphinstone Street, Regina, SK S4P 2Z6, Canada. Queen

City Sports & Entertainment Group Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

55.     Defendant Saskatoon Blades Hockey Club Ltd. operates the "Saskatoon Blades," a team affiliated with the WHL.  Saskatoon Blades Hockey Club Ltd. has a principal place of business at 201 3515 Thatcher Avenue, Saskatoon, SK S7R 1C4, Canada.  The Saskatoon Blades play at the SaskTel Centre, 3515 Thatcher Avenue, Saskatoon, SK S7R 1C4, Canada.  Saskatoon Blades Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) their participation in the illegal anticompetitive scheme described herein, including but not limited to their adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

56.     Defendant Thunderbird Hockey Enterprises, LLC operates the "Seattle Thunderbirds," a team affiliated with the WHL.  Thunderbird Hockey Enterprises, LLC is located within the United States and has a principal place of business at 625 W. James Street, Kent, WA 98032.  The Seattle Thunderbirds play at the accesso ShoWare Center, 625 W. James Street, Kent, WA 98032.

57.    DefendantHat Trick, Inc. operates the "Spokane Chiefs," a team affiliated with the WHL.  Hat Trick, Inc. is located in the United States and has a principal place of business at 700 W. Mallon Avenue, Spokane, WA 99201.  The Spokane Chiefs play at the Spokane Veterans Memorial Arena, 720 W. Mallon Avenue, Spokane, WA 99201.

58.    Defendant Swift Current Bronco Hockey Club Inc. operates the "Swift Current Broncos," a team affiliated with the WHL.  The Swift Current Bronco Hockey Club Inc. has a principal place of business at 2001 Chaplin Street E, Swift Current, SK S9H 5A8, Canada.  The Swift Current Broncos play at the InnovationPlex, 2001 Chaplin Street E, Swift Current, SK S9H 5A8, Canada.  Swift Current Bronco Hockey Club Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

59.    Defendant Top Shelf Entertainment, Inc. operates the "Tri-City Americans," a team affiliated with the WHL.  Top Shelf Entertainment Inc. is located within the United States, and has a principal place of business at 7000 W. Grandridge Boulevard, Kennewick, WA 99336.  The Tri-City Americans play at the Toyota Center, 7000 W. Grandridge Boulevard, Kennewick, WA 99336.

60.    Defendant Vancouver Junior Hockey Limited Partnership operates the "Vancouver Giants," a team affiliated with the WHL.  Vancouver Junior Hockey Limited Partnership has a principal place of business at Suite 300, 4088 Cambie Street, Vancouver, BC V5Z 2X8, Canada.

The Vancouver Giants play at the Langley Events Centre, 7888 200 Street, Langley Township, BC V2Y 3J4, Canada. Vancouver Junior Hockey Limited Partnership has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

61.    Defendant West Coast Hockey LLP operates the "Victoria Royals," a team affiliated with the WHL. West Coast Hockey LLP has a principal place of business at 1925 Blanshard Street, Victoria, BC V8T 4J2, Canada. The Victoria Royals play at the Save-On-Foods Memorial Centre, 1925 Blanshard Street, Victoria, BC V8T 4J2, Canada. West Coast Hockey LLP has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events and (2) their participation in the illegal anticompetitive scheme described herein, including but not limited to their adherence to the market allocation scheme that restricts the WHL Clubs' ability to recruit and draft players outside of the WHL Exclusive States, thus causing antitrust injury to Major Junior Players.

*The OHL Defendants*

62.    Defendant Ontario Major Junior Hockey League, operating as the Ontario Hockey League, is a corporation incorporated under the laws of Canada. Under the supervision of the CHL, the OHL operates twenty (20) franchises called Clubs located in the United States

(Michigan and Pennsylvania) and Canada (Ontario).  The Clubs playing in the OHL consist of the teams owned by the OHL Clubs.  The OHL has a principal place of business at 305 Milner Avenue, Suite 200, Scarborough, ON M1B 3V4, Canada.  The OHL has directly and substantially participated in commerce within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of, *inter alia*, the States of Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin ("**OHL Exclusive States**"), thus causing antitrust injury to Major Junior Players.

63.    Defendant Windsor Spitfires, Inc. operates the "Windsor Spitfires," a team affiliated with the OHL.  Windsor Spitfires Inc. has a principal place of business at 8787 McHugh Street, Windsor, ON N8S 0A1, Canada.  The Windsor Spitfires play at the WFCU Centre, 8787 McHugh Street, Windsor, ON N8S 0A1, Canada.  Windsor Spitfires, Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation

scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

64.     Defendant London Knights Hockey Inc. operates the "London Knights," a team affiliated with the OHL.  London Knights Hockey Inc. has a principal place of business at 99 Dundas Street, London, ON N6A 6K1, Canada.  The London Knights play at Budweiser Gardens, 99 Dundas Street, London, ON N6A 6K1, Canada.  London Knights Hockey Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this jurisdiction, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

65.     Defendant Barrie Colts Junior Hockey Ltd. operates the "Barrie Colts," a team affiliated with the OHL.  Barrie Colts Junior Hockey Ltd. has a principal place of business at 555 Bayview Drive, Barrie, ON L4N 8Y2, Canada.  The Barrie Colts play at the Sadlon Arena, 555 Bayview Drive, Barrie, ON L4N 8Y2, Canada.  Barrie Colts Junior Hockey Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) their participation in the illegal anticompetitive scheme described herein, including but not limited to their adherence to the market allocation

scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

66.    Defendant Bulldog Hockey Inc. operates the "Brantford Bulldogs" (formerly the Hamilton Bulldogs), a team affiliated with the OHL.  Bulldog Hockey Inc. is a subsidiary of Andlauer Healthcare Group and has a principal place of business at 79 Market Street S., Brantford, ON, N3S 2E3, Canada.  The Brantford Bulldogs play at the Brantford Civic Centre, 79 Market Street S, Brantford, ON N3S 2E4, Canada.  Bulldog Hockey Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

67.    Defendant JAW Hockey Enterprises LP operates the "Erie Otters," a team affiliated with the OHL.  JAW Hockey Enterprises LP is a Delaware Limited Partnership and has a principal place of business at 201 E. 8th Street, Erie, PA 16503.  The Erie Otters play at the Erie Insurance Arena, 809 French Street, Erie, PA 16501.

68.    Defendant Guelph Storm Hockey Club Ltd. operates the "Guelph Storm," a team affiliated with the OHL.  Guelph Storm Hockey Club Ltd. has a principal place of business at 55 Wyndham Street N., Guelph, ON N1H 7T8, Canada.  The Guelph Storm play at Sleeman Centre, 50 Woolwich Street, Guelph, ON N1H 3T9, Canada.  Guelph Storm Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has

continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

69.    Defendant Kingston Frontenacs Hockey Club Ltd. operates the "Kingston Frontenacs," a team affiliated with the OHL.  Kingston Frontenacs Hockey Club Ltd. has a principal place of business at 1 The Tragically Hip Way, Kingston, ON K7K 0B4, Canada.  The Kingston Frontenacs play at Leon's Centre, 1 The Tragically Hip Way, Kingston, ON K7K 0B4, Canada.  Kingston Frontenacs Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

70.    Defendant Mississauga Steelheads Hockey Club Inc. operates the "Mississauga Steelheads," a team affiliated with the OHL.  The Mississauga Steelheads Hockey Club Inc. has a principal place of business at 5500 Rose Cherry Place, Mississauga, ON L4Z 4B6, Canada.  The Mississauga Steelheads play at Paramount Fine Foods Centre, 5500 Rose Cherry Place, Mississauga, ON L4Z 4B6, Canada.  Mississauga Steelheads Hockey Club Inc. has directly and

substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

71. Defendant Niagara IceDogs Hockey Club Inc. operates the "Niagara IceDogs," a team affiliated with the OHL. The Niagara IceDogs Hockey Club Inc. has a principal place of business at 1 David S. Howes Way, Unit 2, St. Catharines, ON L2R 0B3, Canada. The Niagara IceDogs play at the Meridian Centre, 1 David S. Howes Way, St. Catharines, ON L2R 0B3, Canada. Niagara IceDogs Hockey Club Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

72. Defendant North Bay Battalion Hockey Club Ltd. operates the "North Bay Battalion," a team affiliated with the OHL. The North Bay Battalion Hockey Club Ltd. has a principal place of business at 100 Chippewa Street West, North Bay Memorial Gardens, Second Floor, North Bay, ON P1B 6G2, Canada. The North Bay Battalion play at North Bay Memorial

Gardens, 100 Chippewa Street West, North Bay, ON P1B 6G2, Canada. North Bay Battalion Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

73.    Defendant Generals Hockey, Inc. operates the "Oshawa Generals," a team affiliated with the OHL. Generals Hockey Inc. has a principal place of business at Tribute Communities Centre, 99 Athol Street E, Oshawa, ON L1H 1J8, Canada. The Oshawa Generals play at Tribute Communities Centre, 99 Athol Street E, Oshawa, ON L1H 1J8, Canada. Generals Hockey, Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

74.    Defendant Ottawa 67's Limited Partnership operates the "Ottawa 67's," a team affiliated with the OHL. The Ottawa 67's Limited Partnership has a principal place of business at 180 Kent Street, Suite 300, Ottawa, ON N3C 4E8, Canada. The Ottawa 67's play at TD Place, 1015 Bank Street, Ottawa, ON K1S 3W7, Canada. Ottawa 67's Limited Partnership has directly

and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

75.    Defendant The Owen Sound Attack Inc. operates the "Owen Sound Attack," a team affiliated with the OHL.  The Owen Sound Attack Inc. has a principal place of business at 1900 3rd Avenue East, Owen Sound, ON N4K 2M6, Canada.  The Owen Sound Attack play at the Harry Lumley Bayshore Community Centre, 1900 3rd Avenue East, Owen Sound, ON N4K 2M6, Canada.  The Owen Sound Attack Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

76.    Defendant Peterborough Petes Limited operates the "Peterborough Petes," a team affiliated with the OHL.  Peterborough Petes Limited has a principal place of business at 151 Lansdowne Street West, Peterborough, ON K9J 1Y4, Canada.  The Peterborough Petes play at Peterborough Memorial Centre, 151 Lansdowne Street, Peterborough, ON K9J 1Y4, Canada.

Peterborough Petes Limited has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

77.    Defendant IMS Hockey, Corp operates the "Flint Firebirds," a team affiliated with the OHL.  IMS Hockey, Corp is a Michigan corporation and has a principal place of business at 3501 Lapeer Road, Flint, MI 48503.  The Flint Firebirds play at the Dort Financial Center, 3501 Lapeer Road, Flint, MI 48503.

78.    Defendant Saginaw Hockey Club, L.L.C. operates the "Saginaw Spirit," a team affiliated with the OHL.  Defendant Saginaw Hockey Club, L.L.C. is a Michigan Limited Liability Company and has a principal place of business at 6321 State Street, Saginaw, MI 48603. The Saginaw Spirit play at the Dow Event Center, 303 Johnson Street, Saginaw, MI 48607.

79.    Defendant 211 SSHC Canada ULC operates the "Sarnia Sting," a team affiliated with the OHL.  211 SSHC Canada ULC has a principal place of business at 1455 London Road, Sarnia, ON N7S 6K7, Canada.  The Sarnia Sting play at the Progressive Auto Sales Arena, 1455 London Road, Sarnia, ON N7S 1P6, Canada.   211 SSHC Canada ULC has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and

products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

80.    Defendant Soo Greyhounds Inc. operates the "Soo Greyhounds," a team affiliated with the OHL.  Soo Greyhounds Inc. has a principal place of business at 269 Queen Street East, Sault Ste. Marie, ON P6A 1Y9, Canada.  The Soo Greyhounds play at GFL Memorial Gardens, 269 Queen Street East, Sault Ste. Marie, ON  P6A 1Y9, Canada.  Soo Greyhounds Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

81.    Defendant Kitchener Rangers Jr. A Hockey Club operates the "Kitchener Rangers," a team affiliated with the OHL.  Kitchener Rangers Jr. A Hockey Club has a principal place of business at 400 East Avenue, Kitchener, ON N2H 1Z6, Canada.  The Kitchener Rangers play at the Kitchener Memorial Auditorium, 400 East Avenue, Kitchener, ON N2H 1Z6, Canada. Kitchener Rangers Jr. A Hockey Club has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events;

and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

82.    Defendant Sudbury Wolves Hockey Club Ltd. operates the "Sudbury Wolves," a team affiliated with the OHL.  Sudbury Wolves Hockey Club Ltd. has a principal place of business at 240 Elgin Street South, Sudbury, ON P3E 3N6, Canada.  The Sudbury Wolves play at Sudbury Community Arena, 240 Elgin Street, Sudbury, ON P3E 3N6, Canada.  Sudbury Wolves Hockey Club Ltd. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the sourcing, training, and recruitment of Major Junior Players; (2) the licensing and selling of merchandise and products, including television events; and (3) its participation in the illegal anticompetitive scheme described herein, including but not limited to its adherence to the market allocation scheme that restricts the OHL Clubs' ability to recruit and draft players outside of the OHL Exclusive States, thus causing antitrust injury to Major Junior Players.

*The QMJHL Defendants*

83.    Defendant Québec Maritimes Junior Hockey League is a corporation incorporated under the laws of Canada.  Under the supervision of the CHL, the QMJHL operates eighteen (18) franchises called Clubs located in Canada, including Québec, New Brunswick, Prince Edward Island, and Nova Scotia.  The Clubs playing in the QMJHL consist of the teams owned by the QMJHL Clubs.  The QMJHL has a principal place of business at 101-1205 rue Ampère, Boucherville, QC J4B 7M6, Canada.  The QMJHL has directly and substantially participated in

commerce within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of, *inter alia*, the States of Maine, Massachusetts, Vermont, Rhode Island, New Hampshire, and Connecticut ("**QMJHL Exclusive States**"), thus causing antitrust injury to Major Junior Players.

