UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/26/2024__

| | |
|---|---|
| WORLD ASSOCIATION OF ICEHOCKEY PLAYERS UNIONS NORTH AMERICA DIVISION et al., | |
| Plaintiffs, | |
| -against- | |
| NATIONAL HOCKEY LEAGUE et al., | |
| Defendants. | |

24-CV-01066 (MMG)

**<u>OPINION & ORDER</u>**

MARGARET M. GARNETT, United States District Judge:

This case concerns purported violations of antitrust law by so-called "major junior" hockey leagues and clubs that operate primarily in Canada and a handful of U.S. states. The alleged antitrust violations arise out of purported agreements among the leagues and clubs to, among other things, allocate exclusive geographic territories within North America for young hockey players, refrain from recruiting players outside of each league's designated territories, conduct an involuntary draft that restricts players' access to other clubs and leagues, and otherwise control and restrict the market for the hockey talent of young players. Plaintiffs are two individual hockey players from outside of New York who played major junior hockey in Washington, Oregon, and Canada, as well as two associations whose members include unidentified current and prospective major junior hockey players.

Pending before the Court is a motion by the CHL Defendants to dismiss the First Amended Complaint under Rule 12(b)(2) of the Federal Rules of Civil Procedure. For the reasons explained below, Plaintiffs have failed to show personal jurisdiction in this Court over

1

the CHL Defendants, which primarily operate in Canada or in states other than New York.  As such, the CHL Defendants' motion to dismiss is **GRANTED**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs World Association of Icehockey Players Unions North America Division and World Association of Icehockey Players Unions USA Corporation (collectively, the "WAIPU Plaintiffs"), on behalf of their members, and Plaintiffs Tanner Gould and Isaiah DiLaura, on behalf of themselves and a class of others similarly situated (collectively, "Plaintiffs"), brought an action against (1) the National Hockey League ("NHL"), and (2) the Canadian Hockey League ("CHL"); three leagues (the "Major Junior Leagues") within the CHL (consisting of the Western Hockey League ("WHL"), the Ontario Major Junior Hockey League ("OHL"), and the Québec Major Junior Hockey League (also known as the Québec Maritimes Junior Hockey League) ("QMJHL")); the 60 member clubs within the three Major Junior Leagues (the "Major Junior Clubs");[1] and CHL President Dan MacKenzie (collectively, the "CHL Defendants") for violations of the Sherman Antitrust Act.

---

[1] The Major Junior Clubs within the WHL include: Goldrush Sports Corp.; Calgary Flames Limited Partnership; Edmonton Major Junior Hockey Corporation; EHT, Inc.; Kamloops Blazers Hockey Club, Inc.; Kelowna Rockets Hockey Enterprises Ltd.; Shoot the Puck Foundation Inc.; Lethbridge Hurricanes Hockey Club; Medicine Hat Tigers Hockey Club Ltd.; Moose Jaw Warriors Tier 1 Hockey Inc.; Winterhawks Hockey LLC; Prince Albert Raiders Hockey Club Ltd.; EDGEPRo Sports & Entertainment Ltd.; Rebels Sports Ltd.; Queen City Sports & Entertainment Group Ltd.; Saskatoon Blades Hockey Club Ltd., Thunderbird Hockey Enterprises, LLC; Hat Trick, Inc.; Swift Current Bronco Hockey Club Inc.; Top Shelf Entertainment, Inc.; Vancouver Junior Hockey Limited Partnership; and Westcoast Hockey LLP (named in the First Amended Complaint as West Coast Hockey LLP).  The clubs within the OHL include: Windsor Spitfires, Inc.; London Knights Hockey, Inc.; Barrie Colts Junior Hockey Ltd.; Bulldog Hockey Inc.; JAW Hockey Enterprises LP; Guelph Storm Hockey Club Ltd.; Kingston Frontenacs Hockey Club Ltd.; Mississauga Steelheads Hockey Club Inc.; Niagara IceDogs Hockey Club Inc.; North Bay Battalion Hockey Club Ltd.; Generals Hockey, Inc.; Ottawa 67's Limited Partnership; Owen Sound Attack Inc.; Peterborough Petes Ltd.; IMS Hockey Corp, Saginaw Hockey Club L.L.C.; 211 SSHC Canada ULC; Soo Greyhounds Inc.; Kitchener Rangers Jr. A. Hockey Club; and Sudbury Wolves Hockey Club Ltd. And the clubs within the QMJHL include: Le Titan Acadie Bathurst (2013) Inc./The Acadie Bathurst Titan (2013) Inc.; Hockey Junior Baie-Comeau Inc.; Le Club de Hockey Drummond Inc.; Cape Breton Major Junior Hockey Club Limited; Les Olympiques de Gatineau Inc.; Halifax Mooseheads Hockey Club Inc.; Club de Hockey Les Remparts de Québec (named in the First Amended Complaint as

On June 21, 2024, the CHL Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) and a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).[2]  With respect to the motion pursuant to Rule 12(b)(2), the parties have engaged in jurisdictional discovery.

## I.    Alleged Conspiracy Among the CHL Defendants

The WAIPU Plaintiffs are "labor organizations that represent the interests of current and prospective North American major junior hockey players."  First Amended Complaint, Dkt. No. 149 ("FAC") ¶ 33.  They allege that they have members who are currently major junior hockey players in the WHL, OHL, and QMJHL, including American and non-American members, as well as "hockey players from the United States and Canada who face the imminent prospect of being involuntarily drafted into one of the Major Junior Leagues."  *Id.*  The WAIPU Plaintiffs have not identified any of their members.

Gould is a Canadian citizen who was born and raised in Calgary, Canada.  *Id.* ¶ 34.  He was drafted at age 15 by the Tri-City Americans (a hockey team in the WHL located in Kennewick, Washington) and subsequently traded to the Prince Albert Raiders (another WHL team located in Saskatchewan, Canada).  *Id.*  DiLaura is an American citizen who was born and raised in Lakeville, Minnesota.  *Id.* ¶ 35.  He was first recruited at age 13 by scouts for certain

---

Club de Hockey Les Remparts de Québec (2014) Inc.); Le Club de Hockey Junior Armada Inc.; Moncton Wildcats Hockey Club Limited; Le Club de Hockey L'Océanic de Rimouski Inc.; Les Huskies de Rouyn-Noranda Inc.; 8515182 Canada Inc.; Les Tigres de Victoriaville (1991) Inc.; Saint John Major Junior Hockey Club Limited; Club de Hockey Shawinigan Inc.; Les Foreurs de Val-d'Or (2012) Inc.; Les Saguenéens Junior Mageur de Chicoutimi; and 7759983 Canada Inc. Club de Hockey-(Le Phoenix de Sherbrooke) (named in the First Amended Complaint as 7759983 Canada Inc.).

[2] Plaintiffs amended the Complaint on July 17, 2024.  *See* Dkt. No. 149.  The First Amended Complaint did not substantively alter the allegations.  The CHL Defendants subsequently filed a letter on July 19, 2024, affirming their intent to rely on their previously filed motions to dismiss.  *See* Dkt. No. 151.

The NHL has also filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).  This Opinion does not address the NHL's motion; it resolves only the CHL Defendants' motions.

WHL clubs, was drafted at age 15 by and signed with the Prince George Cougars (a WHL team located in British Columbia, Canada), and was subsequently traded to the Portland Winterhawks (a WHL team in Portland, Oregon) and then to the Swift Current Broncos (a WHL team in Saskatchewan, Canada).  *Id.*[3]

The CHL is an incorporated, not-for-profit organization that is organized under the laws of Canada and has a principal place of business in Canada.  *Id.* ¶ 37.  Plaintiffs allege that "[d]espite the 'L' in its name, the CHL is not a sports league;" they allege it "exists solely for the benefit of the Major Junior Leagues and to facilitate their collusive conduct."  *Id.* ¶ 109.  The Major Junior Leagues are members of the CHL but are also separate entities that operate independently from the CHL and from one another.  *Id.* ¶¶ 4, 110.  They comprise 60 member Major Junior Clubs; nine of the clubs are located in Washington, Oregon, Michigan, or Pennsylvania, and the remaining 51 clubs are located in Canada.  *Id.* ¶¶ 40–61, 63–82, 84–101, 108.  "The Major Junior Leagues are the primary pathway for prospects to reach hockey's top professional ranks in the NHL," and "[m]ore than half of all current NHL players are former Major Junior Players."  *Id.* ¶ 112.  Plaintiffs allege that within the CHL, the Major Junior Leagues and the Major Junior Clubs each include "horizontal competitors" that would ordinarily "have to compete against each other for Players' services across the entirety of North America by, among other things, offering competitive compensation . . . [and] a humane environment."  *Id.* ¶ 20.  Instead, Plaintiffs allege that the CHL Defendants have agreed to unlawfully restrain competition in several ways.

---

[3] Gould and DiLaura are not asserting claims against their former clubs but are asserting claims against every other Defendant.  *Id.* ¶¶ 34–35.