84.     Defendant Le Titan Acadie Bathurst (2013) Inc./The Acadie Bathurst Titan (2013) Inc. operates the "Acadie-Bathurst Titan," a team affiliated with the QMJHL. Le Titan Acadie Bathurst (2013) Inc./The Acadie Bathurst Titan (2013) Inc. has a principal place of business at KC Irving Center, 14 Avenue Sean Couturier, Bathurst NB, E2A 6X2, Canada. The Acadie-Bathurst Titan play at the K.C. Irving Regional Centre, 850 Sainte-Anne Street, Bathurst, NB E2A 6X2, Canada. Le Titan Acadie Bathurst (2013) Inc./The Acadie Bathurst Titan (2013) Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

85.     Defendant Hockey Junior Baie-Comeau Inc. operates the "Baie-Comeau Drakkar," a team affiliated with the QMJHL. Hockey Junior Baie-Comeau Inc. has a principal place of business at 70 av. Michel-Hémon, Baie-Comeau, QC G4Z 2A5, Canada. The Baie-Comeau

Drakkar play at the Centre Henry-Leonard, 70 av. Michel-Hémon, Baie-Comeau, QC G4Z 2A5, Canada.   Hockey Junior Baie-Comeau Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

86.     Defendant Le Club de Hockey Drummond Inc. operates the "Drummondville Voltigeurs," a team affiliated with the QMJHL.   Le Club de Hockey Drummond Inc. has a principal place of business at 300 rue Cockburn, Drummondville, QC J2C 4L6, Canada.   The Drummondville Voltigeurs play at the Centre Marcel-Dionne, 300 rue Cockburn, Drummondville, QC J2C 4L6, Canada.   Le Club de Hockey Drummond Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

87.     Defendant Cape Breton Major Junior Hockey Club Limited operates the "Cape Breton Eagles," a team affiliated with the QMJHL.   Cape Breton Major Junior Hockey Club Limited has a principal place of business at 481 George Street, Sydney, NS B1P 6G9, Canada. The Cape Breton Eagles play at Centre 200, 481 George Street, Sydney, NS B1P 6R7, Canada.

Cape Breton Major Junior Hockey Club Limited has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) their participation in the illegal anticompetitive scheme described herein, including without limitation their adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

88.    Defendant Les Olympiques de Gatineau Inc. operates the "Gatineau Olympiques," a team affiliated with the QMJHL.  Les Olympiques de Gatineau, Inc. has a principal place of business at 500 Boulevard de la Cité, CP 103, Gatineau, QC J8T 0H4, Canada.  The Gatineau Olympiques play at the Centre Slush Puppie, 500 Boulevard de la Cité, Gatineau, QC J8T 0H4, Canada.  Les Olympiques de Gatineau Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

89.    Defendant Halifax Mooseheads Hockey Club Inc. operates the "Halifax Mooseheads," a team affiliated with the QMJHL.  Halifax Mooseheads Hockey Club Inc. has a principal place of business at 1500-1625 Grafton Street, Halifax, NS B3J 0E8, Canada.  The Halifax Mooseheads play at the Scotiabank Center, 1800 Argyle Street, Halifax, NS B3J 2V9, Canada.  The Halifax Mooseheads' majority owner is Sam Simon, an American who resides in

Michigan.  Halifax Mooseheads Hockey Club Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

90.    Defendant Club de Hockey Les Remparts de Québec (2014) Inc. operates the "Québec Remparts," a team affiliated with the QMJHL.  Club de Hockey Les Remparts de Québec (2014) Inc. has a principal place of business at 18e S-612 rue Saint-Jacques, Montréal, QC H3C 4M8, Canada.  The Québec Remparts play at Videotron Centre, 250 Wilfrid-Hamel Blvd, Québec City, QC G1L 5A7, Canada.  Québecor Sports et Divertissement Inc. is the majority shareholder of Club de Hockey Les Remparts de Québec (2014) Inc., with a principal place of business at 612 rue Saint-Jacques, Montréal, QC H3C 4M8, Canada.  Club de Hockey Les Remparts de Québec (2014) Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

91.    Defendant Le Club de Hockey Junior Armada Inc. operates the "Blainville-Boisbriand Armada," a team affiliated with the QMJHL.  Le Club de Hockey Junior Armada Inc.

has a principal place of business at 4565 Boulevard de la Grande-Allée, Boisbriand, QC J7H 1M8, Canada.  Quebecor, Inc. is a "bénéficiaires ultimes," and has a principal place of business at 612 rue Saint-Jacques, Montréal, QC H3C 4M8, Canada.  The Blainville-Boisbriand Armada play at the Centre d'Excellence Sports Rousseau, 3600 Boulevard de la Grande-Allée, Boisbriand, QC J7H 1M9, Canada.  Le Club de Hockey Junior Armada Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

92.     Defendant Moncton Wildcats Hockey Club Limited operates the "Moncton Wildcats," a team affiliated with the QMJHL.  Moncton Wildcats Hockey Club Limited has a principal place of business at 100 Midland Drive, Dieppe, NB E1A 6X4, Canada.  The Moncton Wildcats play at the Avenir Center, 150 Canada Street, Moncton, NB E1C 0V2, Canada. Moncton Wildcats Hockey Club Limited has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

93.     Defendant Le Club de Hockey L'Océanic de Rimouski Inc. operates the "Rimouski

Océanic," a team affiliated with the QMJHL.  Le Club de Hockey L'Océanic de Rimouski Inc. has a principal place of business at 111 2e rue O, Rimouski, QC G5L 4X3, Canada.  The Rimouski Océanic play at the Colisée Financière Sun Life, 111 2e rue O, Rimouski, QC G5L 4X3, Canada. Le Club de Hockey L'Océanic de Rimouski Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

94.    Defendant Les Huskies de Rouyn-Noranda Inc. operates the "Rouyn-Noranda Huskies," a team affiliated with the QMJHL.  Les Huskies de Rouyn-Naranda Inc. has a principal place of business at 218 av. Murdoch, Rouyn-Norand, QC J9X 1E6, Canada.  The Rouyn-Noranda Huskies play at the Aréna Glencore, 218 Av. Murdoch, Rouyn-Noranda, QC J9X 1E5, Canada. Les Huskies de Rouyn-Naranda Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

95.    Defendant 8515182 Canada Inc. operates the "Charlottetown Islanders," a team affiliated with the QMJHL.  8515182 Canada Inc. has a principal place of business at 46

Kensington Road, Charlottetown, PE C1A 5H7, Canada.  The Charlottetown Islanders play at the Eastlink Center, 46 Kensington Road, Charlottetown, PE C1A 5H7, Canada.  8515182 Canada Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

96.    Defendant Les Tigres de Victoriaville (1991) Inc. operates the "Victoriaville Tigres," a team affiliated with the QMJHL.  Les Tigres de Victoriaville (1991) Inc. has a principal place of business at 400 Boulevard Jutras E, Victoriaville, QC G6P 0B8, Canada.   The Victoriaville Tigres play at the Colisée Desjardins, 400 Boulevard Jutras E, Victoriaville, QC G6P 4T1, Canada.  Les Tigres de Victoriaville (1991) Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

97.    Defendant Saint John Major Junior Hockey Club Limited operates the "Saint John Sea Dogs," a team affiliated with the QMJHL.  Saint John Major Junior Hockey Club Limited's parent company is JSM Sports Entertainment Inc.  Saint John Major Junior Hockey Club Limited

has a principal place of business at 99 Station Street, Suite 200, Saint John, NB, E2L 4X4, Canada. The Saint John Sea Dogs play at the TD Station, 99 Station Street, Saint John, NB E2L 4X4, Canada. Saint John Major Junior Hockey Club Limited has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

98.     Defendant Club de Hockey Shawinigan Inc. operates the "Shawinigan Cataractes," a team affiliated with the QMJHL. Club de Hockey Shawinigan Inc. has a principal place of business at 1 rue Jacques-Plante, Shawinigan, QC G9N 0B7, Canada. The Shawinigan Cataractes play at the Centre Gervais Auto, 1 rue Jacques-Plante, Shawinigan, QC G9N 0B7, Canada. Club de Hockey Shawinigan Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

99.     Defendant Les Foreurs de Val-d'Or (2012) Inc. operates the "Val-d'Or Foreurs," a team affiliated with the QMJHL. Les Foreurs de Val-d'Or (2012) Inc. has a principal place of business at 810 6e Avenue, Val-d'Or, QC J9P 1B4, Canada. The Val-d'Or Foreurs play at the

Centre Agnico Eagle, 810 6e Avenue, Val-d'Or, QC J9P 1B4, Canada.  Les Foreurs de Val-d'Or (2012) Inc. has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

100.    Defendant Les Saguenéens Junior Majeur de Chicoutimi operates the "Chicoutimi Saguenéens," a team affiliated with the QMJHL.  Les Saguenéens Junior Majeur de Chicoutimi has a principal place of business at 643 rue Bégin, Chicoutimi, QC G7H 4N7, Canada.  The Chicoutimi Saguenéens play at the Centre Georges-Vézina, 643 rue Bégin, Chicoutimi, QC G7H 4N7, Canada.  Les Saguenéens Junior Majeur de Chicoutimi has directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

101.    Defendant 7759983 Canada Inc. operates the "Sherbrooke Phoenix," a team affiliated with the QMJHL.  7759983 Canada Inc. has a principal place of business at 360 rue du Cégep, Sherbrooke, QC J1E 2J9, Canada.  The Sherbrooke Phoenix play at the Palais des Sports Léopold-Drolet, 360 rue du Cégep, Sherbrooke, QC J1E 2J9, Canada.  7759983 Canada Inc. has

directly and substantially participated in commerce with and within the United States, and has continuous and systemic business contacts with this district, including with respect to (1) the licensing and selling of merchandise and products, including television events, and (2) its participation in the illegal anticompetitive scheme described herein, including without limitation its adherence to the market allocation scheme that restricts the QMJHL Clubs' ability to recruit and draft players outside of the QMJHL Exclusive States, thus causing antitrust injury to Major Junior Players.

### C. **Non-Party Co-Conspirators**

102.    Each of the following NHL clubs is alleged to be an unnamed co-conspirator in the illegal scheme alleged herein:

      a.    Ownership and management of the Anaheim Ducks.

      b.    Ownership and management of the Arizona Coyotes.

      c.    Ownership and management of the Boston Bruins.

      d.    Ownership and management of the Buffalo Sabers.

      e.    Ownership and management of the Calgary Flames.

      f.    Ownership and management of the Carolina Hurricanes.

      g.    Ownership and management of the Chicago Blackhawks.

      h.    Ownership and management of the Colorado Avalanche.

      i.    Ownership and management of the Columbus Blue Jackets.

      j.    Ownership and management of the Dallas Stars.

      k.    Ownership and management of the Detroit Red Wings.

      l.    Ownership and management of the Edmonton Oilers.

      m.    Ownership and management of the Florida Panthers.

      n.    Ownership and management of the Los Angeles Kings.

o.    Ownership and management of the Minnesota Wild.

p.    Ownership and management of the Montreal Canadiens.

q.    Ownership and management of the Nashville Predators.

r.    Ownership and management of the New Jersey Devils.

s.    Ownership and management of the New York Islanders.

t.    Ownership and management of the New York Rangers.

u.    Ownership and management of the Ottawa Senators.

v.    Ownership and management of the Philadelphia Flyers.

w.    Ownership and management of the Pittsburgh Penguins.

x.    Ownership and management of the San Jose Sharks.

y.    Ownership and management of the Seattle Kraken.

z.    Ownership and management of the St. Louis Blues.

aa.    Ownership and management of the Tampa Bay Lightning.

bb.    Ownership and management of the Toronto Maple Leafs.

cc.    Ownership and management of the Vancouver Canucks.

dd.    Ownership and management of the Las Vegas Knights.

ee.    Ownership and management of the Washington Capitals.

ff.    Ownership and management of the Winnipeg Jets.

103.    Each of following entities associated with the AHL is alleged to be an unnamed co-conspirator in the illegal scheme alleged herein:

a.    The AHL.

b.    Ownership and management of the Bridgeport Islanders.

c.    Ownership and management of the Charlotte Checkers.

d.  Ownership and management of the Hartford Wolf Pack.

e.  Ownership and management of the Hershey Bears.

f.  Ownership and management of the Lehigh Valley Phantoms.

g.  Ownership and management of the Providence Bruins.

h.  Ownership and management of the Springfield Thunderbirds.

i.  Ownership and management of the Wilkes-Barre/Scranton Penguins.

j.  Ownership and management of the Belleville Senators.

k.  Ownership and management of the Cleveland Monsters.

l.  Ownership and management of the Laval Rocket.

m.  Ownership and management of the Rochester Americans.

n.  Ownership and management of the Syracuse Crunch.

o.  Ownership and management of the Toronto Marlies.

p.  Ownership and management of the Utica Comets.

q.  Ownership and management of the Chicago Wolves.

r.  Ownership and management of the Grand Rapids Griffins.

s.  Ownership and management of the Iowa Wild.

t.  Ownership and management of the Manitoba Moose.

u.  Ownership and management of the Milwaukee Admirals.

v.  Ownership and management of the Rockford IceHogs.

w.  Ownership and management of the Texas Stars.

x.  Ownership and management of the Abbotsford Canucks.

y.  Ownership and management of the Bakersfield Condors.

z.  Ownership and management of the Calgary Wranglers.

aa.   Ownership and management of the Coachella Valley Firebirds.

bb.   Ownership and management of the Colorado Eagles.

cc.   Ownership and management of the Henderson Silver Knights.

dd.   Ownership and management of the Ontario Reign.

ee.   Ownership and management of the San Diego Gulls.

ff.   Ownership and management of the San Jose Barracuda.

gg.   Ownership and management of the Tucson Roadrunners.

104.   Each of the following entities associated with the ECHL is alleged to be an unnamed co-conspirator in the illegal scheme alleged herein:

a.   The ECHL.

b.   Ownership and management of the Adirondack Thunder.

c.   Ownership and management of the Allen Americans.

d.   Ownership and management of the Atlanta Gladiators.

e.   Ownership and management of the Cincinnati Cyclones.

f.   Ownership and management of the Florida Everblades.

g.   Ownership and management of the Fort Wayne Komets.

h.   Ownership and management of the Greenville Swamp Rabbits.

i.   Ownership and management of the Idaho Steelheads.

j.   Ownership and management of the Indy Fuel.

k.   Ownership and management of the Iowa Heartlanders.

l.   Ownership and management of the Jacksonville Icemen.

m.   Ownership and management of the Kalamazoo Wings.

n.   Ownership and management of the Kansas City Mavericks.

o.    Ownership and management of the Maine Mariners.

p.    Ownership and management of the Newfoundland Growlers.

q.    Ownership and management of the Norfolk Admirals.

r.    Ownership and management of the Orlando Solar Bears.

s.    Ownership and management of the Rapid City Rush.

t.    Ownership and management of the Reading Royals.

u.    Ownership and management of the Savannah Ghost Pirates.

v.    Ownership and management of the South Carolina Stingrays.

w.    Ownership and management of the Toledo Walleye.

x.    Ownership and management of the Trois Rivières Lions.

y.    Ownership and management of the Tulsa Oilers.

z.    Ownership and management of the Utah Grizzlies.

aa.    Ownership and management of the Wheeling Nailers.

bb.    Ownership and management of the Wichita Thunder.

cc.    Ownership and management of the Worcester Railers.