First, Plaintiffs allege that the CHL, the Major Junior Leagues, and the Major Junior Clubs (collectively, the "Major Junior Defendants") agreed to geographically allocate the North American market, dividing up U.S. states and Canadian provinces into three territories for each Major Junior League. Plaintiffs allege that each of the Major Junior Leagues are "capable of producing hockey games, and a full schedule of games and playoffs, without entering into any agreement with either of the two other Major Junior Leagues." *Id.* ¶ 4. In spite of this, Plaintiffs allege that they "have agreed to allocate the geographic territories in which each of the Major Junior Leagues, and the Major Junior Clubs that participate in those Leagues, recruit and source [p]layers. To this end, the Major Junior Leagues have allocated exclusive, non-overlapping territories among themselves—including New York and every other state—with each League having the exclusive right to recruit and source Players from within their allocated exclusive territories." *Id.* ¶ 7. Specifically, Plaintiffs allege that the OHL clubs are restricted from recruiting and drafting players from outside a set of states that includes New York.[4] *Id.* ¶ 62. Also under the agreement, players from the exclusive states and provinces of one Major Junior League "cannot be recruited by, be drafted by, or otherwise play for" any club in the other two Major Junior Leagues absent permission from that Major Junior League and the CHL. *Id.* ¶ 124. Thus, for instance, the WHL and QMJHL allegedly could not recruit players from New York because the OHL has the exclusive right to recruit players from New York. *Id.* ¶ 122. Plaintiffs

---

[4] Plaintiffs allege that with respect to the United States, the WHL clubs are restricted from recruiting players outside of Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming; that the OHL clubs are restricted from recruiting players outside of Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin; and that the QMJHL clubs are restricted from recruiting players outside of Maine, Massachusetts, Vermont, Rhode Island, New Hampshire, and Connecticut. *Id.* ¶¶ 39, 62, 83.

allege that this market allocation agreement "is memorialized in the rules, directives, and regulations of the CHL and the three Major Junior Leagues." *Id.* ¶ 119.

Second, Plaintiffs allege that the Major Junior Defendants have agreed "to conduct involuntary drafts within their exclusive territories, to draft Players at the same age [*i.e.*, players who will reach age 16 during their first major junior hockey season], and to respect the rights of drafting Clubs across all three Leagues." *Id.* ¶ 8. They allege that the Major Junior Clubs use the annual drafts held by their respective Major Junior Leagues to fill their rosters, and that the drafts are "conducted in accordance with the Leagues' market allocation scheme." *Id.* ¶ 129. They allege that no labor union has ever represented the Major Junior Players, and no collective bargaining agreement ("CBA") has authorized these entry drafts, and as such, the drafts are "ongoing *per se* violations of the antitrust laws." *Id.* ¶ 131.

Third, Plaintiffs allege that Defendants have agreed to restrict the freedom of movement of players in the CHL ("Major Junior Players" or "Players"). Specifically, they allege that the Major Junior Defendants prohibit Players via contractual provisions in their respective Standard Player Agreements ("SPAs") "from providing their hockey services to any club other than the Major Junior Club that drafted the Player until he reaches the age of 20 (with a Club option to extend their contract for one 'overage' year)." *Id.* ¶ 10. They further allege that pursuant to the rules of the Major Junior Leagues, each Major Junior Club maintains a "protected" list—which can include both signed and unsigned Players—and clubs "routinely demand payment [of as much as $500,000] from any club (either within or outside of major junior hockey) that is interested in securing a release for a Player included on the Club's protected list." *Id.* ¶ 11; *see also id.* ¶¶ 138–39, 150. As a result, Plaintiffs allege the "Major Junior Defendants have set up a *de facto* reserve system" for Players who are drafted for their entire major junior careers in which

even Players who have been terminated by a club during the time period of the SPA are still obligated to play hockey exclusively for that club. *Id.* ¶¶ 12, 141.

Fourth, they allege that "Major Junior Clubs are insulated from competition for Players through their territorial allocations, their involuntary drafts, and their rules and contractual provisions that bind Players to their Clubs for a term of five years," *id.* ¶ 13; this lack of competition, in turn, "empowers the Major Junior Clubs to exploit Players," including via agreements "to artificially suppress Player compensation through the standardized terms and payment schedules set forth in the Major Junior Leagues' rules and SPAs," and to "prevent Major Junior Players from receiving any compensation in connection with Defendants' commercial exploitation of Players' names, images, and/or likenesses ("NIL") in merchandise and other products," by including "non-negotiable provisions in each Player's SPA that assign all rights to commercially exploit his [NIL] entirely to Major Junior Defendants." *Id.* ¶¶ 14, 16. As illustrative examples, Plaintiffs allege that Player compensation in the WHL is fixed at $250.00 per month, in the OHL is fixed at $470.00 per month, and in the QMJHL is "similarly fixed at non-competitive levels," and that by comparison, the average salary in the American Hockey League ("AHL") and East Coast Hockey League ("ECHL") is more than $5,000 per month and $2,800 per month, respectively. *Id.* ¶¶ 156–57. Plaintiffs allege that "all Major Junior Players are required to sign SPAs that include these anticompetitive provisions," that "League commissioners review each signed SPA to ensure that the terms are consistent with the Major Junior Defendants' [alleged] illegal agreement," and that "significant fines are imposed on any Major Junior Clubs that deviate from these terms." *Id.* ¶ 18; *see also id.* ¶ 154 ("League fines assessed on clubs have exceeded $200,000."). According to Plaintiffs, "Defendants' cartel

artificially suppresses and standardizes compensation by denying Players their freedom of choice, freedom of movement, and freedom to play for the Club of their choice." *Id.* ¶ 21.

## II.    Alleged Conduct by the NHL

Plaintiffs allege that the NHL is a co-conspirator that joined and facilitated the CHL Defendants' conspiracy.  They allege that through a written agreement with the Major Junior Defendants (the "NHL-CHL Agreement"), the NHL provides funding to the Major Junior Leagues, with annual funding expressly contingent on Major Junior Defendants maintaining many of the rules and policies that Plaintiffs allege comprise the anticompetitive agreements, including that each Major Junior League must have its own exclusive territory, that the Major Junior Defendants must have various rules and practices that serve to bind Players to a particular club for their entire major junior careers, and more.  *Id.* ¶¶ 22–23, 196–98.  Plaintiffs also allege that the NHL agreed that its clubs would pay up to $175,000 to the relevant Major Junior Club for each Major Junior Player selected in the NHL draft, and it agreed that Major Junior Players under the age of 20 who are drafted by an NHL club but do not make the club's opening day roster will be assigned or returned back to the Major Junior League.  *Id.* ¶¶ 200–04.

They further allege that the NHL and its clubs largely own and control the constituent clubs of non-defendants AHL and ECHL, which are developmental hockey leagues that pay their players "substantially more than Major Junior Players;" they allege that the AHL and ECHL (which, unlike the Major Junior Defendants, do not have players under age 18) "have agreed not

to [recruit] Major Junior Players, even further reducing competition for those Players' services."
*Id.* ¶¶ 25, 219, 246–48.[5] [6]

## III.    Claims

Plaintiffs Gould and DiLaura, the individual plaintiffs, seek to represent a putative class
of "[a]ll Major Junior Players who play or played major junior hockey for a Major Junior Club at
any time between February 14, 2020 and the date of judgment in this matter."  *Id.* ¶ 233.

On behalf of themselves and the putative class, Gould and DiLaura claim that the conduct
of both the CHL Defendants in allegedly conspiring to allocate geographic markets, conduct
involuntary Player drafts, impose a *de facto* reserve system upon Players, and artificially depress
and fix the compensation and benefits for players, as well as the conduct of the NHL in allegedly
making its annual funding contingent on the CHL Defendants maintaining many of the rules and
practices alleged and preventing AHL and ECHL clubs from competing to sign 18- and 19-year-
old players that are subject to the NHL-CHL Agreement, violates Section 1 of the Sherman
Antitrust Act, 15 U.S.C. § 1.[7]  *Id.* ¶¶ 242–63.  They seek (1) an injunction enjoining Defendants
and their co-conspirators from:

> (i) enforcing their agreement to allocate geographic markets to source, recruit, and
> draft talent; (ii) enforcing the terms of the SPAs and League rules that create a *de
> facto* reserve system and/or standardize the compensation (including for agreeing
> to assign their NIL rights) that Major Junior Players receive; (iii) otherwise
> restricting Major Junior Players' ability to negotiate with multiple Major Junior

---

[5] Plaintiffs listed in the First Amended Complaint various NHL clubs and AHL and ECHL entities alleged
to be unnamed co-conspirators.  *Id.* ¶¶ 102–04.

[6] A different representative plaintiff brought in Canada a class proceeding under the Canadian
Competition Act against the NHL, CHL, Major Junior Leagues, AHL, ECHL, and Hockey Canada; the
action was dismissed by the Canadian court.  *See Mohr v. National Hockey League*, 2021 FC 488, *aff'd*
2022 FCA 145; *application for leave to appeal dismissed*, SCC File No. 40426.

[7] The Sherman Antitrust Act prohibits "[e]very contract, combination . . . or conspiracy . . . in restraint of
trade or commerce among the several States, or with foreign nations[.]"  15 U.S.C. § 1.