## JURISDICTION AND VENUE

105.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.

106.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and under Section 4 of the Clayton Act, 15 U.S.C. § 15, because the Defendant NHL and some of its clubs reside, are found, and/or have agents in this District.  Alternatively, venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants transact business in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.  These events include the operation of Defendants' market allocation agreement, the recruitment and sourcing of Major Junior Players from this District, and the negotiation of the NHL-CHL Agreement involving the NHL, which resides in this District.

107.    This Court has personal jurisdiction over Defendants because, *inter alia*, they either: (1) transact business in the United States, including in this District; (2) participate in athletic contests and/or engage in licensing and selling merchandise and products, including television events, in the United States, including in this District; (3) have substantial contacts within the United States, including in this District; and/or (4) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

## FACTUAL ALLEGATIONS

### A.  The Collusion that Underpins Major Junior Hockey

#### 1.  The Canadian Hockey League

108.    The CHL is an umbrella organization that is comprised of three independent Major Junior Leagues and the 60 constituent Clubs of those Leagues, namely: (1) the WHL, which consists of 22 professional hockey clubs located in Washington, Oregon, and the Canadian Provinces of British Columbia, Manitoba, Saskatchewan, and Alberta; (2) the OHL, which consists of 20 professional hockey clubs located in Michigan, Pennsylvania, and the Canadian Province of Ontario; and (3) the QMJHL, which consists of 18 professional hockey clubs located in Québec

and the Atlantic Provinces of Canada. There are approximately 1,500 Players across all three Leagues.

109.   Despite the "L" in its name, the CHL is not a sports league. As the CHL President admitted under oath: "*The CHL is not a typical 'league'. It has no teams or organized regular-season game schedules. Apart from a handful of special tournament and exhibition games, the CHL has no role in administering hockey games.*" As set forth herein, the CHL exists solely for the benefit of the Major Junior Leagues and to facilitate their collusive conduct.

110.   The three Major Junior Leagues that operate under the CHL's umbrella are each separate organizations and separate legal entities—not only from each other, but from the CHL itself. As the CHL President previously has stated under oath: "*The CHL and the Leagues are separate entities. There is no parent-subsidiary relationship between them. The CHL has no role in hockey operations for the Leagues, nor has it ever had any material control over the Leagues.*" Major Junior Defendants similarly have admitted this in court, characterizing each of the Major Junior Leagues as "*separate legal entit[ies] . . . . The WHL, OHL and QMJHL and their respective teams operate independently from one another.*"

111.   Even though the WHL, OHL, and QMJHL have admitted that they are each independent Leagues with separate organizations, these Leagues make little effort to conceal the fact that they collude with and through the CHL. Major Junior Defendants admitted as much in recent court submissions that "*[t]he leagues engage and communicate with each other through the CHL's executive council.*" The CHL's executive council is comprised of the three Commissioners of each of the WHL, OHL, and QMJHL. Through the CHL, the WHL, OHL, and QMJHL "*collaborate on issues that affect all of them and their respective teams.*" Indeed, in an article regarding "player benefits," Ron Robertson, the then-WHL Commissioner, stated: "*We are*

*continuing to review [player benefit packages], which we do in conjunct[ion] with the OHL and the Quebec league. We're all heading toward a consistent approach for the players.*"

112.    The Major Junior Leagues are the primary pathway for prospects to reach hockey's top professional ranks in the NHL.  More than half of all current NHL players are former Major Junior Players.  Among North American-born NHL players, the percentage is even higher.

113.    Major Junior Clubs have no educational mission.  Instead, their sole mission is to develop Major League Players and commercially exploit and profit from their labor and talent on the ice.  The Major Junior Leagues and their Clubs prepare Players for the next level by demanding that Players approach major junior hockey as a full-time professional job.  Major Junior Players compete in professional-length schedules and devote at least a full 40-hour week to hockey, every week of the season.  Major Junior Players spend much of their time on the road, typically on long bus rides, traveling from city to city to play weekday games that can include travel between American and Canadian cities.

114.    The lives of the teenagers playing in the Major Junior Leagues are subject to a level of physical and psychological control that is abusive and borders on absolute.  The directives of coaches and management dictate almost everything—from what to eat to when to sleep—while maintaining a vice-like grip on Major Junior Players' future career prospects (and, as a result, their future earning potential).  This was the experience of Individual Plaintiffs as their coaches dictated their schedule throughout the pre-season and regular season.

115.    The restraints of trade detailed in this Complaint empower this abuse because they deny Major Junior Players freedom of movement, thereby rendering Players the property of the Clubs that drafted them.  The unique market position of the Major Junior Clubs empowers and enables the economic, psychological, physical, and sexual abuse of Players, which is a pervasive

problem in the Major Junior Leagues.  Indeed, sexual abuse is so pervasive in the Leagues that it has been the subject of lawsuits and the CHL has commissioned inquiries into the problem.

116.    An Independent Review Panel retained by the CHL concluded that Major Junior Players suffer from bullying, hazing, sexual abuse, and other physical and psychological abuse. For example: "*There was a significant percentage of survey respondents that indicated problems exist within the CHL around bullying, harassment and discrimination.  The extent of the harassment problem was reported to be widespread.*"  The Independent Review Panel identified the reason why Player abuse has long persisted in major junior hockey ("*There is a code of silence around maltreatment that helps perpetuate it.*"), and how to end abuse in the Leagues ("*The CHL and its members must prioritize player safety and focus on developing good humans, **rather than winning at all costs**.*").

117.    "Winning at all costs" is the hallmark of a profit-oriented business.  As a direct consequence of the restraints of trade at issue in this case, and the lack of any labor union that bargains with Major Junior Defendants to protect Major Junior Players, these Players have nowhere to turn for recourse and they accept their abuse as the price they need to pay to "live the dream" and make it to the NHL.

118.    The Major Junior Leagues, coordinated by the CHL and with the NHL's active involvement, have maintained the control that enables their abusive treatment of Major Junior Players through a series of anticompetitive agreements that restrict all competition for Major Junior Players' services.  These unlawful agreements include the following: (1) a geographic market allocation scheme that divides up all states and provinces into three territories, each of which is allocated exclusively to one Major Junior League from which to recruit and source Players; (2) an involuntary draft of Players as young as 14 years old; (3) contractual provisions that grant the

drafting Major Junior Club the exclusive rights to the drafted Player's hockey services for the entirety of that Player's major junior career; (4) a compensation-fixing agreement that artificially depresses the compensation offered to Major Junior Players for their labor below competitive levels; and (5) a price-fixing agreement that deprives Major Junior Players of any compensation for Players' assignment of the right to commercially exploit their names, images, and likenesses, as well as any portion of the revenues earned by such commercial exploitation. Each of these agreements, which results from Major Junior Defendants' collusive development of what they call "*a consistent approach for the players*," is *per se* unlawful.

### 2. The Major Junior Leagues' Market Allocation Scheme

119. The three independent Major Junior Leagues have agreed among themselves and through the CHL to allocate markets from which they can exclusively recruit and source Players. This agreement is memorialized in the rules, directives, and regulations of the CHL and the three Major Junior Leagues.

120. The Major Junior Leagues' market allocation agreement completely restricts the ability of the Clubs in each Major Junior League to recruit and ultimately draft Players from states and provinces outside of their allotted geographic territory. Through this agreement, each Major Junior League is allotted certain states and provinces from which its constituent Clubs can recruit and draft Players. The Major Junior Clubs are not permitted to recruit and draft Players from outside their League's allocated territory.

121. The agreement reached through the CHL and among the WHL, OHL, and QMJHL (and each of their respective Clubs) grants WHL Clubs the exclusive right to recruit, source, and draft Players from the States of Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming, as well as from the four Western Provinces of

Canada.  Pursuant to this agreement, WHL clubs cannot (and in fact do not) recruit, source, or draft Players from outside these states and provinces.

122.    The agreement reached through the CHL and among the WHL, OHL, and QMJHL (and each of their respective Clubs) grants OHL Clubs the exclusive right to recruit, source, and draft Players from the States of Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin, as well as from the Canadian Province of Ontario.  Pursuant to this agreement, OHL clubs cannot (and in fact do not) recruit, source, or draft Players from outside these states and provinces.

123.    The agreement reached through the CHL and among the WHL, OHL, and QMJHL (and each of their respective Clubs) grants QMJHL Clubs the exclusive right to recruit, source, and draft Players from the States of Maine, Massachusetts, Vermont, Rhode Island, New Hampshire and Connecticut, as well as from the Province of Québec and Canada's Maritime Provinces.  Pursuant to this agreement, QMJHL Clubs cannot (and in fact do not) recruit, source, or draft Players from outside these states and provinces.

124.    Pursuant to this agreement, therefore, Players from the exclusive WHL states and provinces, such as Plaintiffs Gould and DiLaura, may not be recruited by, be drafted by, or otherwise play for any Club in the OHL or QMJHL, absent permission from the WHL and CHL. Likewise, Players from exclusive OHL or QMJHL territories cannot be recruited by, be drafted by, or otherwise play for Clubs in the other Major Junior Leagues, absent permission from their respective exclusive Leagues and the CHL.

125.    This market allocation agreement, negotiated through the CHL, among the WHL, OHL, and QMJHL (and each of their respective Clubs) therefore is specifically and directly targeted at, and directly affects, each and every U.S. state.  For example, the OHL's (and its Clubs') agreement to limit its recruitment and drafting to certain states (including New York and this District)—and the WHL's and QMJHL's (and their Clubs') agreement *not* to recruit or draft from New York—affects *all* prospective Players in New York because it (1) limits the number of teams for which those Players can play (to those in the OHL) (2) deprives those Players of the ability to contract with any WHL or QMJHL Clubs, and thereby (3) artificially limits the market (and necessarily the competition) for those Players' services.

126.    The WHL, OHL, and QMJHL (and each of their respective Clubs) have, during all relevant time periods, acted in furtherance of this agreement—including by holding involuntary drafts of Players limited to their allocated territories and by refusing to compete to sign Players located in the territories allocated to the other Major Junior Leagues—and have thus each directly targeted and affected competition in each and every U.S. state.

127.    Major Junior Defendants have thus agreed to limit the talent they compete for, which has degraded the quality of the product they put on the ice.  That qualitative harm to competition has irreparably harmed Players who were deprived of the full benefits of an unrestrained competitive marketplace competing for their talent and labor.  Depriving Major Junior Players of their preferred choice of team can also negatively impact a Player's athletic development and mental health.  These irreparable injuries can, in turn, negatively impact a Player's future earning potential.

128.    The Major Junior Leagues, their respective Clubs, and the CHL have abided by this market allocation scheme at all times material to this Action.

### 3. The Major Junior Leagues' Involuntary Player Drafts

129.    Major Junior Clubs fill their rosters through the annual entry drafts held by their respective Major Junior League that is conducted in accordance with the Leagues' market allocation scheme.  North American hockey players are automatically eligible for selection in one of the Major Junior Drafts if they will be 16 years old by the opening of the Player's first season of major junior hockey in that League.  For example, in the WHL, Players are drafted beginning at age 15 and are scouted even earlier.  In some cases, Players can be drafted at 14 and start their major junior careers at 15.

130.    Player drafts are used by Major League Baseball, the National Football League, the National Basketball Association, and the NHL to source and allocate players among their respective teams.  In more recent years, the National Lacrosse League, Major League Soccer, the Women's National Basketball Association, Major League Lacrosse, Major League Rugby, and the National Women's Soccer League have all adopted player drafts to allocate players among their respective teams.  In each case, and without exception as of the date of these pleadings, those drafts were the subject of collective bargaining with player associations that represented and protected the players' interests.

131.    At all times relevant to this Action until the present, no labor union has ever represented Major Junior Players in their relations with any Major Junior Defendant, so no CBA has authorized the entry drafts held by any of the Major Junior Leagues.  The drafts are accordingly ongoing *per se* violations of the antitrust laws.

132.    Left to their own devices without having to negotiate with a labor union representing Players, the Major Junior Leagues have designed their drafts to mimic the NHL draft in several ways.  For example, Clubs typically select Players in reverse order according to their

finish in the League, meaning that the Club with the worst record picks first. Major Junior Clubs also can and do trade draft picks for Players.

133.    Drafted Players are, as set forth below, immediately placed on their drafting Club's "protected" list, meaning that no other Major Junior Club, either within or without the drafting Club's League, can negotiate with the Player for his hockey services for the entirety of the Player's major junior career. The Major Junior Leagues also draft far more Players than needed to fill their open roster slots, meaning that many drafted Players will not only have no opportunity to play for their drafted Club but also will be foreclosed from negotiating a deal to play for any other Major Junior Club. As a result of Major Junior Defendants' illegal agreement, Major Junior Players face a single buyer for their services.

134.    Major Junior Defendants' agreement to impose involuntary drafts of Players within their "exclusive territories" is memorialized on the CHL's website (https://chl.ca/), on which all three Leagues maintain an online presence. For example, details regarding the OHL's draft, the "OHL Priority Selection Process," are set forth at https://chl.ca/ohl/priorityselectionprocess/. In relevant part, the OHL draft rules provide: "*North American players born in 2007 . . . from protected OHL territories are eligible for selection in the 15 rounds of the 2023 OHL Priority Selection*." The WHL calls its draft the "bantam draft," which the WHL describes as "*allow[ing] for the orderly transfer of players to the WHL Protected Player Lists (PPL) from the bantam ranks (13-14 year-olds)*" (https://chl.ca/whl/whl-bantam-draft/).

135.    Drafted Players are the "property" of the Major Junior Club that drafted them, and that dynamic empowers and enables the abuse—economic, physical, psychological, and/or sexual—detailed herein.

### 4.   The Major Junior Leagues' Reserve System

136.    All Major Junior Players' SPAs contain terms that bind Players to their drafting Major Junior Clubs for the entirety of their major junior careers.  Both Individual Plaintiffs had such terms included in their SPAs.

137.    The duration of the SPAs is non-negotiable.  Major Junior Defendants therefore use their SPAs to compel Players to agree to play hockey for their Clubs for a term of four years, plus one overage year at the discretion of their Club, for a total term of five years.  During the term of their SPAs, Players are further compelled to agree to play hockey exclusively for their Clubs.

138.    The Major Junior Clubs' dominion over their Players during the term of their SPAs is exacerbated by rules in each League providing for a "protected list" of Players.  Pursuant to these rules, each Major Junior Club also is allowed to maintain such a "protected list" of 50 Players.  For example, the WHL's "FAQ" on the CHL's website reveals: "*Each of the member teams in the WHL has a 50 player protected list that includes current roster players as well as players projected to be able to play for the team in the future. **Once placed on the list of a member team, a player must play with that team if he wishes to play at the Major Junior level***."