Clubs or clubs in other leagues; and (iv) enforcing the provisions of the NHL-CHL
agreement that cement and codify the core aspects of this anticompetitive scheme.

*Id.* ¶ 31.

They further seek: (2) an injunction against Defendants boycotting or otherwise
retaliating against Major Junior Players; (3) treble damages for the difference between the
compensation paid to Major Junior Players and the compensation they would have received in an
unrestrained market; and (4) treble damages and/or disgorgement of profits and restitution for the
amount that Defendants have been unjustly enriched through the exploitation of Major Junior
Players' NIL.  *Id.*

The WAIPU Plaintiffs seek declaratory relief against only the Major Junior Defendants
for conducting involuntary drafts that allocate Players and restrict competition on their
compensation and benefits.  *Id.* ¶¶ 265–76.  They seek an order from the Court declaring that "all
involuntary drafts conducted by the Major Junior Defendants constitute *per se* violations of the
antitrust laws," that all rights claimed by a Major Junior Club based on an involuntary draft are
unenforceable, and that Major Junior Leagues and Clubs may not foreclose other Major Junior
Leagues and Clubs from negotiating terms of employment with a drafted and unsigned Player.
*Id.* ¶ 276.  They also seek to enjoin the Major Junior Defendants from conducting future
involuntary entry drafts and from enforcing rights obtained by participating in such drafts.  *Id.*
¶¶ 277–80.

The parties are currently briefing Plaintiffs' motion for preliminary injunction against the
Major Junior Defendants in advance of the Major Junior Defendants' 2025 entry drafts.  *See* Dkt.
No. 190.

## LEGAL STANDARDS UNDER RULE 12(B)(2)

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant" on a motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (internal references omitted). The showing plaintiffs must make "'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Before jurisdictional discovery, a plaintiff may defeat a motion under Rule 12(b)(2) "by pleading in good faith legally sufficient allegations of jurisdiction." *Ball*, 902 F.2d at 197 (internal reference omitted).  After jurisdictional discovery, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.*  "At that point, the *prima facie* showing must be factually supported." *Id.*  Where, as here, jurisdictional discovery has been conducted and affidavits have been submitted but the court has not held a "full-blown evidentiary hearing," the court construes the pleadings and affidavits in the light most favorable to the plaintiff and resolves all doubts in the plaintiff's favor.  *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85 (internal references omitted); *see also Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 121 (S.D.N.Y. 2020) ("[T]he court applies a 'standard . . . akin to that on a motion for summary judgment,' construing the 'pleadings documents, and other evidentiary materials . . . in the light most favorable to the plaintiff and all doubts are resolved in its favor.'" (quoting *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 503 (S.D.N.Y. 2004))).  Given the time provided for jurisdictional discovery, "the Court will limit its jurisdictional analysis to the facts presented and must assume that the Plaintiffs have provided all the evidence they possess to support their jurisdictional claims."

*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001).

Plaintiffs must make jurisdictional allegations with "factual specificity"—they "cannot establish jurisdiction through conclusory assertions alone." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 395 (S.D.N.Y. 2021) (internal references omitted). Additionally, "[w]hen personal jurisdiction is predicated on specific jurisdiction, a plaintiff must establish a prima facie case of jurisdiction as to each claim." *Id.* at 396.

The Rule 56 standard guides the court as to the documents it may consider outside the pleadings; the court may only consider admissible evidence. *Astor Chocolate Corp.*, 510 F. Supp. 3d at 121.

## DISCUSSION

The CHL Defendants argue that they are not subject to personal jurisdiction in this District. They argue, *inter alia*, that the CHL Defendants primarily operate in Canada, that no hockey games within or across the Major Junior Leagues are played in New York, that no Major Junior Players are trained in New York, that the Major Junior Defendants do not have physical locations in New York and do not sell tickets to hockey events in New York, and that their broadcasting arrangements focus largely on Canadian audiences. *See* Dkt. No. 133 at 2–6. To the extent they have any conduct that touches upon New York, they assert that contact is incidental and insufficient to establish personal jurisdiction under any theory proffered by Plaintiffs.

For their part, Plaintiffs argue that the CHL Defendants have sufficient connection to New York state or to this District through, for example, their recruiting and scouting activities, the availability of their internet-based merchandise to New York customers, and their

connections to and relationships with the NHL, which is headquartered in New York City. However, the lack of evidence that the claims and injuries of *these plaintiffs* have any connection to the CHL Defendants' contacts with the forum, even assuming those contacts are otherwise sufficient, is fatal to the Plaintiffs' jurisdictional arguments, under any proffered theory. For the reasons further explained below, the Court GRANTS the CHL Defendants' motion to dismiss for lack of personal jurisdiction.

## I.    Legal Principles Concerning Personal Jurisdiction

In order for a federal court to exercise personal jurisdiction over a defendant, three requirements must be met.

"First, the plaintiff's service of process upon the defendant must have been procedurally proper." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). The CHL Defendants do not challenge proper service of process.

"Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective." *Id.* Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure:

> Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.

Fed. R. Civ. P. 4(k)(1)(A). Here, Plaintiffs rely on (1) New York's long-arm statute, C.P.L.R. § 302(a), in accordance with Rule 4(k)(1)(A), and (2) the Clayton Act, 15 U.S.C. § 22.

"Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Licci ex rel. Licci*, 673 F.3d at 60. This due process analysis includes two components: the "minimum contacts" inquiry, which requires considering "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction," and the "reasonableness" inquiry, which requires considering "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial

justice—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Id.* (internal references omitted).

Because the Court finds that Plaintiffs have not shown a statutory basis for personal jurisdiction, it need not and does not consider the third requirement.

## II.    Plaintiffs Have Not Established Jurisdiction Under New York's Long-Arm Statute

New York law provides for general and specific jurisdiction over non-domiciliary defendants. *See Royalty Network v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 417 (S.D.N.Y. 2009). Plaintiffs do *not* contend that the CHL Defendants' contacts with New York are sufficient to essentially render them "at home" in New York such that this Court has general jurisdiction over them. *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (per curiam). And indeed, jurisdictional discovery shows that neither the CHL, nor any Major Junior Leagues or Major Junior Clubs, are located in New York or train or play games in New York. *See* Decl. of Lauren Willard Zehmer, Dkt. No. 134, Exs. 1–4, 6–65.

Instead, Plaintiffs argue that two different provisions of New York's "long-arm statute," C.P.L.R. § 302(a), provide for specific jurisdiction over the CHL Defendants. The statute provides, in relevant part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
>     1. transacts any business within the state . . .; or . . .
>
>     3. commits a tortious act without the state causing injury to person or property within the state . . . if he
>
>     (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
>     (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

C.P.L.R. §§ 302(a)(1), (3).

Plaintiffs contend that C.P.L.R. § 302(a)(3) ("Section 302(a)(3)") applies to the CHL Defendants because their antitrust violations outside of New York caused injury in New York, including to players who were based in New York or played on hockey teams in New York. *See* Dkt. No. 179 (hereinafter, "Pls.' 12(b)(2) Opp.") at 23. They point to evidence that since 2021, Major Junior Clubs in the OHL have drafted 44 players from New York, and since 2020, they have signed seven players from New York. *See id.* at 11 n.41, n.42. However, even if these asserted injuries were sufficient to establish jurisdiction, the requirements of Section 302(a)(3) are nonetheless unsatisfied because Plaintiffs have not shown that the CHL Defendants caused injury in New York to the *named Plaintiffs*.

Plaintiffs further contend that C.P.L.R. § 302(a)(1) ("Section 302(a)(1)") provides a basis for personal jurisdiction because the CHL Defendants transact business in New York in several ways, including by scouting New York teams, advertising and streaming games on New York-targeted online platforms, and marketing merchandise online to within the United States (including New York). *See* id. at 27. Again, even if these activities were sufficient to amount to "transacting business" within the meaning of Section 302(a)(1), Plaintiffs still would not be able to rely on Section 302(a)(1) because Plaintiffs have not shown that *their* claims arise from any such New York transactions or conduct of business.

### A. Section 302(a)(3): Tortious Acts Outside of New York

Jurisdiction pursuant to Section 302(a)(3) requires "tortious activity out of state . . . causing injury in New York," *Royalty Network Inc.*, 638 F. Supp. 2d at 423, and it must also satisfy either Section 302(a)(3)(i) or (ii).

Plaintiffs argue that the CHL Defendants' alleged violations of antitrust law constitute tortious conduct committed outside New York that has caused injury within New York.

Plaintiffs' allegations of antitrust violations validly allege tortious activity conducted outside of New York for jurisdictional purposes. *See Yellow Page Sol., Inc. v. Bell Atl. Yellow Pages Co.*, No. 00-cv-05663, 2001 WL 1468168, at *8 (S.D.N.Y. Nov. 19, 2001). For purposes of this motion, the CHL Defendants do not contest that this element has been met.