139.    These protected lists bind Players to the Club that owns their rights, and thereby prevent Players from trying to market their talents to other Major Junior Clubs or clubs in other leagues.  The protected lists also discipline Players by reiterating that if they withhold their consent to be traded, they can be shelved on a protected list indefinitely.  For example, the OHL SPAs provide that a "*Player may not enter into a hockey player agreement with a CHL team other than the Club so long as the Player is included on the protected list of the Club in accordance with the OHL By-Laws.*"  The WHL SPAs similarly provide that Clubs can avoid having to release Players for no compensation upon the Club's termination of his SPA by retaining the Player on its "50 Player Protection List."

140.    Clubs may terminate SPAs for several reasons, including if the Player does not, in the Club's opinion, "demonstrate sufficient skill" to warrant a spot on the Club's roster.   In contrast, Major Junior Players may not terminate their SPAs for any reason other than for breach of a Major Junior Club's contractual obligations to that Player.

141.    Termination by a Club is decidedly one-sided.   While termination ends a Club's obligation to a Player, including its obligation to fund a Player's educational package, terminated Players included on a protected list are still obligated to play hockey exclusively for their Club and are therefore foreclosed from signing with a new club (within or outside of major junior hockey), typically until that new club pays a hefty transfer fee to the Player's former Club to secure his release.   This is the functional equivalent of a "reserve clause" designed to prevent Player movement once their career with a club ends.

142.    Gould experienced this reality first-hand.   According to the rules of each League, underage Major Junior Players must consent to be traded because trades can be very disruptive to a teenager who may already be living far from home, at the home of a billet family, and attempting to finish high school while providing full-time hockey services for his Club.   Accordingly, each League purports to prohibit trades to which underage Players do not consent.   But the Major Junior Clubs routinely override these consent provisions, or ignore them altogether.   They do so by presenting the traded Player with a Hobson's Choice: Accept the trade (whether or not the Player genuinely consents) or face the prospect of being parked on his Club's protected list until the age of 20, which effectively would end the Player's hockey career.

143.    The Clubs' threats and ability to retaliate against kids who do not consent to be traded are effective due to the restraints detailed herein.   Accordingly, Major Junior Players have no real choice but to reluctantly accede to being traded if they want to continue their pursuit of

their dreams of playing in the NHL and not squander the huge sacrifices that they and their families have made to get them this far in their hockey career.

144.    This happened to Gould at the beginning of his second season, when he was traded to Prince Albert—another WHL Club, located across the border in Saskatchewan, and which was *nearly 1,000 miles* from his original Club in Kennewick, Washington.  Gould hurt his back during a game in his rookie season, and the Tri-City Club took almost three months to get him an MRI to confirm the nature of the injury.  That injury continued to plague him, and Gould aggravated it further before his sophomore season.  Tri-City, demonstrating the "win at all costs" culture of major junior hockey, was not sympathetic to Gould's situation.  Instead of developing a rehabilitation program for Gould after learning of his injury, the Tri-City General Manager told Gould not to show up at the Club's pre-season training camp if he was not "good to go" (meaning physically ready to play).  A few games into the season, Gould was told that he had been traded to Prince Albert.  Although Gould's consent to the trade was technically required under WHL rules, Gould was told that if he did not consent, he would be "sent home" and be prevented by the restrictive terms of his SPA from signing with another club.  Faced with the threat of being "sent home" and his hockey career coming to a premature and immediate halt, Gould had no choice but to "consent" to a trade that he did not want and to a Club he did not want to play for.  Gould was Club "property" and he had no real choice but to comply.

145.    Gould was treated no better at Prince Albert.  After only a few games with Prince Albert, the Club shuffled its roster in a large trade that resulted in Prince Albert demoting Gould to make room on the roster for the newly acquired Players.  Prince Albert told Gould that he was being sent down to a lower-level league—the Alberta Junior Hockey League ("**AJHL**")—where he would have to pay for equipment, room, and board.  Gould was told he was being sent to the

AJHL's Grand Prairie Storm club, in Grand Prairie, Alberta, seven hours north of his home. Gould initially refused to report and requested a release, but after taking a two-week break to decompress, he was instead allowed to report to the AJHL's Canmore Eagles club, just an hour from his home, but was still obligated to pay $500/month in billet fees. Gould played a few games with Canmore before he decided to heed his increasing disillusionment with hockey and took a more extended break at age 17, just a few months into his second season, when his major junior career came to a halt.

146.    DiLaura also was traded, in exchange for a seventh-round draft pick, after completing two seasons for the Prince George Club. Like Gould, DiLaura was traded across the border, to the Portland Winterhawks. Halfway into his season with Portland, DiLaura was traded again to the Swift Current Broncos Club, in Saskatchewan. DiLaura was ultimately released by Swift Current the summer before his last eligible season, shortly after his 20th birthday.

147.    While Gould was forced to consent to his trades under duress, the Clubs that traded DiLaura did not even bother to pay lip service to the rule that bars the trading of Major Junior Players without their consent. Both times DiLaura was traded followed the same pattern. After arriving at the rink for practice, he was called into the General Manager's office. The GM simply told him he was traded, without any advance notice. Both times, DiLaura was not asked for his consent, was not asked to sign anything, his parents had not been alerted, and all he was told was that his new GM would be calling him to arrange for his travel the next day. Once the new Club's GM called him, he had less than 24 hours to pack up his whole life as fast as he could to make a flight to the new location, both times across the border.

148.    The Major Junior Defendants also have taken steps to ensure that leagues and clubs outside of major junior hockey cannot compete for Players during the term of their SPAs. For

example, due to the Major Junior Defendants' rules, including those regarding Player compensation and the return of NHL players to the Leagues, once a Player signs a SPA, that Player forever waives his NCAA eligibility and is barred from playing college hockey, regardless of how many games (if any) he skates in a Major Junior League. This remains the case even after NCAA schools began allowing their athletes to share in NIL licensing revenues.

149.    Defendants also have adopted rules that restrict Major Junior Players' ability to choose to play in other developmental hockey leagues (such as the AHL and ECHL), which could otherwise compete against the Major Junior Leagues for Players, prior to the age of 20. Any argument that Major Junior Players could not compete on the ice at a high level in the AHL and ECHL was belied by events during the recent pandemic, when those leagues (at the request of their controlling NHL clubs) temporarily allowed Major Junior Players to compete for spots in the AHL and ECHL during the CHL shutdown. Major Junior Players thrived in the AHL and ECHL during this period, playing competitively and increasing the quality of the hockey played in those leagues as a result.

150.    Major Junior Defendants also have taken additional steps to ensure that their Players cannot be poached by clubs in other leagues. If a Major Junior Player wants to play in any other comparable league, his new club will have to pay a prohibitive "player development" or "transfer" fee—*of as much as $500,000*—to his current Major Junior Club as compensation for terminating the SPA.

151.    Given the intentionally prohibitive nature of these fees, Major Junior Players are essentially bound to the Club that drafted him: He is their "property" at all times, as detailed below, until he can be sold to another club or otherwise ages out of major junior hockey. That gives the Major Junior Club (and its coaches and staff) free reign to do as they please with Major

Junior Players, and the result is exploitation of Players' labor and the endemic physical, psychological, and/or sexual abuse that has been well-documented, including by Defendants themselves.

### 5. The Major Junior Leagues' Agreement to Artificially Suppress Player Compensation

152.    Each Major Junior League has rules that, among other things, provide that all Players must sign an SPA with their Major Junior Club in order to play in the League.  The Administrative Rules of the QMJHL, for example, provide: "*The League standard player contract is the only one endorsed by the League and each player registered with a club member of the League shall sign such a contract*."  The OHL and the WHL each have a similar rule.

153.    The relevant and material terms of the SPAs are non-negotiable, and all executed SPAs are scrutinized by the League Commissioner to ensure compliance with those terms.  Such terms include, among other things, all terms related to compensation of Players.  Compensation terms for each Major Junior League are fixed by the League's rules.

154.    Major Junior Clubs that deviate from the standard terms of the SPA, including but not limited to making extra-contractual payments to Players, are required to pay significant fines to encourage strict compliance with the standardized terms that each Major Junior Club has agreed to pay its Players.  Such fines discourage future attempts to compete for talent through competitive compensation offers, which Defendants consider to be cheating on the cartel's rules.  League fines assessed on Clubs have exceeded $200,000.

155.    All Major Junior Players, including Individual Plaintiffs, have had their compensation artificially reduced due to the anticompetitive scheme alleged in this Complaint.

156.    For example, Player compensation in the WHL is fixed at $250.00 per month.  Player compensation in the OHL is fixed at $470.00 per month.  Player compensation in the

QMJHL is similarly fixed at non-competitive levels.  These price-fixed terms are set forth in each and every Major Junior Player's SPA and are provided for in the rules of each League.

157.    By comparison and according to public reports, the average salary in the AHL developmental league is well over $5,000 per month.  Likewise, public reports state that the average salary in the ECHL developmental league exceeds $2,800 per month.

158.    Unlike Major Junior Players, AHL and ECHL players are compensated pursuant to a CBA negotiated on their behalf by their labor union with their respective leagues.

159.    Because the various *per se* illegal agreements discussed above render Players as "property" of the Club that drafted them, those agreements ensure that Major Junior Players cannot negotiate for better terms than the fixed terms set forth in the SPA.  Following the draft, Major Junior Players are presented with a single contract, from a single Club, on "take it or leave it" terms.  Unless and until the player "takes it," he is forever foreclosed from playing major junior hockey.

**B.  <u>Defendants' Efforts to Conceal Their Agreement to Suppress Player Compensation</u>**

160.    Major Junior Defendants have in the past disclosed, through their tax and accounting practices, their understanding that Major Junior Players were workers (either employees or independent contractors) who were paid for their labor.  Specifically, prior to 2013, Major Junior Clubs withheld taxes on payments made to Players, pursuant to U.S. and Canadian tax laws, and accounted for them on their books and records as "salaries."

161.    In addition, the Leagues' SPAs made clear that Major Junior Players were paid for the provision of hockey services to their Major Junior Clubs.  For example, the 2011 WHL SPA stated: "*In consideration of the Player providing his services as a hockey player and otherwise to the Club, and in further consideration of the Player playing hockey exclusively for the Club during the Term of this Agreement, the Club agrees . . . to pay . . . the Player an allowance*."  This

"Allowance" was, at the time, identified as player "*remuneration*" and fixed at non-competitive levels.  That SPA also provided: "*Payment of the Allowance will be subject to any statutory withholdings and deductions,*" referring to income tax withholdings.

162.    Similarly, the 2010 OHL SPA sought to classify Players as independent contractors: "*It is expressly acknowledged and agreed by the parties involved that the relationship between the OHL and the Player is that of an independent contractor.*"  That SPA provided that the Major Junior Club shall "*pay the Player*" "*in exchange for the Player's services.*"

163.    But when Major Junior Defendants faced efforts to unionize Players, and challenges to their compensation system under wage and hour laws, they systematically engaged in a coordinated strategy to conceal the true nature of their conspiracy to deprive Players of competitive compensation for their labor, while doing nothing to change the substance of the conspiracy.

164.    This coordinated strategy started a decade ago, when a proposed labor union calling itself the Canadian Hockey League Players' Association sought to organize and represent Major Junior Players.  That effort was unsuccessful, in large part because of threats of retaliation by Major Junior Defendants against any Major Junior Player who cooperated with the putative union. After that failed attempt to unionize Players, Players' representatives attempted to convince government authorities in the United States and Canada to enforce wage and hour laws against Major Junior Defendants.

165.    In response to the failed union drive and the new effort to enforce wage and hour laws against them, all three Major Junior Leagues agreed to conceal the true nature of their conspiracy to exploit Major Junior Players' labor by substantially revising the language of their SPAs, as well as their accounting and tax reporting practices, to avoid characterizing Players as

"workers" or their remuneration as a "salary." But these superficial and cosmetic changes did not change Major Junior Defendants' exploitation of Major Junior Players, including Defendants' implementation of a reserve system and adherence to their agreement to artificially suppress and standardize Player compensation.

166.    Specifically, at or around this time, OHL Commissioner David Branch distributed a memo to all OHL Clubs (on OHL letterhead) styled as an "Update to Administrative Policies" regarding the "Standard Player Agreement" ("**Branch Memo**"). In that memo, and in a transparent attempt to avoid wage and hour liability, Branch instructed that: "*The Clubs will refer to Players as amateur athletes and will ensure not to use any language referring to the Players and their Clubs that would imply an employment relationship.*" Branch further instructed Clubs to immediately discontinue their practice of withholding a portion of player wages for tax purposes and to "*update their accounting records (general ledger accounts) to remove references to Player allowances/salaries and replace with an account called Player Expense Reimbursements.*" Finally, Clubs were instructed not to include any such Player Expense Reimbursements on any government wage surveys, as they had historically done regarding Player "salaries."

167.    Branch made clear that these rule changes were mandatory, and that the League was acting collectively regarding these cosmetic, and intentionally misleading, changes to the SPA and the Clubs' accounting and tax reporting practices. To that end, Branch demanded that if any Club received an inquiry from a government tax authority, that Club must "*contact the League for direction. The League has decided that it would be in the best interests of the Clubs and their Players to have a consistent and coordinated approach . . . .*"

168.    Branch also served as the CHL Commissioner when this memo was sent and these cosmetic, and intentionally misleading, changes to the SPA and the Clubs' accounting and tax

reporting practices were agreed to and adopted by his counterparts at the WHL and QMJHL. Those changes were part of the Major Junior Leagues' admitted ongoing "*collaboration*," through and with the CHL, to develop a "*consistent approach*" to Player benefits.  All Major Junior Clubs followed these directives, immediately adopting the new SPA language and changing their business practices to conform to the approach outlined in the Branch Memo.

169.    Specifically, as part of this coordinated strategy, the Major Junior Leagues reformulated their SPAs to remove all language referencing employment or worker status.  For example, in the OHL SPA, all references to a Player's "independent contractor" status were removed and replaced with a statement that "this Agreement is not a contract of employment between the club and the player."  The "fees" and "allowances" paid to Players by OHL Clubs were rebranded as "reimbursement of certain expenses" and "honorariums" paid for playoff success.  Likewise, the reformulated WHL SPA changed player remuneration from an "allowance" to a "monthly expense reimbursement" and an "honorarium."  The reformulated WHL SPA likewise classified Players as "amateur athletes," and removed all references to "services" provided by Players to their Clubs.