However, the parties disagree on whether the CHL Defendants' alleged tortious acts caused injury in New York. Plaintiffs argue that the CHL Defendants have caused injury in New York—where New York players have been drafted by the OHL and have signed contracts—by depriving New York resident players of the ability to negotiate the terms of their contracts in a competitive market, be compensated at competitive levels, and freely transfer between Major Junior Clubs or to clubs outside of major junior hockey, which consequences the Plaintiffs claim flow from the market allocation agreement. *See* Pls.' 12(b)(2) Opp. at 23. They have also caused injury in New York by the market allocation agreement itself, which allegedly denies all New York-based players the opportunity to compete for roster spots in WHL and QMJHL clubs. *See id.*

The core issue here is the situs of the claimed injury. "'[C]ourts determining whether there is injury in New York must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury.'" *Yellow Page Sol., Inc.*, 2001 WL 1468168, at *9 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999)). "'The original event occurs where the first effect of the tort that ultimately produced the final economic injury is located.'" *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 327 (S.D.N.Y. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 39–40 (2d Cir. 2010)). Courts disregard both the location of the "initial tort" and the "resultant economic hardships" and felt consequences, and they focus instead on the location of the "first *effect* of the tort." *In re*

*Vitamin C Antitrust Litig.*, No. 06-MD-01738, 05-cv-00453 (BMC) (JO), 2012 WL 12355046, at

*7 (E.D.N.Y. Aug. 8, 2012) (internal references omitted) (emphasis in original).

For instance, the Second Circuit has held that defendants who terminated the employment

of a plaintiff at a meeting in New Jersey were subject to jurisdiction in New York under Section

302(a)(3) because the plaintiff worked in New York, and the "original event" was the plaintiff's

"experience of being removed from his job," which happened in New York. *DiStefano*, 286 F.3d

at 85. This could be distinguished from making the decision to terminate and the termination

itself, which the court held constituted the "tortious act without the state." *Id.* In contrast, where

defendants fired a plaintiff who worked in New Jersey but resided in New York and thus felt the

ultimate economic consequences of the firing in New York, the Second Circuit held that the

defendants were not subject to jurisdiction in New York under Section 302(a)(3). *Mareno v.*

*Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990). Thus, the "first effect" in both cases was the place

where the plaintiff first experienced the termination.

To the extent that Plaintiffs rely on the fact that the alleged injuries were experienced by

some players *from* New York, the mere fact that a player was from New York or previously

played on a hockey team in New York is insufficient under the law to show injury in New York.

*See, e.g.*, *Yellow Page Sol., Inc.*, 2001 WL 1468168, at *9 (collecting cases) (the mere residence

of plaintiff in a state is insufficient to show injury in that state).

So, the Court must consider whether the "first effect" of either of the two types of alleged

antitrust injury occurred in New York. Turning first to the alleged injuries that occurred after

New York players were drafted by the OHL or signed with OHL clubs, such as the inability to

competitively negotiate the terms of their contract, be compensated at competitive levels, or

freely transfer between clubs, the Court agrees with the CHL Defendants that those injuries

occurred *outside* of New York.  *See* Dkt. No. 208 ("CHL 12(b)(2) Reply") at 3–4.  Considering

that none of the Major Junior Defendants are located in New York, none of the clubs train or

play in New York, and there is no evidence that any Player SPAs have been negotiated or signed

in New York, Plaintiffs have made no showing (nor do they argue besides merely stating so in a

short, conclusory paragraph) as to how any of those injuries occurred within New York.  *See*

Pls.' 12(b)(2) Opp. at 23.  Although Plaintiffs point to scouting and recruiting activities that may

have taken place in New York for players who ultimately were drafted and then signed by an

OHL club, the CHL Defendants persuasively argue that "any alleged injuries to current CHL

players necessarily occurred outside of New York" because the injuries were "suffered *outside* of

the state."  CHL 12(b)(2) Reply at 3 (emphasis in original).  Thus, considering that the draft took

place outside New York, and players did not enter into contracts in New York, play for teams

located in New York, or even play any major junior games in New York, any injury flowing

from being drafted into an OHL team occurred outside of New York.  *See id.* at 4–6.

The second type of claimed injury—regarding New York players barred from competing

for roster spots in the WHL or QMJHL—presents a thornier problem.  Prospective market

entrants may in some circumstances suffer antitrust injury where they were thwarted from

entering the market due to antitrust violations.  *See generally Am. Banana Co. v. United Fruit

Co.*, 166 F. 261, 264 (2d Cir. 1908) ("[I]t is as unlawful to prevent a person from engaging in

business as it is to drive a person out of business." (internal references omitted)); *In re Aluminum

Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (courts have recognized antitrust

claims of market participants other than competitors and consumers, including potential new

market entrants); *Fine v. Barry & Enright Prods.*, 731 F.2d 1394, 1396–97 (9th Cir. 1984)*, cert.

denied*, 469 U.S. 881 (plaintiff alleged unlawful agreements between game show producers and

television networks limiting the number of game show appearances by non-celebrity guests; the Court found the Clayton Act "grants standing to prospective entrants to a business as well as to existing industry members").

Plaintiffs adequately allege that players in New York were unable to qualify for clubs outside the OHL; in other words, New York players were pre-restricted from entering the market for WHL and QMJHL clubs as a result of the alleged market allocation agreement. *See, e.g.*, *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 398–403 (S.D.N.Y. 2004) (football player seeking to play in the NFL and challenging under the Sherman Act a rule limiting player eligibility experienced an antitrust injury because the alleged group boycott excluded him from the market for NFL player services), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); *Singh v. Am. Racing-Tioga Downs Inc.*, No. 21-cv-00947 (LEK/ML), 2021 WL 6125432, at *7 (N.D.N.Y. Dec. 28, 2021) (owners of racing horses who sued defendants for an alleged group boycott excluding them from entering competitions had plausibly alleged injury from defendants' alleged conspiracy to exclude plaintiffs).  Although CHL Defendants argue that this type of injury is too speculative, if the injury is cognizable under the antitrust laws, then the Plaintiffs have a much stronger argument that the situs of this type of injury would be New York. This would not be a situation in which a New York resident is attempting to carry home his injury merely because he is a resident of New York.  Rather, a hypothetical New York player who otherwise would be competing freely for roster spots in any Major Junior League or Club likely felt the *first* effects of the tort—the alleged exclusion from competing for clubs outside the OHL—in New York because the CHL Defendants allegedly determined this restriction based on the players' location in New York, where the player would also likely be scouted playing for his current club or team.  *C.f. In re Vitamin C Antitrust Litig.*, 2012 WL 12355046, at *8 (finding

personal jurisdiction in New York for a conspiracy to inflate prices that occurred in China because the plaintiffs did not feel the effects of the conspiracy until they purchased the product at a supra-competitive price in New York; the economic injury was not "an attenuated result of the injury," but was rather the "first and primary" injury).

However, the Court need not conclusively determine this issue because there is no such plaintiff in this case. Indeed, none of the *named* Plaintiffs could plausibly establish that they suffered either type of injury in New York, regardless of the Court's situs-of-injury analysis, as neither of the individual Plaintiffs were from or played on hockey teams in New York, and the WAIPU Plaintiffs have not identified any of their members beyond general and conclusory statements. *See Berdeaux*, 561 F. Supp. 3d at 397. Because none of the *named* Plaintiffs allege any injury in New York, there can be no personal jurisdiction under Section 302(a)(3).

The Court must assess personal jurisdiction over the CHL Defendants based only on the claims of the *named* Plaintiffs, "notwithstanding the fact that [the] [n]amed Plaintiffs purport to represent individuals domiciled across the United States, including in New York." *Id.* "[T]he unnamed class members, who may or may not ever become parties to this action, are irrelevant to the question of specific jurisdiction." *Id.* Rather, courts—including courts in this Circuit— have long looked only to the claims of *named* plaintiffs in assessing personal jurisdiction. *See id.*; *Beach v. Citigroup Alt. Inv. LLC*, No. 12-cv-07717 (PKC), 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) ("Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified."); *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1980) (citing *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495 (7th Cir. 1972)); *DeCoursey v. Murad, LLC*, 673 F. Supp. 3d 194, 208 (N.D.N.Y. 2023); *Chernus v. Logitech, Inc.*, No. 17-673 (FLW), 2018 WL 1981481, at *3 (D.N.J. Apr. 27, 2018)

(collecting cases); NEWBERG & RUBENSTEIN ON CLASS ACTIONS (6th ed.) § 6.30 ("[A] court must have personal jurisdiction to adjudicate the putative class representative's individual[] claims against the defendant just as in any individual case."); *see also Suarez v. Cal. Nat. Living, Inc.*, No. 17-cv-09847 (VB), 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019); *Lyngaas v. Curaden AG*, 992 F.3d 412, 433 (6th Cir. 2021) ("Long-standing precedent shows that [in class actions,] . . . the personal-jurisdiction analysis has focused on the defendant, the forum, and the *named plaintiff*, who is the putative class representative." (emphasis in original)).

For instance, in *Berdeaux*, in which the plaintiffs brought claims of fraud against defendants concerning an alleged cryptocurrency scheme, the court held that there was no personal jurisdiction over the moving defendants under Section 302(a)(3) because, even accepting *arguendo* the plaintiffs' argument that they were injured where they resided, the named plaintiffs resided in Montana and Tennessee, not in New York.  *Berdeaux*, 561 F. Supp. 3d at 406.  Although they sought to assert claims on behalf of "***all*** investors and entities who transferred investment money to the [defendants]," the court held that for the purposes of determining jurisdiction over the moving defendants, only the claims of the *named* plaintiffs could be considered, not those of unnamed putative class plaintiffs.  *Id.* (emphasis in original).