170.    In or around the same time, and consistent with Major Junior Defendants' desire to maintain their conspiracy to artificially suppress Player compensation, the hockey press reported that the "*QMJHL reduce[d] over age player salary to match OHL and WHL.*"

171.    The changes to the Leagues' SPAs were simply cosmetic.  They were designed to avoid hundreds of millions of dollars in wage and hour liability while doing nothing to change the substance of Major Junior Players' relationships with their Clubs, the fixed compensation those Players received, or the exploitative and non-competitive working conditions those Players endured.

172.    During this time frame, the Major Junior Leagues continued to operate commercial, for-profit operations where they were exploiting Major Junior Players to maximize their profits. When it suits their interests to do so, Major Junior Defendants readily drop the facade and admit that their operations bear no resemblance to amateur leagues.  For example, the court overseeing the litigation the CHL faces regarding the prevalence of concussions among Major Junior Players observed that Defendant MacKenzie "*took issue with the comparison of the leagues that comprise the CHL with other 'amateur' youth hockey leagues.*"

### C.  Major Junior Players Are Professionals

173.    Major Junior Players are professional athletes.  They play professional-length seasons, with professional-level demands that leave them little time for school, and they do so for commercial, for-profit Clubs that, in substance, pay them at artificially reduced and standardized rates.  Major Junior Players work on average at least 40 hours per week and occasionally up to 65 hours or more.  This includes travel to and from away games, usually on long bus rides, time spent in practices and training sessions, attendance in team promotional activities, and participation in games, three times a week, with at least 68 regular-season games plus playoffs.  The season begins in September with training camp and runs to the following spring, with the annual Memorial Cup competition typically occurring in late May or early June.  This schedule leaves little time for school, which is often reduced to minimal instruction through online sessions.  Clubs often encourage Players to sacrifice their education to spend more time training on the ice and in the weight room.

174.    The rigors of this schedule also expose teenaged Players to significant, and potentially life-changing, injuries.  Both Individual Plaintiffs suffered severe injuries while playing major junior hockey.  Plaintiff Gould, once a top prospect, suffered a career-altering injury during

his first season.  Plaintiff DiLaura also suffered from severe injuries from playing, including a concussion and bulging disk.

175.    Plaintiff Gould experienced the rigors of this professional-length schedule during his tenure in the WHL, the Major Junior League with far-flung Clubs in Oregon and Washington State and various Western Canadian provinces.  The closest road game for Tri-City was 2.5 hours away by bus, and the furthest was to Prince George, British Columbia, which took over 13 hours by bus.  Gould and his teammates would endure that road trip to play back-to-back games at Prince George and then take the 13-plus-hour bus trip back to Tri-City.  Gould did this as part of the punishing professional-length schedule set by the WHL, which, as detailed above, exposed him to what proved to be a significant and career-altering injury as a 16-year-old.  DiLaura had a similar experience, enduring long bus trips across Western Canada and Washington and Oregon.  Such trips ranged from a minimum of a 7.5-hour bus ride, to the nearest game when he played in Northern British Columbia, to a three-day bus trip to Saskatchewan.

176.    Major Junior Players also are routinely traded by Clubs that are trying to improve or recalibrate their rosters to achieve greater success and increase their bottom lines, as well as to sell Players who no longer factor into their plans for cash.  While the Leagues claim that they protect Players by requiring Player consent to all trades, in practice, these protections offer little more than the proverbial fig leaf.  For example, Gould, as detailed above, was told by team management that he would be "sent home" if he did not consent to be traded to a Club located nearly 1,000 miles away.  As Tri-City told Gould that, once "sent home," he would be effectively barred from playing hockey again for at least three years, Gould had no choice but to consent to the trade.  Such tactics are common in major junior hockey to compel kids to consent to trades.

177.    To avoid the legal implications of this exploitation, and following the above-described conspiracy to conceal their illegal conduct to suppress Player compensation, Major Junior Defendants have steadfastly maintained that the Major Junior Leagues are amateur leagues and that Major Junior Players are amateur athletes—which, of course, is not a defense to the Claims brought by Plaintiffs in this Action.

178.    This "defense"—cosmetic and ineffective as it is—is a sham.  As alleged above, and when it suits their interests, the Major Junior Leagues resist all comparisons to other amateur hockey leagues.

179.    The Major Junior Leagues, tellingly, are the only self-declared "amateur" leagues whose Players are barred from ever playing in the NCAA because they are considered to be professionals.  In short, just because Major Junior Defendants call their Players "amateurs" does not make it true.

180.    Historically, this was never a debate: The NCAA has always considered "*the signing of a contract with a CHL Team [to be] the equivalent of signing a professional contract*." There have been recent reports that the NCAA is reconsidering its hard and fast rule against opening its system to Major Junior Players.  While it is unclear whether the NCAA ultimately will do that, the NCAA is not reconsidering its classification of Major Junior Players as professionals. Instead, the NCAA's review of its policy towards Major Junior Players appears to have been brought about by changes caused by antitrust litigation against the NCAA, including NCAA players receiving compensation for the licensing of their names, images, and/or likenesses, much like professional athletes.  With the NCAA beginning to compensate players like professionals, reports suggest that Major Junior Defendants are finding it increasingly untenable to legally justify

barring Major Junior Players from its ranks.  But the NCAA's longstanding classification of Major Junior Players as professionals remains in place.

181.    Courts that have substantively analyzed this issue have likewise determined that Major Junior Players are professionals.  For example, one court determined that Major Junior Players were employees of their club because clubs are "*in the business of hockey.  [They are] commercial organization[s] . . . carrying on business for profit.  The players are employees who receive remuneration, defined as cash, pursuant to the appropriate regulations governing insurable earnings*."

182.    Indeed, the CHL previously admitted in an agreement with the United States Hockey League ("**USHL**") regarding inter-league transfers: "*It is agreed that CHL Teams are considered and treated by third parties as being professional.  Therefore, the signing of a contract with a CHL Team is the equivalent of signing a professional contract.*"

183.    When compared with the rules governing student-athletes in the NCAA ("**NCAA Athletes**"), it is clear that the rules that govern Major Junior Players are consistent with how professional sports leagues work and are primarily, if not entirely, designed to preserve Major Junior Defendants' profits.  These distinctions are among the reasons why Major Junior Defendants do not compete with NCAA schools in the relevant market.   For example:

- NCAA schools may recruit NCAA Athletes from anywhere in North America to play hockey for them.  By comparison, Major Junior Clubs may only source Players from certain designated territories within North America that are exclusive to their League, regardless of the Player's best interests.

- There is no draft in the NCAA and nothing prevents any NCAA hockey team from recruiting any player who wants to play for that school.  By comparison, each Major Junior League holds an involuntary draft, which, combined with the agreement among the Major Junior Clubs not to compete for Players drafted by other Clubs, eliminates Players' choice of Club.

- NCAA Athletes cannot be traded.  By comparison, Major Junior Players are traded— often with little to no notice and always with no real choice in the matter —across the

vast geographic reaches of each League and often across borders, including before a Player turns 18 and without parental consent.

- NCAA teams play a reduced schedule of 34 regular-season games pursuant to NCAA rules and regulations. By comparison, Major Junior Clubs play a full professional-style schedule of 68 regular-season games, which largely mirrors the NHL's 82-game schedule, and those games are played pursuant to rules and regulations designed to mimic those of the NHL.

- If an NCAA Athlete is unsatisfied with his situation, he has the unilateral right (with or without his school's consent) to transfer to another school, where he may start competing on the ice in the very next NCAA season. That NCAA Athlete's new school has no obligation to compensate the Athlete's former school, monetarily or otherwise. By comparison, Major Junior Players lack any ability to unilaterally decide to move to another Major Junior Club, regardless of whether that Club is in the same or a different Major Junior League. And if a Major Junior Player attempts to sign with another club in another league, such as the AHL or ECHL, that Player's Major Junior Club has the right to demand a significant transfer payment from the Player's potential new club (as much as $500,000), which is designed to prevent Players from leaving major junior hockey.

184.    There is no procompetitive benefit to Major Junior Defendants' agreed-upon restraints of competition. Meanwhile, the NCAA's much more player-friendly rules have not compromised athletic competition on the ice: Since 2000, 17 different Major Junior Clubs have won the Memorial Cup, while 13 different schools have won the NCAA hockey title.

185.    As alleged above, Major Junior Defendants have purposefully mischaracterized Major Junior Players as "amateur student athletes." While the term "amateur student athlete" has drawn criticism as applied to certain NCAA Athletes, its use to describe Major Junior Players is nonsensical on its face. The Major Junior Leagues and their Clubs have no educational mission. Consistent with that, Players need not be in school to play in the Major Junior Leagues and, in fact, the professional schedules that Major Junior Players are required to play leaves little time for school or a meaningful education. Major Junior Clubs have, in fact, ordered their Players that were actually attending in-person high school, as opposed to taking courses online, to stop attending school to prioritize their actual profession—hockey. Indeed, reflecting the professional

rigors of the Major Junior Leagues' schedules, one study concluded that fewer than 20% of Major Junior Players ever complete their post-secondary education.

186.    One reason so few Major Junior Players complete their post-secondary education is that the educational packages allegedly earned by Players over the course of their major junior careers often prove to be illusory.  Prominent agents have called upon the Major Junior Leagues to revisit the rules that restrict the ability of Players to access funds allegedly set aside by their Major Junior Clubs to finance their post-hockey education.  One agent remarked: "*The CHL's dirty little secret is they don't want players using these packages.  They're severely limiting the number of former players that can make use of their earned school money.*"

187.    It is undisputed that Major Junior Players play games in the Major Junior Leagues with and against Players who have been both drafted and signed by an NHL club to an NHL entry-level contract.  Accordingly, all Major Junior Players compete against Players who are, indisputably, professionals.  This is one reason the NCAA considers all Major Junior Players to be professionals and ineligible to play NCAA hockey.

188.    For these reasons, Major Junior Players are professionals who are employed by Major Junior Clubs that have agreed among themselves, the CHL, the NHL (and each NHL Club), the AHL (and each AHL Club), and the ECHL (and each ECHL Club) not to compete for Players' services.  As a result, the employment bargain for Major Junior Players is decidedly one-sided, and Players have thus been denied their legal right to a competitive market for their services, free of collusion.  In exchange for non-competitive and conspiratorially fixed compensation and little to no control over working conditions, Major Junior Players have little job security, may be subjected to abuse, traded, let go, or demoted at the whim of their Club, all while performing work in which occupational injuries—including career-ending or altering injuries—are common.

D. **Major Junior Hockey Is a Lucrative Business**

189.    A prominent sports journalist described the Major Junior Leagues thusly: "*It is, at base, a ticket-selling entertainment business. Those who buy franchises do so with the intent of turning a profit. They face the same challenges as other sports entrepreneurs . . . [except that] their product—the players—costs them next to nothing.*"

190.    Each Major Junior Club has a separate owner and, as the CHL President stated in his recent affidavit, "*each Team is constituted and operated, both legally and practically, separate from (a) every other Team; (b) the Leagues; and (c) the CHL.*"

191.    Each Major Junior Club owner is seeking to win games and thereby attract more fans to games so that owners can sell more tickets, more luxury boxes, more food, and more club merchandise, as well as selling more advertising and garnering more lucrative media contracts. Certain owners also own the real estate associated with the arena in which their Clubs plays, and they garner additional revenues from those investments. And these Clubs operate in Major Junior Leagues that conduct professional-style playoffs, culminating in the Memorial Cup tournament, and do so to sell tickets and concessions at games, as well as garner lucrative TV contracts in both the United States and Canada, among other revenue sources.

192.    As commentators have noted, major junior hockey is "*big business across Canada and the United States,*" and the Major Junior Clubs are "*major business operations with multi-million dollar budgets.*" Indeed, Major Junior Club owners buy and sell their franchises for many millions of dollars.

193.    Major Junior Defendants' profits are enhanced by their illegal and anticompetitive restraints imposed on Major Junior Players, who do not receive competitive compensation for their labor, lack the ability to negotiate with Major Junior Clubs for their services, and are unable, due to Major Junior Defendants' reserve system and business practices, to seek alternatives with other

developmental leagues across North America.  Major Junior Players generate millions of dollars in revenues for their Clubs through various sources, including game-attendance ticket revenues (and associated concessions), corporate sponsorship deals, TV contracts, merchandise sales, and NIL licensing.  By way of summary only, Defendants and Major Junior Clubs earn revenues from the following sources:

    a. Major junior hockey games are televised in the United States and Canada.  Major junior hockey games, along with games from the World Junior Hockey Tournament that showcase Major Junior Players, are broadcast on NHL TV in the United States.  In Canada, prior to 2021, CHL TV rights were bundled with the NHL's TV rights in a $4.9 billion deal with Rogers Communications' Sportsnet.  In 2021, the CHL agreed to a deal with TSN and other broadcasters for the right to exclusively broadcast CHL games—the terms of which are not public.  However, the cost of an "All Access Pass" for the regular season and playoffs cost fans $280 for the 2022-23 season, more than the NHL's "Center Ice" package.

    b. Major Junior Defendants also arrange for certain games to be broadcast on a pay-per-view basis.

    c. Major Junior Defendants earn revenues from the participation of Major Junior Players in the World Junior Ice Hockey Championships.  This popular sporting event is televised throughout North America pursuant to a contract with NHL Network and TSN (Bell Media).  This event generates more than $100 million in ticket sales alone, plus revenues from selling TV rights and concessions, and from the licensing of Major Junior Players' names, images, and/or likenesses.

    d. The Major Junior Clubs earn significant facility-based revenues, including from ticket sales, concessions, merchandising, sponsorship, and the sale of luxury boxes.

    e. Many Major Junior Clubs own their facilities, from which they earn rental fees and other real estate-related revenue (such as leasing fees for concerts and other events and parking revenue) while using the facilities at little to no additional cost for their own purposes.

    f. Online merchandizing also represents a significant revenue stream for Major Junior Defendants.

    g. Major Junior Clubs have affiliated academies across North America that Major Junior Players and prospects attend in lieu of a traditional high school.  Boys as young as 10 are recruited by academies, which sell dreams of NHL stardom and riches for more than upwards of $50,000 in annual tuition.

    h. Major Junior Clubs run development camps for younger Players.  For example, the

WHL Club located in Spokane, Washington runs different camps across the West Coast for which it charges $500 per day for 3 days of instruction. Other Major Junior Clubs have similar operations in the United States and Canada.

i.  Major Junior Defendants also have profited from licensing the names, images, and/or likenesses of Major Junior Players for merchandising and for various media products, including for use in a popular NHL video game. That video game agreement, from which Defendants profit but Major Junior Players earn nothing, allows for the licensing of, among other things, (1) all 60 Major Junior Clubs, (2) the names, images, and/or likenesses of each Player who appears on a Major Junior Club's roster, (3) Major Junior Club jersey designs, and (4) logos and league structures from each of the WHL, OHL, and QMJHL.

j.  Major Junior Defendants received multi-million-dollar annual "funding" payments from the NHL, plus annual transfer payments of as much as $175,000 per Player from NHL clubs.

k.  The CHL now permits gambling on major junior hockey games, which garners substantial revenues for Major Junior Defendants.