Here, Gould is a citizen of Canada who was born and raised in Canada, and who played for Major Junior Clubs in Washington state and in Canada.  FAC ¶ 34.  DiLaura is an American citizen who was born and raised in Minnesota and played for Major Junior Clubs in Canada and in Oregon.  *Id.* ¶ 35.  Although the individual Plaintiffs may seek to represent a class of all Major Junior Players who played for a Major Junior Club during a specified time period, for purposes of determining whether this Court has specific personal jurisdiction over the CHL Defendants, the Court may only consider the claims brought by the named Plaintiffs.  *See, e.g.*, *Berdeaux*,

561 F. Supp. 3d at 406.  Gould and DiLaura—who are not from New York and did not play on

New York-based hockey teams—do not argue that they have experienced any injury in New

York, and they may not rely on the injury experienced by absent putative class members who

may or may not ever become parties to this action to assert personal jurisdiction.  *See id.*

Moreover, the WAIPU Plaintiffs—who are not bringing a class action—have declined to

identify any of their members, including any who may have suffered injuries in New York.  (Nor

have they even specifically alleged that they have any members who were injured in New York.)

Because Plaintiffs have not adequately established that the CHL Defendants' alleged

antitrust violations caused them injury in New York, the Court need not address whether

Plaintiffs have established the remaining elements of Section 302(a)(3).

### B.  Section 302(a)(1):  Transaction of Business in New York

The jurisdictional inquiry under Section 302(a)(1) is twofold:  "[U]nder the first prong

the defendant must have conducted sufficient activities to have transacted business in the state,

and under the second prong, the claims must arise from the transactions."  *Am. Girl, LLC v.*

*Zembrka*, 118 F.4th 271, 276–77 (2d Cir. 2024) (internal references omitted).

The transaction of business involves "purposeful activity—some act by which the

defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws."  *Id.* at 277 (internal references

omitted).  "New York decisions[,] . . . at least in their rhetoric, tend to conflate the long-arm

statutory and constitutional analyses by focusing on the constitutional standard: whether the

defendant's conduct constitutes purposeful availment of the privilege of conducting activities

within the forum State, thus invoking the benefits and protections of its laws."  *Best Van Lines,*

*Inc. v. Walker*, 490 F.3d 239, 247 (2d Cir. 2007) (internal marks and references omitted).  The

business in question does not need to be commercial in nature.  *See id.* at 247 n.10.  Moreover,

"Section 302 is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction," *Am. Girl, LLC*, 118 F.4th at 276 (internal references omitted), although jurisdiction cannot be based on conduct that is "extraneous or coincidental." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 640 (2d Cir. 2023).

The second prong is satisfied where "there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Spetner*, 70 F.4th at 643 (internal references omitted); *see also Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 379 (2014) ("There must be a substantial relationship between the transaction and the claim asserted." (internal references omitted)). This is satisfied where "'at least one element of the claim arises from defendant's New York contacts.'" *Spetner*, 70 F.4th at 643 (internal marks omitted) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 341 (2012)). While this inquiry is "relatively permissive," *id.*, "'the nexus is insufficient where the relationship between the claim and transaction is too attenuated or merely coincidental.'" *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 139 (S.D.N.Y. 2023) (internal marks omitted) (quoting *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 299 (2017)). Essentially, there must be a "relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Licci ex rel. Licci*, 732 F.3d at 168–69 (internal references omitted).

Plaintiffs argue that at least some of the CHL Defendants have engaged in a relevant course of business in New York: The OHL and its constituent clubs have scouted, recruited, drafted, and signed New York players. *See* Pls.' 12(b)(2) Opp. at 27; *see also* Decl. of Judith A. Zahid, Dkt. No. 180 ¶ 5 (between 2020 and 2024, the OHL recruited 89 players in some regard who played for a New York-based club or were from a New York hometown); *id.*, Ex. 13 at 1–3

(the OHL has scouted players from New York-based teams)[8]; Pls.' 12(b)(2) Opp. at 11 n.41, n.42.  They also argue that the CHL broadcasts hockey games in the United States and has offered an app in the United States through which fans can watch CHL games, and that some Major Junior Clubs have advertised on New York-targeted radio and other media platforms.  *See* Pls.' 12(b)(2) Opp. at 11; Decl. of Zahid, Dkt. No. 180, Exs. 33–38 (concerning an app and packages for CHL TV); *id.*, Exs. 39–40 (concerning online advertising and streaming of OHL hockey games).  They further argue that the CHL has a licensing agreement with EA Sports through which Major Junior Players and CHL teams appear in an EA Sports NHL video game, *see* Decl. of Zahid, Dkt. No. 180, Ex. 43, and they argue in their opposition brief (but do not allege or show) that the video game generates revenue in the United States (including in New York).  *See* Pls.' 12(b)(2) Opp. at 14.  Moreover, they argue that some CHL Defendants have offered on the Internet and for sale into the United States the merchandise (such as hats) of Major Junior Clubs (but do not argue or show that any of this merchandise includes any Player's NIL).  *See id.* at 14, 27; Decl. of Zahid, Dkt. No. 180, Exs. 44–45; FAC ¶ 193.

Finally, Plaintiffs argue that Major Junior Clubs have offered their players to be drafted and signed by New York-based NHL teams pursuant to an anticompetitive agreement between the NHL and CHL.  *See* Pls.' 12(b)(2) Opp. at 28.  Plaintiffs submitted exhibits to support that in 2024, two New York-based NHL teams each drafted one Major Junior Player from the QMJHL and from the OHL, and pursuant to the NHL-CHL Agreement, draft picks that were not chosen for the NHL team's roster were returned to their Major Junior Clubs.  *See* Decl. of Zahid, Dkt. No. 180, Exs. 52–53, 59–62.

---

[8] The unsealed version of this exhibit (and of various other documents) can be found at Dkt. No. 220.

The CHL Defendants argue that recruiting and scouting activities in New York for positions outside New York do not constitute transacting business within the meaning of Section 302(a)(1).  CHL 12(b)(2) Reply at 8–10.  They further argue that none of the named Plaintiffs' claims "arise from" the conduct alleged.  *Id.* at 8, 12–13.

For the reasons below, Plaintiffs have not satisfied Section 302(a)(1).

### 1. Transaction of Business Prong

The CHL Defendants argue that recruiting and scouting activities conducted by OHL Defendants in New York do not constitute the transaction of business in New York.  The Court finds that Plaintiffs have not made a sufficient showing as to scouting activities in New York.  Moreover, for the reasons explained further below, even if such activities were sufficient for "transacting business," Plaintiffs' claims do not arise from this conduct.

In assessing whether recruiting constituted the transaction of business, the Second Circuit in *Suber v. VVP Services, LLP* assessed circumstances in which plaintiff, an attorney in New York City, was approached by a New York-based recruitment agency with the opportunity to work as an attorney for the defendant (an esports venture) in California.  No. 21-2649, 2023 WL 115631, at *1–2 (2d Cir. Jan. 10, 2023) (summary order), *cert. denied* 144 S. Ct. 346.  Plaintiff went to work for defendant in California (though she initially worked in New York remotely for around a month), and she ultimately brought several claims against defendant concerning her employment.  *Id.*  The Second Circuit found that the recruitment of plaintiff in New York did not constitute a business transaction under Section 302(a)(1); "[r]ecruiting [plaintiff] was not a New York transaction because the Defendants did not invoke the benefits or protections of the laws of New York by contacting [plaintiff] in New York, inviting her to interview in California, and hiring her to work in California."  *Id.* at *3.

The court cited in contrast to *Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007), in which the New York Court of Appeals found jurisdiction under Section 302(a)(1) where defendants (California residents) had substantial and continuing contacts in New York with plaintiff, a New York attorney they had solicited in New York to represent them in Oregon. *See Suber*, 2023 WL 115631, at *3. The Second Circuit in *Suber* emphasized that the defendants in *Fischbarg* had phoned the plaintiff "'at least twice per week' for 'approximately *nine months*' alongside dozens of emails, faxes, and other communications." *Id.* (quoting *Fischbarg*, 9 N.Y.3d at 378) (emphasis in original). In *Fischbarg*, the court noted that a defendant transacts business in New York when, "on his or her own initiative . . . [the defendant] projects himself or herself into this state to engage in a sustained and substantial transaction of business." 9 N.Y.3d at 382 (internal marks and references omitted); *see also Paterno*, 24 N.Y.3d at 377 (transaction of business under Section 302(a)(1) can be found where the defendant "seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship").