194.    Virtually all the economic value of these revenue streams is captured by Major Junior Defendants, even though none of it would have been possible without the labor of Major Junior Players. As a direct result of the anticompetitive acts alleged herein, no Major Junior Player has been competitively compensated for his labor or received any compensation for the licensing and other commercial exploitation of his name, image, or likeness.

### E.  The National Hockey League Is a Co-Conspirator that Actively Facilitates Major Junior Defendants' Anticompetitive Conduct

195.    Defendant NHL is the world's premier professional ice hockey league. There are currently 32 NHL clubs: 25 in the United States and 7 in Canada. The NHL is considered one of the major professional sports leagues in North America, with annual revenues of approximately $6 billion. NHL clubs each have affiliated minor league clubs in the AHL and ECHL. The AHL and ECHL (and each of their constituent clubs) also participate in the conspiracy, at the behest of the NHL, as discussed herein.

196. The NHL actively participates in the conspiracy through the NHL-CHL Agreement, which governs the relationship between the two organizations. The most recent version of the NHL-CHL Agreement was signed by the parties on November 14, 2013, and was recently extended by the parties. The NHL-CHL Agreement enshrines the NHL's central role in the conspiracy alleged herein in three ways.

197. *First*, the NHL-CHL Agreement requires the NHL to make annual payments to the Major Junior Leagues, which payments are expressly conditioned on the Major Junior Leagues maintaining the rules and practices that comprise the anticompetitive agreements described above. No other developmental league receives similar payments from the NHL. The NHL-CHL Agreement thus provides financial incentives for Major Junior Defendants to rigorously adhere to their illegal scheme.

198. Major Junior Defendants' rules and practices that the NHL maintains through the NHL-CHL Agreement include, for example:

   a. That each of the Major Junior Leagues has its own exclusive territory, comprised of certain U.S. states and Canadian provinces and, further, that Players outside the allocated territory of a Major Junior League cannot be recruited to, drafted in, or permitted to play in that League;

   b. Certain of the various rules and practices that comprise Major Junior Defendants' *de facto* reserve system that binds each Players to a single Club for the entirety of his major junior career;

   c. That Major Junior Defendants abide by the 20-Year-Old Agreement, as discussed below by limiting the number of 20-year-old Players on Club rosters to three; and

   d. That each Major Junior Player must execute an SPA, the key terms of which are non-negotiable.

199. In sum, the NHL conditions annual payments to Major Junior Defendants—payments that Major Junior Defendants depend upon—on Major Junior Defendants maintaining their anticompetitive agreements.

200.    *Second*, the NHL, in the NHL-CHL Agreement, agrees that its clubs will make a payment—up to $175,000—to the relevant Major Junior Club for each Major Junior Player selected in the NHL draft and signed to an NHL entry-level contract.  Major Junior Clubs pursue these transfer payments ruthlessly by culling their squads regularly to give the Clubs the best opportunity to score multiple transfer payments every year.  And because the NHL drafts players beginning at 18, Major Junior Players have a limited window to convince their Clubs that they have what it takes to be sold on to the NHL.

201.    *Third*, the NHL-CHL Agreement sets forth the rules governing the transfer or assignment of Major Junior Players who are drafted by NHL clubs but do not make the club's opening day roster.  These rules, which require such Players to be assigned or returned back to the Major Junior Leagues, substantially reduce the NHL clubs' costs of developing and training players, thereby giving the NHL and NHL clubs a structural financial incentive to not only support but also perpetuate the anticompetitive agreements described herein.

202.    The NHL administers an entry draft ("**NHL Draft**") each June.  To be eligible for the NHL Draft, North American players must be 18 years old by September 15th and under 20 years old by December 31st in the draft year.  Because of the financial incentives created by the NHL-CHL Agreement that substantially reduce the development costs of players who are drafted, signed by their NHL club, and assigned back to their former Major Junior Club, NHL clubs draft far more players than they need to maintain their rosters.

203.    The NHL-CHL Agreement accomplishes this through the following provisions:

a.  **Players who are signed**: When a Major Junior Player under the age of 20 has been drafted and signed to an NHL contract but is not retained by his NHL club for more than 10 regular-season games, the Player "***must be assigned***" to the Major Junior Club that most recently owned the Player's exclusive rights under the Player's SPA.  NHL clubs specifically agree not to assign those Players to their AHL or ECHL affiliates, where Players would be better compensated, and the AHL and ECHL have agreed not

to compete with Major Junior Defendants for North American hockey players under the age of 20. These agreements ensure that Major Junior Players drafted and signed by NHL clubs continue to suffer the impact of the conspiracies detailed above until they either make it onto the roster of their drafting NHL club or age out of the Major Junior Leagues if they do not make it back to the NHL.

b. **Players who are not signed**: Major Junior Players who were drafted, but who remain unsigned, likewise "***must be returned***" to the Major Junior Club that owns the Player's exclusive rights under the Player's respective SPA no later than Opening Day of the NHL regular season depending on the round in which they were drafted.

204.     The NHL's obligation to assign or return players under the age of 20 to the Major Junior Leagues (the "**20-Year-Old Agreement**") uniquely applies to Major Junior Players. In contrast, those players who are not subject to Defendants' unlawful agreements—most notably, European players and former NCAA players—are eligible to (and do) play in the AHL, ECHL, and other professional leagues, even when they are under the age of 20. These players routinely receive pay substantially in excess of the artificially depressed compensation Major Junior Players earn due to Defendants' conspiratorial conduct. The 20-Year-Old Agreement, which all AHL and ECHL clubs agree to abide by due to their affiliation with NHL clubs, only restrains competition for, and suppresses the compensation of, North American hockey players who play in the Major Junior Leagues. In exchange for the benefits Major Junior Defendants receive from the 20-Year-Old Agreement, Major Junior Defendants agree that no Club shall retain more than three 20-year-olds on their rosters.

205.     This agreement not to compete degrades the quality of the AHL and ECHL, both of which operate entirely in the United States, because it artificially deprives those leagues of players who could compete, and improve the quality of play, in those leagues.

206.     The NHL and NHL clubs control the AHL, ECHL, and their constituent clubs. In fact, virtually all AHL and ECHL clubs are owned by, or are otherwise affiliates of, NHL clubs.

All but one NHL club has an affiliated AHL club; all but four NHL clubs have an affiliated ECHL club.

207.    Major Junior Players are more than capable of playing in the AHL and ECHL and enriching the quality of play in those leagues.  This was apparent when Major Junior Players were granted (at the direction of the NHL and NHL clubs) temporary permission to play in the AHL and ECHL during the pandemic.  During that time, Major Junior Players thrived in the AHL and ECHL, often winning honors and leading their teams in scoring.  When the pandemic receded and Major Junior Leagues reopened, the agreement not to compete for Major Junior Players was reinstated, and the AHL and ECHL again barred those Players under the age of 20 from playing in their leagues.  The result was, once again, a reduced quality of play in the AHL and ECHL, an injury to competition that harms all Major Junior Players.  All Major Junior Players would have benefitted from unrestricted competition, whereby the AHL and ECHL would have been free to compete for those Players' services.

208.    The NHL-CHL Agreement provides multiple benefits to the NHL, its clubs and Major Junior Defendants, all at the expense of Major Junior Players.  For example, Major Junior Player compensation is significantly less than that of AHL or ECHL players, who are compensated pursuant to CBAs.  But Players who are drafted by NHL clubs that do not make the opening day roster, must be either assigned or otherwise returned back to their former Major Junior Club and cannot play in either the AHL or ECHL.  Defendants' agreement to assign Players back to their former Major Junior Club thus saves NHL clubs and/or their affiliated AHL and ECHL clubs money, while Major Junior Defendants benefit from the return of top-tier talent.

209.    In sum, for players who believe that major junior hockey is the best path to develop their skills to reach the NHL, their only option is to play in the Major Junior Leagues, which then

(by agreement with the NHL) place significant restrictions on where they can play if the Player is drafted and signed by an NHL club but does not ultimately make the NHL club's roster. The NHL and CHL clearly intended the NHL-CHL Agreement to expressly limit where such Players can play once they sign an NHL entry-level contract but do not make the NHL club's roster. The NHL-CHL Agreement effectively bars these Players from participating in any other professional hockey league in the world, other than the NHL or CHL. This scheme ensures that Major Junior Defendants will continue to maintain a stranglehold on top-tier talent, which they can employ, market, and profit from without returning any portion of the proceeds to Players.

## INTERSTATE TRADE AND COMMERCE

210.     Major Junior Defendants' conduct that is the subject of this Action was at all times within the flow of, and substantially affected and continues to affect, interstate trade and commerce in the United States. All Major Junior Leagues and their Clubs recruit, source, and draft talent across the United States, and in doing so, operate feeder camps and training facilities in the United States. Major Junior Defendants have multiple teams in various U.S. states, and most Major Junior Clubs travel to those states to play games. Many major junior hockey games are broadcast in the United States on TV, radio, and/or the Internet pursuant to contracts entered into by Major Junior Defendants. The names, images and likenesses of Major Junior Players also have been commercially exploited, licensed, and marketed without compensation to those Players by merchandisers and other companies, whose products are bought and sold across the United States.

211.     During the Class Period, Major Junior Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## THE RELEVANT MARKET

212.     To the extent that Plaintiffs are required to plead a relevant market to support their claims, Plaintiffs allege as follows:

213.    The anticompetitive agreements described herein restrain and inflict harm on the market for the provision of hockey services by players aged 16-20 to developmental leagues that train players to play in the NHL and other major professional hockey leagues (the "**Relevant Market**").  In this labor market, Major Junior Players seek to secure places on Major Junior Clubs' rosters because Major Junior Leagues are the leading developmental leagues that prepare players to play in the NHL.  The Major Junior Clubs should and would compete in this market to recruit and source elite-level hockey players, but for Defendants' anticompetitive agreements.

214.    The relevant geographic market is North America.  Major Junior Clubs are located, play games on the ice, and compete in the Relevant Market, both in the United States and Canada. Major Junior Clubs recruit, draft, and sign Players who reside throughout the United States and Canada.  Defendants also readily admit that Major Junior Leagues operate "*on either side of the common border.*"

215.    The Relevant Market is thus a single, integrated market that exists on both sides of the 49th parallel.  Defendants' own businesses and conduct prove this point.  For example, NHL and CHL clubs are located on both sides of the border.  Defendants' market allocation agreement created three exclusive territories, each of which consists of states and provinces on either side of the border.  These exclusive territories are not segmented by country but divide North America north to south and collectively include all U.S. states and all Canadian provinces.  Within these exclusive North American territories, each Major Junior League conducts a single entry draft where North American hockey players are selected regardless of nationality.  Once drafted, these Players are anticompetitively restrained from negotiating with any other Major Junior Club in North America, regardless of where that Club is located.  Players who sign a SPA are coerced into agreeing to anticompetitive and artificially suppressed compensation terms that apply regardless

of whether the Player is providing his hockey services in the United States or Canada. Indeed, Players are paid the same amount, regardless of where those games were located, how long they spent on road trips or practicing for those games, or where such trips and practices occurred. Players who are drafted by an NHL club, but do not make the club's opening day roster, must be assigned or returned back to their former Major Junior Club regardless of where the NHL club is located or where the Major Junior Club is located.

216.    As a result of Defendants' anticompetitive practices, as detailed herein, Major Junior Defendants exercise control over the price paid in the Relevant Market for the labor and licensing rights of Major Junior Players, and have set that price at a pittance and zero, respectively. Defendants' anticompetitive agreements—which are enshrined in Major Junior Defendants' SPAs, rules, regulations, and directives—which are strictly enforced—have virtually eliminated competition among Major Junior Defendants to recruit, draft, and sign players, and have decreased the compensation of Major Junior Players far below what they would have been paid in an unrestrained and competitive market.

217.    Thus, Defendants have exercised monopsony power in the Relevant Market to control the price paid to Major Junior Players and have excluded all competition for the services of those Players by limiting the number of Major Junior Clubs that will ever offer a SPA to that Player to exactly one. Once that Player is drafted and signs an SPA, Defendants have exercised monopsony power to exclude all competition for that Player's hockey services for the entirety of the Player's major junior career.

218.    For Major Junior Players, there are no reasonably interchangeable substitutes for major junior hockey. Defendant Mackenzie describes the Major Junior Leagues as "*the world's most competitive development leagues for players between the ages of 16-20.*" The Major Junior

Leagues, as Defendants readily admit, provide a unique combination of a professional-length schedule with playoffs, on-ice games that they have agreed to be conducted pursuant to the NHL's rules of play, elite-level training, television exposure, and exposure to talent scouts who work for the NHL and other major professional leagues.

219.    Moreover, by drafting Players at age 14 or 15, Major Junior Defendants ensure that there is no competition from other leagues that develop talent for the NHL. Players under age 18 are not eligible to play in the AHL or ECHL, and NCAA rules not only prohibit their members from making offers to players at age 14 or 15, but few (if any) hockey players skate for NCAA teams before turning 18.

220.    The years between ages 16 and 20, when players mature physically and emotionally, are critical to the development of major professional hockey talent. Major Junior Players are the leading source of hockey players for the NHL. In the last NHL draft, 11 of the 32 players drafted in the first round, including the number one pick overall, were Major Junior Players. Overall, 80 of the 224 players drafted by the NHL were Major Junior Players, dwarfing any of the other many domestic and global leagues whose players were drafted in the 2023 draft.

221.    Other self-described "developmental leagues" are not substitutes for the Major Junior Leagues and, as a result, those leagues do not constrain Defendants' ability to artificially reduce compensation below competitive levels. For example, although the AHL and ECHL describe themselves as "development leagues," their age rules limit eligibility to players who are at least 18 years of age, meaning they cannot compete for players who are drafted into the Major Junior Leagues at age 14 or 15. And, as noted, the AHL and ECHL have agreed not to compete for North American players under the age of 20, and thus, only European players under age 20 can play in those leagues. As a result, the AHL and ECHL do not compete for talent when the players

are entering the critical development period for hockey talent and become eligible for the Major Junior Leagues' drafts.