As between *Suber* and *Fischbarg*, the nature of the CHL Defendants' business is much more closely related to the scouting and recruiting activity in *Suber*. As developmental hockey leagues, the Major Junior Leagues and their clubs might have an interest in finding and recruiting promising hockey players that goes beyond merely hiring the employees necessary to produce their product (major junior hockey games for which tickets, broadcast rights, and merchandise can be sold), compared to *Suber*, where the defendant was in the business of an "esports venture" and engaged in recruiting only to find an employee. But *Suber* counsels that courts must look to the nature of recruiting and scouting to assess whether a defendant transacted business in New York, and here the evidence and allegations suggest even fewer deliberate contacts with New York than was true in *Suber*.

26

Plaintiffs have not shown any substantial or continuing scouting and recruiting activities in New York. They have not made any specific factual averment that any scouting activities by the CHL Defendants or their agents in New York actually involved contact with players, as opposed to involving merely involving *observing* players and gathering information about which players to recruit. Indeed, many of the exhibits Plaintiffs cite to show scouting activities in New York indicate that scouts *observed* players to identify and rank them. *See, e.g.*, Decl. of Zahid, Dkt. No. 180, Ex. 13 at 2, 5 (indicating that an OHL scout "identifies and reports on junior players who reside in New York" and other Eastern states and watches them play "wherever their team is playing and regardless of where the team is based," but does not "conduct outreach to prospective players or their families about playing in the OHL or related recruiting activities"); *id.*, Ex. 15 at 1 (explaining that the purpose of the OHL Central Scouting Bureau is to "identify, rate and rank players"); *id.*, Ex. 17 at 4 (indicating that a scout who focuses on Eastern U.S. states (including New York) for the London Knights—a team within the OHL— evaluates and develops an opinion about players, which he reports to management).[9] Nor have Plaintiffs shown that any negotiation of player contracts occurred in New York, that any contracts were signed in New York, that any drafts were conducted by the CHL Defendants in New York, or that the CHL Defendants otherwise maintained continuing relationships in New York in connection with recruiting, as in *Fischbarg*. Overall, Plaintiffs have not met their

---

[9] While Plaintiffs argue that clubs reach out to meet players and their families after club scouts report back their findings, they point only to an allegation in the First Amended Complaint in which the family of Gould—who was born and raised in Canada, not New York—allegedly received various calls from scouts and general managers. *See* Pls.' 12(b)(2) Opp. at 9 n.33; FAC ¶ 34. They also point to some evidence that Brodie Barrick, the OHL Director of Player Recruitment & Player Support Services, met once with the *coaching staff* of the Buffalo Jr. Sabres (a New York minor league team) and spoke "a handful of times" over the phone from Ontario with "the team." *See* Decl. of Zahid, Dkt. No. 180, Ex. 13 at 6. But while Barrick has spoken to top potential prospects for the OHL, none of the prospective players with whom he has spoken since starting in his role were from New York. *See id.* at 5.

burden to show that the CHL Defendants invoked the benefits or protections of the laws of New York through scouting and recruiting in New York.  *See Suber*, 2023 WL 115631, at *3.

Plaintiffs point to an inapposite case, *Lutz v. Rakuten, Inc.*, in which the court assessed Pennsylvania's long-arm statute—which provides for jurisdiction "based on the most minimum contact with the Commonwealth allowed under the Constitution of the United States"—and not New York's long-arm statute.  376 F. Supp. 3d 455, 463 (E.D. Pa. 2019) (internal references omitted).  The court found personal jurisdiction over defendants—entities in Japan that operate a baseball team—where they engaged in extensive contract negotiations with plaintiff via text and email while plaintiff (a baseball player) was in Pennsylvania, plaintiff signed the contract in Pennsylvania, and defendants wire transferred his salary to his bank account in Pennsylvania and paid for his medical insurance for physical therapy and rehabilitation (most of which occurred in Pennsylvania).  *Id.* at 462, 465.  These are not the circumstances at play in this case.  To the extent Plaintiffs argue that *Lutz* shows that the analysis for personal jurisdiction is different in sports cases, *see* Pls.' 12(b)(2) Opp. at 28 n.95, Plaintiffs provide no basis for this argument; *Lutz* involved entirely different jurisdictional facts and a different long-arm statute.

Overall, Plaintiffs' allegations and evidence concerning the solicitation and recruiting of players in New York do not show the transaction of business in New York sufficient to satisfy Section 302(a)(1).

### 2.  "Arise From" Prong

Moreover, even if the identified activities of the CHL Defendants were sufficient to constitute "transacting business" for purposes of Section 302(a)(1), none of the named Plaintiffs' claims arise from the transactions Plaintiffs point to in New York.

With respect to the arguments regarding recruiting and scouting in New York and releasing players to the NHL pursuant to the allegedly unlawful NHL-CHL Agreement,

Plaintiffs' arguments suffer the same flaw as did their arguments under Section 302(a)(3): The *named* Plaintiffs' claims do not arise out of the CHL Defendants' transaction of business in New York. As explained, courts only look to the claims of *named* plaintiffs, not absent putative class members, in this analysis. *See, e.g.*, *Beach*, 2014 WL 904650, at *6; *Selman*, 494 F. Supp. at 613 n.6.

For instance, in *In re Dental Supplies Antitrust Litigation*, dental practices and dentists sued distributors of dental supplies and equipment for allegedly entering an agreement not to compete involving price-fixing, anti-poaching, and group boycotts, through which they blocked new competitors from entering the market. No. 16-cv-00696 (BMC) (GRB), 2017 WL 4217115, at *1 (E.D.N.Y. Sept. 20, 2017). In assessing whether the court had personal jurisdiction over moving defendants under Section 302(a)(1), the court held that even if, *arguendo*, it were to consider sales of defendants' products by another entity in New York as the transaction of business by defendants, plaintiffs' conspiracy allegations did not arise from those sales because the moving defendants did not make any sales to any *named* plaintiff in New York. *Id.* at *6.

Similarly, in *In re SSA Bonds Antitrust Litigation*, plaintiffs alleged that defendants conspired to fix the price of various bonds in the secondary market. 420 F. Supp. 3d 219, 226 (S.D.N.Y. 2019). In determining whether the court had personal jurisdiction under Section 302(a)(1) over various individual defendants—who allegedly promoted, artificially priced, and traded bonds with class members in the United States and New York—the court held that plaintiffs could not "rely on bare allegations that Defendants transacted with unnamed absent class members to establish jurisdiction." *Id.* at 233. Rather, they would need to show that individual defendants transacted with *named* plaintiffs. *Id.*

Plaintiffs' brief fails to address or explain how the claims of the named Plaintiffs, as opposed to unnamed putative class members or unidentified association members, can be said to properly arise from any identified activity in New York.  Here, as explained, neither of the individual Plaintiffs are from New York or played hockey in New York, and the WAIPU Plaintiffs have not identified any of their members who are from or played in New York.  There are no allegations and there is no evidence that any of the named Plaintiffs were scouted or recruited in New York or released to New York-based NHL teams pursuant to the NHL-CHL Agreement.  Thus, the *named* Plaintiffs' claims do not arise from the CHL Defendants' transaction of business in New York, even if they could establish that the conduct of the CHL Defendants was sufficient.

Finally, with respect to the CHL Defendants' marketing of merchandise, advertising, and streaming online to within the United States, including advertising by certain CHL Defendants on New York-targeted platforms, Plaintiffs have not articulated any "substantial relationship" or "articulable nexus" between those transactions and Plaintiffs' claims of violations of antitrust law.[10]  *See, e.g., World Skating Federation v. International Skating Union*, 357 F. Supp. 2d 661, 662–66 (S.D.N.Y. 2005) (defendant's contracts with major television networks in New York were unrelated to plaintiff's claims that the defendant used its market power to coerce skaters and judges not to compete in plaintiff's figure staking events); *Conrad v. Latido Mitu Holdings, LLC*, No. 21-cv-03596 (PKC), 2021 WL 5909656, at *4 (S.D.N.Y. Dec. 10, 2021) (defendants' online sales through their website of unrelated merchandise into New York did not confer jurisdiction under Section 302(a)(1) because those transactions were unrelated to plaintiffs'

---

[10] Nor have Plaintiffs articulated more specifically any such substantial relationship or articulable nexus between the transactions and the *named* Plaintiffs' claims.

claims that defendants displayed on their website plaintiffs' copyrighted photos without authorization).  Tangential or attenuated connections between the conduct of a defendant in the relevant forum and a plaintiff's claims will not suffice for jurisdiction.  *See Cutting Edge Enterprises, Inc. v. National Association of Attorneys General*, 481 F. Supp. 2d 241, 243–48 (S.D.N.Y. 2007) (holding that the New York negotiation of a multi-state tobacco settlement, which resulted in the publication of directories of compliant tobacco manufacturers in states that entered the settlement agreement, was too attenuated from the claim of a non-New York plaintiff that he had been excluded from those directories in violation of the Sherman Act; although the settlement agreement had been negotiated and executed in New York, the claim of a horizontal group boycott by defendants which did not take place in New York did not arise out of those transactions in a sufficiently direct way to support jurisdiction).