222.    The USHL, which operates only within the United States, also is limited to hockey players aged 16-20.  But the USHL does not compete with the Major Junior Leagues in terms of its ability to develop and train players for the NHL.  Indeed, the most obvious distinction between the USHL and the Major Junior Leagues is that while over 90% of USHL players go on to play NCAA hockey, virtually none directly make it to the NHL, whereas Major Junior Players go straight to playing in the NHL and other major professional leagues.  This distinction supports the conclusion that for hockey players seeking a direct path to the NHL and major professional hockey, the USHL is not a viable substitute for the Major Junior Leagues.

223.    Developmental leagues outside of North America similarly are not substitutes for major junior hockey and do not constrain Defendants' ability to artificially reduce compensation and benefits below competitive levels.  The reason for this is obvious:  Most parents are loathe to allow their 15- and 16-year-old children to travel halfway around the world, often to live in a country where they do not speak the language, to play hockey full-time.  Moreover, none of these leagues have a comparable track record of developing NHL talent.

224.    The NCAA also does not compete in the Relevant Market.  When a player turns 15 and is eligible for the Major Junior League drafts, the NCAA is barred from offering a scholarship to that player because he is several years away from being eligible for college.  Moreover, a boy who is considering the NCAA over the Major Junior Leagues must play at levels inferior to major junior hockey at age 16-17 before becoming eligible to play hockey at an NCAA school.  As a result, the NCAA path presents a totally different value proposition (with an emphasis on education) than the more direct path to the NHL offered by Major Junior Defendants.  Major Junior

Hockey also offers a professional-style schedule and demands, as described above, and does so specifically to position itself as the best training ground for an NHL career.  The NCAA, as discussed above, does not offer that type of schedule or routine.

225.    In sum, there is little to no cross-elasticity of demand between the Major Junior Leagues and other developmental leagues for hockey players aged 16-20.  The Major Junior Leagues are the only developmental hockey leagues within North America where hockey players can be paid at ages 16 and 17; where competition conducted is at the highest level and played pursuant to NHL rules; and which provides a unique and time-tested platform for players to showcase their skills for the NHL, which represents the global pinnacle of the sport.  For the vast majority of North American hockey players with aspirations of playing in the NHL, there is simply no substitute for the Major Junior Leagues.

## ANTITRUST INJURY

226.    Individual Plaintiffs and Class Members have suffered cognizable antitrust injury. Major Junior Defendants and their co-conspirators are, or in the absence of the illegal agreements alleged herein would be, horizontal competitors, as Leagues and as Clubs, for the services of North American hockey players aged 16-20.

227.    Defendants have eliminated competition in the Relevant Market.  They have entered into *per se* illegal and anticompetitive agreements, including agreements (i) to allocate geographic markets, (ii) to institute an involuntary draft, (iii) to implement a reserve system that renders Major Junior Players as "property" of the Club that drafts them, and (iv) not to compete and to fix Player compensation for both their services and for the assignment of the right to commercially exploit their names, images, and likenesses.  These agreements have resulted in the compensation of Major Junior Players below competitive levels.

228.    Defendants' illegal agreements have inflicted irreparable harm on Major Junior Players, harm that flows from the anticompetitive agreements detailed throughout this Complaint. Those anticompetitive agreements effectively render Major Junior Players as "property" of the Major Junior Club that drafted them.  Because they are treated as nothing more than "property," a Major Junior Player has no freedom to choose the Club, or League, or community, that is best suited to his talent, or to his particular personality or interests.  As a result, the Player is exposed to, and often subjected to, abuse—be it economic, physical, psychological, or sexual—which he has no ability to fight back against given his lack of freedom and competitive choices.  Players who complain are frequently blacklisted, and their hockey careers will be terminated before they ever gain momentum.  None of this would happen in a competitive market, where Major Junior Players could receive competitive choices and enjoy freedom of movement, likely supported by a labor union dedicated to protecting their interests.

229.    The anticompetitive agreements detailed herein have harmed competition in the Relevant Market in the United States.  They have done so by, among other things, (i) fixing compensation of Players who were drafted from, practice, play, or travel to or within the United States below competitive levels; (ii) fixing the compensation paid to Players for the assignment of the right to commercially exploit their names, images, and likenesses at zero; (iii) degrading the quality of Major Junior Clubs operating in the United States who have agreed not to compete for the best talent available, wherever it may be located; (iv) degrading the quality of the AHL and ECHL, both of which operate entirely in the United States and who have agreed not to compete for the best North American talent to stock their leagues; and (v) harming Players who were drafted from, reside, and/or provide their labor in the United States, who have been deprived of the benefit of unrestrained competition for their services.

230.    Defendants' anticompetitive conduct, as detailed herein, was specifically aimed at the integrated North American market and, specifically, at each of the U.S. states which comprise inseverable parts of that market.  In so targeting North America, U.S. trade constitutes a focal point of Defendants' illegal conduct.  The antitrust injuries suffered by Individual Plaintiffs and Class Members therefore arise from the anticompetitive effects of Defendants' conduct that is felt in the integrated North American market.  These effects, which are felt simultaneously and interdependently on both sides of the border, are so inextricably intertwined that they cannot be segregated by geography.  As a result, Players in Clubs that operate in Canada whose compensation (including for assignment of NIL rights) has been artificially depressed due to the conspiracies detailed herein have suffered antitrust injury that arises from and is inextricably intertwined with harm to competition in the Relevant Market in the United States.

231.    While the harms from Defendants' illegal agreements to artificially reduce compensation can be remedied through monetary damages, Defendants' illegal agreements regarding market allocation, the involuntary draft, and the reserve system, individually and collectively, inflict irreparable injury on Individual Plaintiffs and Class Members.  For example, it is undisputed that different Major Junior Clubs offer different experiences to their Players.  As the President of the CHL stated in his recent affidavit, "*each Team is its own entity, playing its own game with its own culture and training. . . . A player playing on one Team in a League may have a different experience than a player playing at the same time on another Team . . . .*"  Yet Defendants' illegal agreements prevent Players from choosing to play for Clubs that best match their personal needs.  Distance from family, struggles with mental health, greater attention to Players' physical well-being, or better athletic opportunities are just a few of the many variables that would otherwise determine where Players would choose to play major junior hockey, if only

they had any say in the matter. But Players have no say, and have no choice, because of Defendants' illegal restraints.

232.    Defendants boast that playing in the Major Junior Leagues comes with substantial opportunities for personal, professional, and economic growth. But such opportunities are a pipe dream for the vast majority of Major Junior Players because of Defendants' conduct. Defendants' illegal agreements regarding market allocation, the involuntary draft, and reserve system deny Players the agency to determine for themselves where they can best showcase their athletic skills in front of national audiences and professional scouts. This lack of freedom negatively impacts Players' athletic development and mental health at a particularly fraught moment for most adolescents. These illegal agreements also can negatively impact Players' playing time, which can, in turn, negatively impact Players' future earning potential in the NHL or another professional league. Such harm is irreparable, which cannot be compensated through monetary damages alone.

## CLASS ACTION ALLEGATIONS

233.    Individual Plaintiffs bring this Action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. Specifically, Individual Plaintiffs pursue this action on behalf of the following proposed class:

> All Major Junior Players who play or played major junior hockey for a Major Junior Club at any time between February 14, 2020 and the date of judgment in this matter.

234.    This Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are several thousand Class Members.

235.    Individual Plaintiffs' claims are typical of the claims of other Class Members. Individual Plaintiffs and other Class Members in the proposed classes were injured by the restraints on competition and sustained damages arising out of Defendants' conspiratorial conduct as detailed herein.   Specifically, Individual Plaintiffs' claims are typical of the Classes they seek to represent because the restrictions collusively imposed on Major Junior Players have injured both Individual Plaintiffs and all members of the Class.   The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

236.    Individual Plaintiffs will fairly and adequately protect the interests of the members of the Class because their claims are typical of those respective Class Members overall and there are no conflicts between their interests and those of the Class.   In addition, Individual Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust and labor law class action litigation.

237.    Common questions of law and fact exist as to all Class Members which predominate over any questions affecting solely individual members of the Class.   The questions of law and fact common to each Class Member include:

   a.   Whether Defendants engaged in a *per se* unlawful contract, combination, or conspiracy to restrain trade, or alternatively, to unreasonably restrain trade by standardizing the compensation Major Junior Players receive for their services and by artificially reducing the compensation of Major Junior Players below competitive levels;

   b.   Whether Defendants engaged in a *per se* unlawful contract, combination, or conspiracy to restrain trade, or alternatively, to unreasonably restrain trade by allocating territories with respect to the recruitment and drafting of prospective Major Junior Players;

   c.   Whether Defendants engaged in a *per se* unlawful contract, combination, or conspiracy to restrain trade, or alternatively, to unreasonably restrain trade by operating entry drafts that eliminate the ability of Major Junior Players to negotiate their terms of employment with more than one Major Junior Club;

d. Whether Defendants engaged in a *per se* unlawful contract, combination, or conspiracy to restrain trade, or alternatively, to unreasonably restrain trade by agreeing that Major Junior Clubs have exclusive rights to employ Major Junior Players drafted by or otherwise appearing on the protected Player lists of each Club;

e. Whether Defendants engaged in a *per se* unlawful contract, combination, or conspiracy to restrain trade, or alternatively, to unreasonably restrain trade by agreeing that Major Junior Clubs have exclusive rights to control and license the names, images, and likenesses of Major Junior Players that play in the Major Junior Leagues and fix the compensation Major Junior Players receive for assigning the right to commercially exploit their NILs at zero;

f. Whether Defendants' conduct caused Class Members to receive artificially reduced compensation for their hockey services below the competitive level;

g. Whether Defendants' conduct caused Class Members to receive artificially reduced compensation for assigning the right to commercially exploit their names, images, and likenesses than they would have received in a truly competitive market; and

h. Whether the Class was injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages.

238. Defendants have acted in a manner applicable to the entire Class, thereby making final injunctive relief appropriate for the Class as a whole.

239. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The prosecution of separate actions by individual Class Members would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

240. All Class Members were injured by Defendants' unlawful conduct, as described herein.

241.    The interest of Class Members in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class Members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

### Violation of § 1 of the Sherman Act, 15 U.S.C. § 1
### (Individual Plaintiffs and Class Against All Defendants)

242.    Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

243.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, Defendants, along with their co-conspirators, entered into a continuing contract, combination, and conspiracy, which consisted of a continuing horizontal agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to allocate geographic markets, conduct involuntary drafts of Players, impose a *de facto* reserve system that bound Major Junior Players to their Major Junior Clubs for the entirety of their major junior careers, and artificially fix, depress, maintain, and/or stabilize the compensation and benefits received by Individual Plaintiffs and Class Members for their hockey services, including the forced and uncompensated assignment of the right to commercially exploit, and actual licensing, merchandising, and other commercial exploitation, of Players' names, images, and/or likenesses in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

244.    In formulating and effectuating the contract, combination, or conspiracy, Major Junior Defendants and their co-conspirators conspired to eliminate all or substantially all economic

competition to sign North American hockey players aged 16-20 in the Relevant Market.  To that

end, Major Junior Defendants:

a.  Agreed to the following geographic market allocation among the three independent Major Junior Leagues:

   i.  OHL: Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin, as well as the Canadian Province of Ontario (the "**OHL Exclusive Territories**");

   ii.  WHL: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming, as well as the Canadian Provinces of British Columbia, Alberta, Saskatchewan, and Manitoba (the "**WHL Exclusive Territories**"); and

   iii.  QMJHL: Maine, Vermont, New Hampshire, Massachusetts, Connecticut, and Rhode Island, as well as the Canadian Provinces of Québec, New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland and Labrador (the "**QMJHL Exclusive Territories**");

b.  Agreed to source North American hockey players only from their respective Exclusive Territories and to refrain from competing to sign Players from Exclusive Territories allocated to another Major Junior League (the allegations in subparts a and b of this paragraph constituting the "**Market Allocation Agreement**");

c.  Each Major Junior Defendant and each Major Junior Club took acts in furtherance of this Market Allocation Agreement, including but not limited to refraining from competing to sign Individual Plaintiffs and Class Members from any Exclusive Territory not allocated to their League and enforcing the Market Allocation Agreement through the threat and/or use of fines and other sanctions and penalties;

d.  Agreed to source North American hockey players exclusively through a draft of North American hockey players (the "**Involuntary Draft Agreement**");

e.  Took acts in furtherance of the Involuntary Draft Agreement by, among other things, implementing such drafts, participating in such drafts, drafting and signing Individual Plaintiffs and Class Members, and enforcing the Involuntary Draft Agreement through the threat and/or use of fines and other sanctions and penalties;

f.  Agreed to include in every Major Junior Player's SPA terms that bound such Players to their respective Major Junior Clubs for the entirety of their major junior careers, as well as to League rules that provide that Clubs may continue to control the rights of Players included on their "protected" lists (the "**Reserve System Agreement**");

g. Took acts in furtherance of the Reserve System Agreement by, among other things, implementing language to reflect the specific terms of the Reserve System Agreement for use in the SPAs of each Major Junior League, incorporating such terms into the SPAs for each League, requiring the Individual Plaintiffs and Class Members to sign SPAs containing such terms, and enforcing the Reserve System Agreement through the threat and/or use of fines and other sanctions and penalties;

h. Agreed not to compete at the Major Junior Club level for Major Junior Players once they have been drafted and placed on a protected list by a Major Junior Club, even if a Player was never signed or had their SPA terminated by his drafting Club (the "**Non-Competition Agreement**"); and

i. Took acts in furtherance of the Non-Competition Agreement by, among other things, declining and refusing to compete for the hockey services offered by Individual Plaintiffs and Class Members, and monitoring and enforcing the Non-Competition Agreement through the threat and/or use of fines and other sanctions and penalties.