Here, while some of the players who were subject to the alleged unlawful agreements may play in some of the hockey games that are advertised online or may appear in video games that are sold online (including to New York residents), those transactions are far too distant from Plaintiffs' antitrust claims.  There may, of course, be *some* tenuous connection between some of the alleged anticompetitive agreements and some of the transactions.  For example, it could be said that because of the Major Junior Leagues' alleged agreement to allocate North American territories, a Major Junior Club was able to scout a player with limited competition, which then allowed the club to draft the player, which then allowed the relevant Major Junior League or Major Junior Club to negotiate the player's contract in an uncompetitive market, which then allowed the Major Junior League or Major Junior Club to insist upon terms in the player's SPA allowing the club, league, and/or CHL to gain control over the player's NIL, which then allowed the CHL to negotiate with entities that sought to use the player's NIL, which then allowed the

CHL to license the player's NIL to EA Sports, which then allowed EA Sports to develop a video game that included the player's NIL, which then allowed the video game to be marketed and sold to users, which then allowed users in the United States (including, perhaps, in New York) to purchase the game. But any such connection is far removed and does not amount to a sufficiently "substantial relationship" or "articulable nexus" for the purposes of specific jurisdiction under Section 302(a)(1).[11] *See Cutting Edge Enter., Inc.*, 481 F. Supp. 2d at 247–48; *see also Suber*, 2023 WL 115631, at *4 (plaintiff's allegations that defendants defrauded investors in New York "have nothing whatsoever to do with" her claims arising from her employment, which center on promises made prior to her employment).[12]

For all of the reasons stated above, the Court finds that Plaintiffs have not established that there is specific personal jurisdiction over the CHL Defendants under New York's long-arm statute.[13]

---

[11] For the same reasons, the fact that some of the CHL Defendants may advertise or stream hockey games online, including on New York-targeted platforms, is far too tenuous a connection, and the fact that some clubs may make available online for sale merchandise that does not bear the NIL of any player is even more tenuous of a connection.

[12] Plaintiffs referred in their brief to the fact that OHL clubs paid fees to minor league New York-based teams pursuant to release agreements to secure the release of Major Junior Players, *see* Pls.' Br. at 11, but they did not advance these facts in support of their Section 302(a)(1) arguments or make any arguments whatsoever as to how these fee payments constitute the transaction of business under Section 302(a)(1). In any case, Plaintiffs' antitrust claims do not arise out of such transactions. Although there may be some thin connection between the fee payments and the relevant antitrust claims because without such release payments, Major Junior Clubs in the OHL might not be able to secure some New York-based players, and thus might not fully be able to exploit the New York market to which OHL clubs allegedly have an exclusive right under a wholly separate geographic allocation agreement with entirely different entities, such a connection is far too tenuous to support jurisdiction. *See Cutting Edge Enter., Inc.*, 481 F. Supp. 2d at 247–48. Nor is there any connection between the payments and the *named* Plaintiffs' claims.

[13] The CHL Defendants also argue that even if Plaintiffs had established personal jurisdiction over some of the CHL Defendants, Plaintiffs could not invoke conspiracy jurisdiction for the purposes of satisfying either the New York long-arm statute or due process over the other CHL Defendants because such conspiracy jurisdiction only applies where a co-conspirator committed a tort within New York, among other reasons. CHL 12(b)(2) Reply at 14–16. The Court need not reach this issue because it finds that Plaintiffs have not shown specific jurisdiction as to any of the CHL Defendants.

### III.    Plaintiffs Have Not Established Jurisdiction Under the Clayton Act

In addition to their arguments under New York's long-arm statute, Plaintiffs further contend that the Clayton Act provides a statutory hook for personal jurisdiction over the CHL Defendants.

"'Although plaintiffs allege violations of the Sherman Act, the private right of action to pursue antitrust claims is provided by the Clayton Act[.]'" *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d at 229 (quoting *In re Vitamin C Antitrust Litig.*, 2012 WL 12355046, at *5). The Clayton Act provides, in relevant part:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

The Second Circuit, interpreting the phrase "in such cases," held that the Clayton Act's service of process provision only applies when the Clayton Act's particular venue provision is satisfied. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423–27 (2d Cir. 2005). In other words, the Clayton Act's service of process provision only applies when the defendants reside, are found, or transact business in the district where the action is brought (here, the Southern District of New York). *See id.* at 427. Plaintiffs do not argue that the CHL Defendants reside or are found within the Southern District of New York; rather, they argue that the CHL Defendants "transact business" in this District. *See* Pls.' 12(b)(2) Opp. at 35–39.

"The Supreme Court has construed the phrase 'transacts business,' as used in the venue provision of Clayton Act Section 12, to refer to 'the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'" *Daniel*, 428 F.3d at 428 (quoting *United States v. Scophony Corp.*, 333 U.S. 795, 807 (1948)). Transaction of

business of a "substantial character" requires that there be "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 199 (S.D.N.Y. 2018) (internal references omitted). "[T]he propriety of venue turns on the nature of the corporate defendant's business." *Daniel*, 428 F.3d at 429.

Plaintiffs have not shown that the CHL Defendants "transact business" *in this District*. They make three overarching arguments in service of this unsuccessful effort:

First, Plaintiffs argue that venue under the Clayton Act lies in this District because the alleged market allocation agreement dictates whether or not the Major Junior Leagues recruit in this District. *See* Pls.' 12(b)(2) Opp. at 36–37. But Plaintiffs do not explain how this agreement constitutes the transaction of business in this District.

Plaintiffs point to *In re Blue Cross Blue Shield Antitrust Litigation* ("*BCBS*"), a case from the Northern District of Alabama, in support of their argument, but that case involved entirely different circumstances. 225 F. Supp. 3d 1269 (N.D. Ala. 2016). In *BCBS*, similar to this case, the plaintiffs alleged that the defendants had agreed to allocate geographic service areas for the provision of Blue Cross Blue Shield insurance plans, to boycott all health care providers who resided outside of their allocated geographic service areas, and to fix prices. *Id.* at 1278. But in that case, the court found that the moving defendants "transacted business" in the district only after detailing the particular "substantial business" conducted by each defendant: namely, that the defendants had received hundreds of thousands of dollars in insurance premiums from subscribers in the Northern District of Alabama and/or had providers within their provider network within the district. *Id.* at 1291, 1296–97. Plaintiffs here do not make any similar allegations about the CHL Defendants' transaction of business in this District, such as receiving

substantial or regular payments from this District, or maintaining clubs or facilities in this District.

Plaintiffs point to one line in *BCBS* in which, in discussing one of the numerous defendants' transaction of business, the court wrote, "In addition, Moving Defendants have transacted business in this district by entering into an agreement with another insurance company who maintains a provider network within this district . . . to provide access to medical services for insured parties." *Id.* at 1298. But entering into a geographic allocation agreement alone did not satisfy the Clayton Act's venue requirement, and the court had already detailed each defendant's extensive transaction of business in the district. Indeed, with respect to two of the defendants—who had also allegedly engaged in the market allocation scheme—the court ultimately found that the defendants conducted substantial business in the district because they collected tens of thousands of dollars from members in the district, settled claims from providers in the district, and more. *Id.* at 1298. But the court noted that those defendants "presented a closer question as they have historically maintained less than ten subscribers in this district," making clear that the existence and operation of the market allocation scheme alone was not sufficient to satisfy the Clayton Act's transaction of business clause. *Id.*

Overall, the Court finds that the geographic market allocation alone, or the fact that it allegedly dictates which clubs can recruit in this District, does not constitute the carrying on of business of any substantial character under the Clayton Act.

Second, Plaintiffs argue that the CHL Defendants enforced the market allocation agreement across Canada and the United States, including in this District. *See* Pls.' 12(b)(2) Opp. at 37. They point to the fact that the CHL Defendants have penalties in place for Major

Junior Clubs that breach the market allocation agreement, and they argue that this ensures that any player from this District would only be drafted by the OHL.  *Id.*

Plaintiffs cite *Myers v. American Dental Association*, in which plaintiff, a dentist practicing in the Virgin Islands, challenged a rule by the American Dental Association (the "ADA") (and that was subsequently implemented by a constituent association in the Virgin Islands ("VIDA")) requiring dentists who announce an area of specialization to limit his or her practice to that area.  695 F.2d 716, 718 (3d Cir. 1982).  VIDA was a constituent organization of the ADA that paid dues, adopted the code promulgated by the ADA, and was prohibited from adopting rules inconsistent with the ADA's code.  *Id.* at 719.  The plaintiff's affidavits showed that officers of the ADA came to the Virgin Islands to attend VIDA's business meeting and to ensure that it adopted the ADA's newly promulgated code.  *Id.* at 730.  The affidavits also showed that for eight years, an ADA trustee participated in VIDA's annual meetings to ensure VIDA did not take any actions inconsistent with ADA policy.  *Id.*  The court held that "when a national professional organization . . . polices the qualifications of members residing in a judicial district, or sets standards which it attempts to enforce[,] . . . the organization's activities should provide a basis for venue in the district in which they occur" under the "transacts business" clause of the Clayton Act.  *Id.* at 726.  It held that the ADA's "direct, continual supervision" of VIDA *in the Virgin Islands* to ensure enforcement was sufficient for venue.  *Id.* at 730.