245. As a direct and immediate consequence of Major Junior Defendants' conspiracy to eliminate all or substantially all economic competition among them in the Relevant Market, Major Junior Defendants enjoyed sufficient monopsony power to control the compensation and benefits paid to Major Junior Players. Major Junior Defendants exploited their monopsony power by:

a. Agreeing to, as set forth in the rules for each Major Junior League and/or in the SPA for each Major Junior League, artificially fix, depress, maintain, and/or stabilize the compensation and other benefits paid to Individual Plaintiffs and Class Members for their hockey services (the "**Wage-Fixing Agreement**");

b. Taking acts in furtherance of the Wage Fixing Agreement by, among other things, agreeing to implement and/or implementing provisions limiting Player compensation and benefits to fixed maximums in their League rules and SPAs, requiring the Individual Plaintiffs and Class Members to sign SPAs containing terms that reflected the terms of the Wage Fixing Agreement, restricting all payments and other compensation paid to Individual Plaintiffs and Class Members to such payments and other compensation set forth in such League rules and SPAs, and monitoring and enforcing the Wage Fixing Agreement through the threat and/or use of fines and other sanctions and penalties.

c. Agreeing to artificially fix, depress, maintain, and/or stabilize the compensation received by Individual Plaintiffs and Class Members for assigning the right to exploit their names, images, and likenesses through licensing or other merchandising activities at zero dollars (the "**NIL Agreement**"); and

d. Taking acts in furtherance of the NIL Agreement by, among other things, forcing Individual Plaintiffs and Class Members to surrender all of their rights to their names,

images, and likenesses to Major Junior Defendants in exchange for no compensation through the inclusion of terms to this effect in their SPAs, which were at all times non-negotiable, and monitoring and enforcing the NIL Agreement through the threat and/or use of fines and other sanctions and penalties.

246.    Defendant NHL facilitated and joined this conspiracy by, among other things, agreeing in the NHL-CHL Agreement to (a) make its annual "funding" payments to Major Junior Defendants contingent on Major Junior Defendants maintaining the rules and practices that underpin the conspiracy; and (b) abide by the terms of the 20-Year-Old Agreement by preventing AHL and ECHL clubs from competing to sign 18- and 19-year-old players subject to the NHL-CHL Agreement.

247.    As a consequence of their collective bargaining agreements, AHL and ECHL players earn substantially greater compensation than do Major Junior Players.

248.    As a consequence of Defendant NHL's agreement with the Major Junior Leagues to refuse to allow AHL and ECHL clubs to sign 18- or 19-year-old players subject to the NHL-CHL Agreement, the quality of competition in the AHL and ECHL has been degraded and Major Junior Players have been barred from earning the significantly higher wages paid by AHL and ECHL clubs.

249.    The activities described above have been engaged in by Defendants and their co-conspirators, for the purpose of effectuating the unlawful agreements set forth above.  Defendants' activities have had the intended result of fixing, depressing, maintaining, and/or stabilizing the compensation and benefits paid to Individual Plaintiffs and Class Members for their hockey services and the exploitation of their names, images, and likenesses.

250.    Defendants' contract, combination, or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants that Individual Plaintiffs and Class Members have been, and are, restrained and prevented from negotiating for competitive

wages, compensation, or other competitive benefits packages from Major Junior Clubs or other professional league hockey clubs at any time prior to the time they turn 20 years of age.

251.    At no time were Individual Plaintiffs and Class Members represented in their dealings with Major Junior Defendants by a labor union, players' association, or other collective bargaining entity.

252.    Defendants collectively agreed not to compete through the involuntary draft of players under the age of 16 and by fixing the terms of Individual Plaintiffs' and Class Members' employment, including by fixing the compensation and benefits paid to Individual Plaintiffs and Class Members, despite not being authorized to collectively bargain with Players.

253.    Defendants collectively agreed to require Individual Plaintiffs and Class Members, as a condition of their employment, to assign all rights to the exploitation of their names, images, and likenesses to their Major Junior Club, despite not being authorized to collectively bargain with Players.

254.    Defendants have collectively conspired to illegally limit and depress the compensation of Individual Plaintiffs and Class Members for their continued use and exploitation of their names, images, and/or likenesses to zero.  This anticompetitive and illegal scheme has unreasonably restrained trade.

255.    As a direct and proximate result of Defendants' actions, Individual Plaintiffs and Class Members have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

256.    Defendants' Market Allocation Agreement, Involuntary Draft Agreement, Reserve System Agreement, Non-Competition Agreement, Wage Fixing Agreement, and NIL Agreement, individually and collectively, constitute unreasonable restraints on competition, which were agreed

to by independent leagues, and which on their face would always or almost always tend to restrict competition and decrease output, are plainly anticompetitive, and obviously lack any redeeming procompetitive virtues. Accordingly, these agreements, separately and collectively, are *per se* violations of Section 1 of the Sherman Act.

257.    Alternatively, Defendants' Market Allocation Agreement, Involuntary Draft Agreement, Reserve System Agreement, Non-Competition Agreement, Wage Fixing Agreement, and NIL Agreement each individually and collectively also are naked restraints on competition in the Relevant Market that cannot be justified on procompetitive grounds and which, therefore, are violations of Section 1 of the Sherman Act under an abbreviated rule of reason analysis, *i.e.*, the "quick look" test.

258.    Defendants' Market Allocation Agreement, Involuntary Draft Agreement, Reserve System Agreement, Non-Competition Agreement, Wage Fixing Agreement, and NIL Agreement each individually and collectively have had significant anticompetitive effects in the Relevant Market, resulting in antitrust injury to Individual Plaintiffs and Class Members, as alleged herein. This antitrust injury has included reduced output and lowered the quality of games, harming consumers as well.

259.    Defendants' Market Allocation Agreement, Involuntary Draft Agreement, Reserve System Agreement, Non-Competition Agreement, Wage Fixing Agreement, and NIL Agreement each individually and collectively serve no procompetitive purpose in the Relevant Market. Reasonable, less restrictive alternatives also would exist to achieve any plausible procompetitive purpose of each of these various agreements. As a result, the participation of Defendants in these agreements, separately or collectively, are, in the alternative, violations of Section 1 of the Sherman Act under a full rule of reason analysis.

260.    Individual Plaintiffs and Class Members are direct participants in the Relevant Market and are the intended targets of Defendants' Market Allocation Agreement, Involuntary Draft Agreement, Reserve System Agreement, Non-Competition Agreement, Wage Fixing Agreement, and NIL Agreement.

261.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, including in the form of lower compensation (including for assigning the right to exploit Players' names, images, and likenesses in licensing or other merchandising activities) and other benefits, including inferior and often illusory educational packages, that were paid to Individual Plaintiffs and Class Members than they would have received absent Defendants' antitrust violations, as set forth above.

262.    The amount of damages suffered by Individual Plaintiffs and Class Members has not yet been ascertained.  Pursuant to Section 4 of the Clayton Act, Individual Plaintiffs are entitled to recover from Defendants, jointly and severally, treble the amount of their actual damages as well as an award of reasonable attorneys' fees and costs of suit.

263.    Individual Plaintiffs and Class Members are entitled to a permanent injunction pursuant to Section 16 of the Clayton Act that enjoins Defendants from engaging in the ongoing violations described in this Complaint.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief, 28 U.S.C. § 2201
### (WAIPU Plaintiffs Against Major Junior Defendants)

264.    Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

265.     A defined and concrete controversy of a justiciable nature exists between WAIPU Plaintiffs, in their representative capacity, and Major Junior Defendants, concerning the legality of the involuntary entry drafts conducted and administered by Major Junior Defendants.

266.     Each year, Major Junior Defendants draft more than 1,000 Players between the ages of 15 and 16.  Each Major Junior League conducts and administers its own involuntary entry draft. By agreement among Major Junior Defendants, all North American hockey players who will turn 16 during their first major junior season are eligible to be drafted, whether the player agrees to submit to the draft or not.  Also, by agreement of Major Junior Defendants, Clubs are restricted to drafting only those players who reside within the exclusive territories allocated to their respective Leagues.

267.     Following the draft, each Major Junior Club has the exclusive right to sign each of their drafted Players for the entirety of those Players' eligibility to play major junior hockey.  No Player may negotiate or contract with any Club other than the Major Junior Club that drafted him.

268.     Once drafted, Players will be presented with the collusively standardized SPA. Pursuant to agreements among Major Junior Defendants, Players are unable to negotiate any of the material terms of the SPA, including compensation and the obligation to surrender all rights to the Player's name, image, and likeness, the term of the agreement, and termination rights.

269.     At no time were Individual Plaintiffs and Class Members represented in their dealings with Major Junior Defendants by a labor union, players' association, or other collective bargaining entity concerning the involuntary entry drafts (or any of the other restraints of trade detailed herein).

270.    Major Junior Defendants administer involuntary and binding drafts that allocate Players and restrict competition on compensation and benefits, among other things, despite the lack of any authorization of those drafts by a CBA.

271.    Among the various members of WAIPU Plaintiffs are Players who will become eligible for the various major junior drafts in future years.  If drafted, these WAIPU members will be unable to choose the Major Junior Club they play for and will be unable to competitively negotiate the terms of their employment.

272.    If a Player refuses to sign a SPA, he will face threats of retaliation and blacklisting that would effectively end the Player's dream of playing in the NHL.

273.    As a direct and proximate result of Major Junior Defendants' unlawful conduct, WAIPU Plaintiffs' members will be irreparably injured in their property and businesses.

274.    WAIPU Plaintiffs' mission is to protect the rights of their members as set forth in the Universal Declaration of Player Rights (https://uniglobalunion.org/wp-content/uploads/official_udpr.pdf).  Among other things, the Universal Declaration provides that sports leagues must (a) protect the rights of the child (Article 4); (b) respect the right of every player to organize and collectively bargain (Article 6); (c) take all necessary actions to ensure that every player shares in the economic activity and wealth that he has helped generate for his sport (Article 7); and (d) refrain from commercially exploiting a player's name, image, or likeness absent the voluntary consent of the player (Article 12).

275.    Participation of each of WAIPU Plaintiffs' affected members is not necessary in order to prosecute this claim.

276.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, WAIPU Plaintiffs ask that this Court should declare that (1) all involuntary drafts conducted by Major Junior Defendants

constitute *per se* violations of the antitrust laws; (2) rights claimed by a Major Junior Club based on the results of an involuntary entry draft are unenforceable; and (3) Major Junior Leagues and Major Junior Clubs may not foreclose any other Major Junior League or Major Junior Club from negotiating terms of employment with any drafted and unsigned Player.

### THIRD CLAIM FOR RELIEF

**Equitable and Ancillary Relief, 28 U.S.C. § 2202**
**(WAIPU Plaintiffs Against Major Junior Defendants)**

277.    Plaintiffs incorporate and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

278.    As a direct consequence of Major Junior Defendants' intention to conduct entry drafts for the upcoming seasons, as described above, WAIPU Plaintiffs' members who are eligible for such future drafts will have no ability to choose which Major Junior Club they play for, where they will play, and with whom they will live.  Accordingly, these WAIPU members will be deprived of the benefits of competition, and they will suffer irreparable harm and, accordingly, are entitled to equitable and ancillary relief, including permanent injunctive relief.

279.    Permanent injunctive relief is justified because WAIPU Plaintiffs' members who are eligible for upcoming drafts have no adequate or complete remedy at law to redress the wrongs identified in the preceding paragraph other than through injunctive relief.

280.    Pursuant to 28 U.S.C. § 2202, this Court should grant WAIPU Plaintiffs permanent injunctive relief enjoining Major Junior Defendants and their agents, servants, employees, and all other persons acting on their behalf, under their authority, or in concert with them, from conducting any future entry drafts as described herein and/or from enforcing rights supposedly obtained by virtue of participating in an entry draft at any time in the future.

## PRAYER FOR RELIEF

WHEREFORE, WAIPU Plaintiffs and Individual Plaintiffs, on behalf of themselves and all Class Members, pray for judgment against Defendants as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

B. That the Court designate Individual Plaintiffs herein as class representatives of the Class, and designate their undersigned counsel of record as Class Counsel;

C. That the contract, combination, or conspiracy alleged herein, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

D. That judgment be entered for Individual Plaintiffs and Class Members against Defendants for three times the amount of damages sustained by Individual Plaintiffs and the Class as allowed by law, together with the costs and expenses of this action, including reasonable attorneys' fees;

E. That Defendants be ordered to disgorge all profits earned as a consequence of the unlawful acts described herein;

F. That Individual Plaintiffs and Class Members be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

G. That Individual Plaintiffs and Class Members are entitled to Declaratory relief declaring void and unenforceable (i) the Market Allocation Agreement, (ii) the Involuntary Draft Agreement, (iii) the Reserve System Agreement, (iv) the Non-Competition Agreement, (v) the Wage Fixing Agreement, (vi) the NIL Agreement, as well as any releases or contractual terms that purport to have caused Individual Plaintiffs and Class Members to relinquish rights to compensation for the exploitation and use of their names, images, and/or likenesses, and (vii) the terms of the NHL-CHL Agreement that reinforce the foregoing, as well as the agreement not to compete for their services.

H. That Defendants, their affiliates, successors, transferees and assignees, and the officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contracts, combinations, or conspiracies alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

I. That WAIPU Plaintiffs, in their representational capacity, are entitled to Declaratory relief declaring void and unenforceable the various entry drafts held by the WHL, OHL, QMJHL, or CHL; and

J.  That Plaintiffs and Class Members have such other and further relief, as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all other similarly situated, hereby request a jury trial on any and all claims and issues so triable.

Dated: February 14, 2024

By:    /s/ *Jeffrey I. Shinder*
Jeffrey I. Shinder
Ethan E. Litwin
CONSTANTINE CANNON LLP
6 E 43rd Street, 26th Fl.
New York, NY 10017
Tel: (212) 350-2700
jshinder@constantinecannon.com
elitwin@constantinecannon.com

J. Wyatt Fore (*pro hac vice*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300N
Washington, DC 20004
Tel: (202) 204-3500
wfore@constantinecannon.com

Judith A. Zahid (*pro hac vice*)
Sarah Van Culin (*pro hac vice*)
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
jzahid@zellelaw.com
svanculin@zellelaw.com

James R. Martin (*pro hac vice*)
ZELLE LLP
1774 Pennsylvania Avenue, NW, Suite 375
Washington, DC 20006
Tel: (202) 899-4101
jmartin@zellelaw.com

Stacey Leyton (*pro hac vice*)
Michael Rubin (*pro hac vice*)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altber.com
mrubin@altber.com

Gregory S. Asciolla
Noah L. Cozad (*pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel: (646) 933-1000
gasciolla@dicellolevitt.com
ncozad@dicellolevitt.com

Steve D. Shadowen (*pro hac vice*)
Richard Brunell (*pro hac vice*)
HILLIARD SHADOWEN LLP
1135 6th Street, Suite 125
Austin, TX 78703
Tel: (717) 903-1177
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com

Paul Slater (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Trevor K. Scheetz (*pro hac vice*)
Matthew Slater (*pro hac vice*)
SPERLING & SLATER, LLC
55 West Monroe, Suite 3200
Chicago, IL 60603
Tel: (872) 212-3320
pes@sperling-law.com
jvanek@sperling-law.com
tscheetz@sperling-law.com
mslater@sperling-law.com