In this case, Plaintiffs point to evidence of rules in place to effectuate the CHL Defendants' alleged conspiracies, as well as the threat of monetary penalties in place for breaking those rules, as set out, *inter alia*, on the WHL's website and in an OHL Manager's Manual.  *See* Decl. of Zahid, Dkt. No. 180, Exs. 6, 10; *see also id.*, Ex. 14.  But unlike in *Myers*, other than pointing to rules and mechanisms for enforcement, Plaintiffs point to no *conduct*—and

no conduct in *this District* whatsoever—by the CHL Defendants that shows that they actually attempted to supervise or otherwise enforce those rules.  Merely having rules and potential penalties in place alone is insufficient to show the transaction of business in this District.

Also unlike in *Myers*, in which a constituent organization was located in the Virgin Islands, *none* of the Major Junior Leagues or Major Junior Clubs are located in this District, and Plaintiffs have not otherwise shown that any policing or supervision regarding the enforcement of rules occurred in this District.  Overall, they have provided no support as to how the rules and any enforcement of those rules concern the Southern District of New York.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 13-2609 (PGS) (LHG), 2014 WL 1334260, at *5–6 (D.N.J. Apr. 2, 2014) (argument that defendant organization enforced qualifications on New Jersey physicians by maintaining a website asking patients to determine whether their physician complied was insufficient; unlike in *Myers*, the website did not rise to the level of "policing," plaintiff did not show that the organization engaged in "direct, continual supervision" of its member boards in New Jersey, none of the member boards had their principal place of business in New Jersey, and the organization did not conduct any regular meetings in New Jersey).

Third, Plaintiffs argue that the CHL Defendants' recruiting efforts constitute the transaction of business.  They argue that the OHL Defendants, acting in accordance with the geographic market allocation agreement, recruited and scouted players across the United States and Canada, including in this District.  *See* Pls.' 12(b)(2) Opp. at 37–38.  But Plaintiffs have not averred facts showing such recruitment efforts of any substantial character in this District.

Plaintiffs only allege in a conclusory fashion in the First Amended Complaint that the OHL has recruited and sourced players from this District, *see, e.g.*, FAC ¶¶ 106, 125, which is plainly insufficient. *See Ball*, 902 F.2d at 197.

Outside the pleadings, Plaintiffs' proffered evidence shows additional connection to New York, but it does *not* specifically show activities in *this District*. For instance, Plaintiffs present evidence that the OHL has a scouting staff member assigned to New York (among other states), and that between 2020 and 2024, the OHL scouted or recruited in some way 89 players who played for a New York-based club or were from a New York hometown. [14] *See* Decl. of Zahid, Dkt. No. 180 ¶ 5; *id.* Ex. 15; *id.* Ex. 13 at 2. They have shown that some Major Junior Clubs in the OHL also have scouts for New York and other states. *See id.*, Ex. 17 at 4 (the London Knights have a scout based in the Eastern United States, which includes New York in the coverage area); Decl. of Zehmer, Dkt. No. 134, Ex. 39 ¶ 11 (the Oshawa Generals has "one part-time volunteer scout located in New York"). [15] They additionally point to evidence that at least one OHL scout has traveled to showcases, including in Buffalo, New York, to observe players, *see* Decl. of Zahid, Dkt. No. 180, Ex. 13 at 4; Decl. of Zehmer, Dkt. No. 134, Ex. 3 ¶ 17, and the OHL Director of Player Recruitment and Player Support Services has "had introductory calls and meetings with a handful of elite hockey teams in the United States," *see* Decl. of Zahid, Dkt. No.

---

[14] The CHL Defendants have not countered this showing with affidavits or other evidence, but have stated in their brief that the record "reflects merely that those [89] players were identified as potentially eligible to play in the CHL." CHL 12(b)(2) Reply at 11 n.3. Even accepting Plaintiffs' affidavit as true, the Court's analysis does not change.

[15] Plaintiffs also cite a document (an online article) that they argue shows that the Sarnia Sting, an OHL team, has a regional scout for New York, but the article merely states that in January 2022, the team welcomed an individual to their scouting department who is a native of Brooklyn, New York. *See* Decl. of Zahid, Dkt. No. 180, Ex. 18; *see also* Pls.' 12(b)(2) Opp. at 9 n.28.

180, Ex. 13 at 6.[16]  Without any connection to the Southern District of New York, however, this evidence does not show the transaction of business in this District.

Plaintiffs provide some general evidence that an OHL scout travels to watch players where their teams play, and has scouted New York-based teams, including Westchester Express (a team in this District).  *See id.* Ex. 13 at 2–3.[17]  This is plainly insufficient to show the transaction of business of any "substantial character."  Plaintiffs do not show that any scout has ever even traveled to this District or how many times a scout has observed a team located in this District.  Their showing is bare and fails to show any contact by a CHL Defendant with this District.  In other words, Plaintiffs provide no support that there is "some amount of business continuity," or indeed anything "more than a few isolated and peripheral contacts" with the Southern District of New York.  *See Dennis*, 343 F. Supp. 3d at 199.

This case is similar to *Dennis*, in which the court found that plaintiffs did not satisfy the Clayton Act's venue prong where plaintiff merely alleged that a defendant corporation, which was headquartered in Australia, recruited students from the Southern District of New York for its New York office because there were "no allegations in the amended complaint as to the regularity of such recruitment."  343 F. Supp. 3d at 200.  The court stated that "[w]ithout more," it could not conclude that the recruiting efforts "evidence the 'practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'"  *Id.* (quoting *Daniel*, 428 F.3d at 430).

---

[16] As explained above, *supra* Section II(B)(1), Plaintiffs have not shown that any of these scouting efforts involved any contact with players or anything more than observing players and gathering information.

[17] Plaintiffs also argued that an OHL scout has watched the NY Saints (a team in this District), but does not indicate where in any of the affidavits or exhibits this appears.  *See* Pls.' 12(b)(2) Opp. at 8.  Even assuming this is true, it does not change the Court's analysis.

Here, too, Plaintiffs have not made an averment of facts as to the regularity of any recruiting activities in this District (or indeed, even that any recruiting activities ever occurred in this District), and the Court is unable to conclude that the CHL Defendants transacted business of any "substantial character" in this District.

Because the Court finds, for all of the reasons explained above, that it does not have personal jurisdiction over the CHL Defendants, it need not decide the CHL Defendants' motion to dismiss for failure to state a claim.

## IV.    Plaintiffs Have Not Established Jurisdiction as to Dan MacKenzie

While the Court has already extensively explained why it does not have personal jurisdiction over any of the CHL Defendants, including MacKenzie, the Court emphasizes that Plaintiffs have not come close to establishing personal jurisdiction over MacKenzie, who resides and works in Canada.  *See* Decl. of Zehmer, Dkt. No. 134, Ex. 5.  The allegations and jurisdictional facts asserted with respect to MacKenzie are paper thin.  Concerning jurisdiction, Plaintiffs allege in the First Amended Complaint only that MacKenzie is the President of the CHL, and they allege:

> MacKenzie . . . has continuous and systemic business contacts with this district, including with respect to the licensing and selling of merchandise and products, including television events, and his participation in the illegal anticompetitive scheme described herein, which has caused and is causing antitrust injury to Major Junior Players.

FAC ¶ 38.

These conclusory allegations are wholly insufficient to show personal jurisdiction in this Court.  Moreover, in their brief, Plaintiffs note that MacKenzie executed the NHL-CHL Agreement, *see* Pls.' 12(b)(2) Opp. at 16 n.75, but the affidavit they cite shows that MacKenzie never traveled to New York as part of the negotiation, execution, or implementation of the agreement, and in fact, the NHL deputy commissioner traveled to Canada to negotiate the

agreement.  *See* Decl. of Zehmer, Ex. 1 ¶ 22.  These facts do not establish personal jurisdiction in New York, nor do Plaintiffs appear to argue that they do.

In short, for all the reasons explained above—including throughout this Opinion—this Court does not have personal jurisdiction over MacKenzie.

## CONCLUSION

The Court does not have personal jurisdiction over the CHL Defendants under New York's long-arm statute because, among other reasons, the named Plaintiffs—who are not from New York and did not play hockey in New York—did not experience injury in New York for the purposes of Section 302(a)(3), and the claims of the named Plaintiffs do not "arise from" the CHL Defendants' transaction of business in New York for the purposes of Section 302(a)(1). The same is true for the WAIPU Plaintiffs, who have not even attempted to identify a member who satisfies these requirements.  Additionally, the Court does not have personal jurisdiction under the Clayton Act because Plaintiffs have not satisfied the Act's venue prong:  They have not shown that the CHL Defendants "transact[] business" in this District.

Because the Court dismisses without prejudice all claims asserted against the CHL Defendants for lack of personal jurisdiction, the Court's scheduling order regarding the preliminary injunction hearing, *see* Dkt. No. 68, is moot, and the preliminary injunction hearing that was previously scheduled for January 27, 2025, is CANCELLED.  By separate order, the Court will schedule a conference for the remaining parties in this action. The Clerk of Court is directed to terminate Dkt. No. 132, and to terminate Dkt. Nos. 135, 190, and 230 as moot.

Dated: November 26, 2024            SO ORDERED.
      New York, New York

_____
MARGARET M. GARNETT
United States District Judge